**Exhibit 1**



**midwestbonejoint.com**

September 28, 2020

Michael Gitelis, M.D.
Anthony W. Savino, M.D.
James S. Fister, M.D.
Michael G. Kogan, M.D.
Vincent P. Cannestra, M.D.
Shawn W. Palmer, D.O.
James R. Seeds, M.D.
Joshua M. Alpert, M.D.
Tom D. Stanley, M.D.

**ELGIN**
2350 Royal Blvd
Suite 200
Elgin, IL 60123
(847) 931-5300

**BARRINGTON**
420 W. Northwest Highway
Barrington, IL 60010
(847) 382-6766

**GENEVA**
308 Randall Road
Suite A
Geneva, IL 60134
(630) 262-5391

**ALGONQUIN**
2971 W. Algonquin Road
Suite 101A
Algonquin, IL 60102
(847) 854-8590

Kenneth Flaxman
Law Offices of Kenneth N. Flaxman P.C.
200 South Michigan Avenue, Suite 201
Chicago, Illinois 60604
(312) 427-3200, (312) 427-3930 (fax)
jaf@kenlaw.com

Re: Richard White v. Nurse Blake Woods, Alfonso David, MD, Shawnee Correctional
Center et al.
Case No.: 3:18-cv- 00165-MJR-SCW

Dear Mr. Flaxman,

What follows is my Medical Case Report regarding Richard White. As you know, he
is a 38-year-old gentleman who sustained an injury to his left knee while incarcerated
at Shawnee Correctional Center. I did review the medical records that were forwarded
including those of Shawnee Correctional Center, Orthopedics of Southern Illinois, Dr.
John Davis, the Declaration of Dr. Alfonso David, the Declaration of Advanced Nurse
Practitioner Blake Woods, the deposition of Mr. White, and the reports of the imaging
studies including radiographs and the December 19, 2017 MRI scan.

Examination of the medical records revealed that Mr. White has a past medical history
for polysubstance abuse, left shoulder pain, allergic rhinitis, gastroesophageal reflux
disease, and sexually transmitted diseases. His previous surgeries included ear surgery
and insertion of a chest tube for a pneumothorax, which he sustained after a stabbing
injury to his chest or back. The earliest pertinent medical record was on the date of
injury, June 26, 2015, from Shawnee Correctional Center. At the time, Mr. White was
only 33 years of age.

Mr. White was seen on June 26, 2015, with a chief complaint of throbbing left knee
pain. He was evaluated shortly after he injured his left knee. He rated his pain 5/10,
which occurred immediately at the time of the injury. He was seen at the Nurse Sick
Call. The nurse documented signs of obvious discomfort. However, no physical
examination was documented by the nurse. The nurse discussed Mr. White's
condition with Nurse Practitioner Woods. Crutches were ordered until Mr. White
could be seen by Nurse Practitioner Woods. He was also prescribed Motrin 600 mg. 3
times a day for 10 days. Mr. White was to follow up with Nurse Practitioner Woods
the next week.

Mr. White came to the MD Sick Call on June 30, 2015, and was seen by Nurse Practitioner Woods. Dr. David in his Declaration stated that Mr. White was seen by the nurse practitioner on this date. Mr. White was there for follow up of his left knee injury according to the nurse practitioner. Mr. White provided a history of being struck from the side while playing sports. On exam, his gait was slow and with limp. The knee did not demonstrate any swelling, bruising, or deformity.

The assessment by the nurse practitioner was left knee pain. Crutches were ordered for two weeks. He was placed on a sports restriction for one month. He was instructed to return in ten days, and if Mr. White was no better the nurse practitioner would consider an x-ray. Mr. White was given a slow walk pass, which expired on July 14, 2015. Again, there was minimal to no physical examination of Mr. White's left knee recorded. It appears that Nurse Practitioner Woods only documented what he could see with simple observation of Mr. White and his left knee.

Mr. White came back to the Nurse Sick Call three days later on July 3rd. His reported that his left knee had popped again. He remained on crutches. Mr. White complained of hearing noise while working his left knee out. The nurse on exam noted that he was unable to extend the leg fully. He was also unable to bend the knee even to 90 °. The nurse noted no swelling or obvious deformity. Again, there was no documentation by the nurse of any other clinical exam findings, including areas of pain or point tenderness, or other pertinent medical history. The nurse contacted Nurse Practitioner Woods who ordered intramuscular Decadron and naproxen 500 mg. twice a day for 10 days. Nurse Practitioner Woods ordered x-rays and an ACE wrap.

The radiographs of the left knee were performed three days later on July 6th for knee pain. The radiologist read minimal early tricompartmental osteoarthritis with a small effusion. I do not have these x-rays to examine.

When Mr. White returned to the nurse on July 9th, the nurse noted that Mr. White was essentially the same in regards to his left knee. Mr. White was quoted as saying, "I have a bad feeling about this. Will I be messed up all the time now?" The physical exam by the nurse documented no major swelling. However, there are no further objective findings documented on the physical exam, including areas of pain, tenderness, loss of range of motion, or gait examination. The nurse documented the radiographic findings. Mr. White was advised to use warm compresses and continue the medications that were prescribed. The nurse's assessment was left knee pain and Mr. White was to follow up with the nurse practitioner as scheduled.

On July 10th, Mr. White returned to the MD Sick Call and saw Nurse Practitioner Woods. His knee pain was slightly better but his knee was "still swollen". However, this contradicts the previous examination by Nurse Practitioner Woods on June 30th when he noted no swelling.

On physical exam, Nurse Practitioner Woods found that Mr. White was in no apparent distress. He was walking and not using his crutches. However, this was the extent of

his physical exam. There was no comment as to painful motion, loss of range of motion, areas of tenderness, whether there was an effusion or crepitus with range of motion of the knee present or any ligamentous laxity. There was no mention as to whether Mr. White had a limp or not. The extent of Nurse Practitioner Woods' examination was simply based on observation and the appearance of Mr. White and his left knee.

Nurse Practitioner Woods reviewed the radiographic findings. His assessment was left knee pain with early osteoarthritis and a small joint effusion. He advised Mr. White to gradually increase his activities and discontinue his crutches. Mr. White was started on a third different anti-inflammatory medication, Indocin, 50 mg. 3 times a day for a month. Nurse Practitioner Woods left Mr. White's follow up on an as needed basis despite Nurse Practitioner Woods' acknowledgement in this medical record that Mr. White had sustained a sports injury to the left knee.

Mr. White next was seen on July 17, 2015. The LPN note quoted Mr. White as saying "that he still walked with a limp and couldn't straighten his left leg out." Mr. White had started his Indocin the previous day. The assessment of the LPN was left leg issues. The LPN was advised by Nurse Practitioner Woods to have Mr. White continue his prescription as scheduled and see him after his treatment was completed on August 13th. This was despite the fact that Mr. White still walked with a limp and had loss of motion of the left knee.

When Mr. White returned to the nurse on August 10, 2015, he complained of left knee stabbing and throbbing pain. The nurse documented that his pain was 10/10 and that he had been seen multiple times. He had no relief with treatment and his symptoms and pain had been ongoing since June 26th. On physical exam, Mr. White showed signs of obvious discomfort. His left knee was larger than his right knee. He had decreased range of motion of the left knee. The nurse decided to refer Mr. White to the physician and prescribed ibuprofen 200 mg. 1 to 2 tablets 3 times a day for the next 3 days. Mr. White was also given orders for lay-in, crutches, no yard or gym activities, and meals only in his cell for five days.

The next day on August 11th Mr. White was re-examined by Nurse Practitioner Woods. He had unresolved left knee pain and he complained of his pain being worse. Nurse Practitioner Woods documented that in June Mr. White presented with a complaint of a side strike to the knee with sports. He had tried various anti-inflammatory medications and had an x-ray which showed a small effusion.

On exam, Nurse Practitioner Woods found Mr. White in no apparent distress. His left knee patella was in line. There was a negative drawer test for excessive laxity, although it is not specified in Nurse Practitioner Woods' physical exam whether this was an anterior drawer or posterior drawer test. Nurse Practitioner Woods recorded moderate anterior swelling and mild warmth of the knee. Nurse Practitioner Woods' assessment was left knee pain. Mr. White was finally referred to Dr. David.

Mr. White saw Dr. David on August 13th for follow up of unresolved left knee pain. He was on Indocin. Dr. David noted that Mr. White injured his left knee playing basketball on June 26th when another player came down onto his left knee. Mr. White was placed on a non-weight bearing restriction on the left leg with crutches. However, the medical record showed no evidence of an order for non-weight bearing or even a recommendation for non-weight bearing on the left leg. In fact, Nurse Practitioner Woods on July 10th discontinued his crutches and advised Mr. White to gradually increase his activities on the left leg.

Dr. David wrote that Mr. White was noncompliant with treatment recommendations. However, it is unclear what treatment recommendations Mr. White was not following. It appeared that Mr. White had done everything that his caretakers instructed him to do. Dr. David stated that Mr. White started walking without his crutches and then started running when he could tolerate it.

Mr. White claimed that his left knee popped out a few times a few days ago and subsequently Mr. White was put back on crutches. However, Dr. David observed that Mr. White was still putting weight on his left foot. The x-rays, according to Dr. David, showed minimal early tricompartmental osteoarthritis with a small effusion.

On physical exam, Dr. David saw no significant swelling in the left knee. There was slight tenderness around the patella. Dr. David documented that Mr. White was unable to fully extend the knee and lacked 20° of extension. Dr. David's assessment was a left knee ligament strain. He instructed Mr. White to be non-weight bearing on the left leg. He was to continue using his crutches for three weeks. Naproxen 500 mg. twice a day was prescribed for three weeks.

Dr. David also ordered repeat x-rays in two weeks. It is unclear as to the thought process of Dr. David why he was ordering repeat x-rays in two weeks if he believed Mr. White had a left knee ligament strain or injury. At this point in time, it had been seven weeks since Mr. White sustained his left knee injury.

Mr. White had repeat radiographs performed of his left knee for pain on August 27, 2015. These demonstrated minimal early degenerative changes without change from his previous radiographs of July 6th. A small effusion was still apparent. I do not have these radiographs to review. Mr. White came back to Dr. David on September 8th. Mr. White claimed that he still had pain in his left knee on "both sides". Mr. White stated that certain movements caused his knee to pop or give out. He had been using his crutches and had been compliant with his non-weight bearing status.

On physical exam Dr. David observed that Mr. White ambulated with a limp. He was unable to extend his leg fully and had a lack of 20° of extension and was not able to flex the knee to 90°. Dr. David documented no muscle atrophy. Lachman testing was negative. Dr. David's assessment was a left knee injury. He recommended continued crutch use and non-weight bearing on the left leg. He also prescribed naproxen 500 mg. twice a day for an additional two weeks. Dr. David was concerned

that Mr. White had sustained a ligament tear. He elected to present his findings for collegial review for a left knee MRI scan.

The MRI scan request by Dr. David on this date noted that Mr. White was a 33-year-old who injured his left knee playing basketball on June 26th. He was treated conservatively with non-weight bearing, crutches, and various anti-inflammatory medications with no improvement. Mr. White continued to have knee pain and ambulated with a limp.

Mr. White was unable to extend his left leg beyond 160° and he was only able to flex the knee to 60°. (However, in his Sick Call record Dr. David stated that Mr. White was unable to flex the knee to 90°. This raises the concern of whether Dr. David actually examined Mr. White's range of motion on September 8th or simply duplicated his findings from the August 13th visit.) Dr. David wrote that x-rays were completed on July 6th and August 27th showing minimal osteoarthritis and a small joint effusion. Dr. David's impression was a left knee ligament tear or sprain.

The following day on September 9, 2015, Dr. David discussed Mr. White's condition in his collegial review. Dr. Ritz did not approve Dr. David's request for an MRI scan but did approve sending Mr. White for a one-time physical therapy evaluation and then be monitored in the Healthcare Unit performing a home exercise program that the physical therapist would suggest for four to six weeks. Mr. White was to continue on his oral anti-inflammatory medication.

On September 10th, Dr. David completed a referral to physical therapy at Union County Hospital with a diagnosis of left knee pain. On September 11, 2015, Shawnee Correctional Center received an approval number from Wexford Utilization Review for a one-time physical therapy evaluation for a home exercise program. Contact was made with Union County Hospital and a physical therapy appointment was scheduled for September 18th. On September 14th, Mr. White's naproxen was renewed until September 22nd.

On September 18, 2015, Mr. White underwent his physical therapy evaluation at Union County Hospital. The physical therapist took a history from Mr. White that he was playing basketball and someone landed onto his left knee. Mr. White heard a pop and was unable to weight bear on his left leg. His knee swelling had decreased but he was still having pain. His left knee wanted to give out if he put too much weight on it. He was using crutches on and off since his injury in June. He stated that he was using his crutches for a second time, mostly for long distance walking.

He rated his pain 6-7/10. He described all sensations of pain to the physical therapist. His symptoms were worse with walking, weight bearing, and stair climbing. He was unable to straighten his knee. The therapist wrote that Mr. White found no factors that eased his symptoms or pain. His hobbies included basketball. His previous level of function prior to his June injury was normal. But at the time, Mr. White was careful to do his any of his activities of daily living. Mr. White's goal was to have surgery.

On physical exam, the therapist discovered that Mr. White's right knee range of motion was 0° to 130° and his left knee range of motion was 13° to 103°. (This was essentially a 40° loss of motion of the left knee in comparison to the right knee or a loss of 31% of his left knee range of motion.) Mr. White had poor quadriceps contraction of his left knee, and there was evidence of atrophy of his quadriceps and gastrocnemius muscles.

The physical therapist was unable to fully assess for ligament laxity due to Mr. White's guarding and pain. However, within the physical therapist's ability to test for ligamentous laxity, she found a positive anterior drawer test, a positive McMurray test, and a positive medial collateral ligament stress test at 0° of flexion and at 30° of flexion. Mr. White exhibited moderate tenderness of his left knee. He had decreased weight bearing on his left lower extremity without use of his assistive devices. His left knee remained slightly flexed with ambulation.

The assessment by the physical therapist was a possible left knee internal derangement due to a sports injury. Mr. White had decreased active range of motion and strength of the left knee. His balance impairment was affecting his functional mobility and independence. A home exercise program was recommended daily for four to six weeks. An ACE bandage was also provided for support, and she recommended continued use of one to two crutches. The physical therapist suggested weight bearing as tolerated unless otherwise ordered by Mr. White's physician.

The physical therapist wrote that she suspected ligament laxity. This physical therapy evaluation on the referral form was signed by Dr. David on September 21, 2015, and the formal physical therapy initial evaluation report was signed by Dr. David on September 24, 2015.

Mr. White next saw Dr. David on September 22, 2015. Dr. David explained the recommendations of the physical therapist and that Mr. White should pursue a daily home exercise program as ordered. The physical examination by Dr. David was listed as "the same" as his previous exam. This raises the concern that no physical exam was performed by Dr. David given the grossly abnormal findings of the physical therapist four days earlier. Dr. David's assessment was a left knee injury and rule out a ligament sprain.

Mr. White was scheduled for daily home exercise program exercises, as directed by the physical therapist in the Healthcare Unit. Mr. White was to be supervised and his compliance documented in the progress notes by the nurses for the next two months, despite the fact that Dr. Ritz in the collegial review recommended a home exercise program for only four to six weeks. It is unclear why Dr. David ordered Mr. White to pursue a course of action longer than recommended in the collegial review. Dr. David instructed Mr. White to follow up with him in two months.

Beginning September 24, 2015, Mr. White went to the Healthcare Unit to pursue his exercise program with documentation by the nurses daily. On September 29th, Mr.

White was given a quad cane to use for one month. On October 23, 2015, nearly a month into his daily exercise program, it was documented that Mr. White was not sure if the therapy exercises were really helping. On October 25th, the nurse wrote that Mr. White still felt the "tear". He complained of calf pain up to his back.

On October 28th, the nurse recorded that Mr. White continued to complain of left knee pain. The nurse elected to refer Mr. White to the nurse practitioner or the physician per Mr. White's request. He pursued his home exercise program but had increased pain complaints. On the next day on October 29th, Mr. White again described increasing left knee pain with his therapy program. The nurse spoke with Dr. David about scheduling a follow up appointment with Mr. White due to his persistent complaints of left knee pain. Dr. David responded that Mr. White should continue treatment with his physical therapy exercises for a total of two months before any further appointment or evaluation.

Mr. White participated in his daily physical therapy program through the majority of November. He eventually was allowed to see Dr. David on November 30, 2015. Dr. David noted that Mr. White had finished his two months of physical therapy. According to Dr. David, Mr. White claimed that his left knee occasionally hurt. On physical exam, Dr. David found that the left knee was unremarkable. Mr. White had good strength, was able to walk normally, and was able to squat without problem. Dr. David's assessment was left knee pain and a ligament sprain, despite his apparent normal physical exam.

Dr. David elected to discontinue the exercise program in the Healthcare Unit. Mr. White was to pursue his exercise program on his own. Dr. David recommended follow up in three to four months. This was scheduled for March 14, 2016. Mr. White had no loss of motion of his left leg and a questionable ligament sprain. It was at the time 5 months after Mr. White's sports injury.

Mr. White, however, returned to the Nurse Sick Call on January 28, 2016. The location of his pain or discomfort was "left knee ACL". This was the first time in the medical record that there was any direct mention regarding Mr. White's left knee anterior cruciate ligament by any medical or health care provider. Mr. White described stabbing, throbbing, and constant left knee pain since June of 2015. He rated his pain 8/10. On physical exam, the nurse found signs of obvious discomfort with movement of the left knee and no deformity. This was the extent of her observations. No physical exam otherwise was documented regarding the left knee or leg.

The nurse noted that Mr. White had been seen in the MD, Nurse Practitioner, and Nurse Sick Calls. He had a home exercise program without resolution of his discomfort. Mr. White was referred to the physician. Ibuprofen 200 mg. 1 to 2 tablets 3 times a day was ordered for three days.

On January 29, 2016, Mr. White was evaluated by Nurse Practitioner Woods. Nurse

Practitioner Woods wrote that Mr. White's "ACL was unresolved". Mr. White still complained of left knee pain. He admitted that he was not doing his exercise program all the time. On physical exam, Nurse Practitioner Woods found that Mr. White was in no apparent distress and was able to walk. There was no knee swelling. This was the extent of his physical exam findings. There was no documentation of loss of range of motion, tenderness, pain, crepitus, or ligamentous stability.

Nurse Practitioner Woods' assessment was a history of a left knee anterior cruciate ligament sprain. Nurse Practitioner Woods prescribed naproxen 500 mg. twice a day for 14 days. He advised compliance with Mr. White's exercise program. Nurse Practitioner Woods recommended follow up as scheduled in March despite his acknowledgement of a possible anterior cruciate ligament injury.

Mr. White returned to Dr. David on March 14, 2016, nearly 4 1/2 months after Dr. David's last evaluation of Mr. White. According to Dr. David, Mr. White had occasional left knee pain. He was doing his exercise program, but Mr. White was upset. He claimed that the exercise program was not doing any good. On physical exam, Dr. David observed Mr. White to ambulate normally. The left knee and leg were unremarkable. There was no tenderness, swelling, loss of motion, crepitation, or disfigurement. Mr. White was able to squat without problem.

Dr. David's assessment was a history of an anterior cruciate ligament sprain, despite the physical therapist's concerns of possible left knee internal derangements. Dr. David advised Mr. White to continue his range of motion exercise program. It is unclear why Dr. David recommended a continued exercise program when Dr. David's examination of Mr. White's left knee was normal. Dr. David's impression was an anterior cruciate ligament sprain, even though Mr. White had had persistent complaints nearly 9 months after his sports injury. Dr. David ordered another ten days of naproxen and left Mr. White's follow up on an as needed basis.

The next pertinent medical record was dated July 14, 2017. Mr. White saw the LPN. He complained of left knee pain, which was constant and sharp. He stated that his leg felt like a noodle. He denied any significant pain but believed that there was something wrong in his left knee. He believed that there was nothing in his knee to support his knee.

On physical exam, the nurse observed no swelling or bruising. The knee, however, did click with range of motion. There was no pain with range of motion of the knee. The nurse's assessment was a left knee issue which began in 2015. Mr. White claimed that he tore his anterior cruciate ligament playing basketball. He insisted on his need for an MRI scan of the left knee. However, he had no complaints of left knee pain since March 14, 2016, as documented in the medical record. The LPN felt that there was no need for referral to the physician at the time due to Mr. White's lack of left knee pain. However, the LPN did document that Mr. White stated that he just knew something was wrong with his left knee.

Mr. White had no relief and his pain continued despite not returning to the Nurse Sick Call. In the past, Mr. White refused Nurse Sick Call, as he did not feel that he should have to pay to see the nurse for a chronic problem that was not being addressed or fixed by the medical staff. The LPN initially wrote to refer Mr. White to the physician. However, she crossed this out on the progress note and instead wrote for ibuprofen 200 mg. 1 to 2 tablets 3 times a day for three days. It is unclear who ordered the ibuprofen other than the LPN as there was no listing of it in the Boswell Pharmacy Services records or in the Prescription Orders. Mr. White was instructed to return to the Nurse Sick Call on an as needed basis.

It is unclear why the LPN did not refer Mr. White to someone who could evaluate him for an anterior cruciate ligament tear or other internal derangement of the knee. It appears that based on this note the LPN believed that the only reason to refer Mr. White to a physician or nurse practitioner was the presence of knee pain. This in spite of the fact that Mr. White had a long history of continued complaints regarding his left knee, the mechanism of initial injury, the concern about an anterior cruciate ligament injury by multiple staff members, and the abnormal clicking with range of motion of the left knee that she documented.

On August 19, 2017, Mr. White sustained an injury to his left knee when he fell in his housing unit. He was seen in the Nurse Sick Call. He had limited passive range of motion of the left knee. There was no active range of motion of the knee observed. Mr. White rated his pain 10/10. On exam, there was no swelling, discoloration, or breaks in the skin. The knee was aligned. There again was a minimal physical examination of Mr. White's left knee.

He was referred to the physician. Cold packs, elevation, crutches, and non-weight bearing were recommended. The nurse discussed Mr. White's condition with Dr. David. Dr. David prescribed naproxen for ten days and ordered a third set of x-rays on the left knee. Mr. White was written for a low bunk and low gallery until further orders.

The radiographs of the left knee were done for pain and limited range of motion on August 21, 2017. These demonstrated mild early tricompartmental osteoarthritis changes with a small effusion, which were similar to the prior study. I do not have these x-rays to examine. Mr. White on this date was also provided an order to use the Healthcare Unit shower.

Mr. White attended the Nurse Practitioner Sick Call the next day on August 22nd. He was instructed to follow up on August 28th as the radiographs had been done just the previous day. The LPN on this date witnessed Mr. White walking without the assistance of his crutches. The LPN recommended the physician to review his need for crutches. On August 26, 2017, the LPN again wrote that Mr. White was not using his crutches and he had a normal gait.

On August 30, 2017, Dr. David saw Mr. White for review of his x-rays of his left knee

which had been done nine days earlier. Mr. White had stopped using his crutches on his own for two days. Mr. White was upset and asked if he was going to get an MRI scan of his left knee. On physical exam, Dr. David documented a normal gait. The left knee showed no soft tissue swelling. There was a slight bony prominence seen medially. There was no tenderness or crepitation and no loss of range of motion. Lachman test was negative.

The radiographs of the left knee were reviewed. Dr. David's assessment was early osteoarthritis of the left knee. Dr. David documented that Mr. White walked out when he was told that he was not going to get an MRI scan of his left knee. Dr. David discontinued his crutches and instructed Mr. White to follow up on an as needed basis.

On September 10, 2017, Mr. White was seen by the LPN. He complained of his left knee hurting. He returned to the LPN on November 4, 2017. He again described sharp, throbbing, constant left knee pain since 2015 which he rated 10/10. On physical exam, the LPN found minimal swelling, no bruising, and Mr. White's continued inability to straighten the left leg fully. This was in stark contrast to Dr. David's exam findings 11 days earlier.

The LPN documented that Mr. White's knee problem started in 2015 and since 2015 Mr. White had no improvement or relief in his knee. Mr. White once again informed the medical staff that he knew that there was something wrong with his knee. He had turned earlier that morning and felt another pop in his left knee. He was given a lay-in order by Dr. David who also ordered naproxen for another ten days. Mr. White was returned to the housing unit and Dr. David ordered another set of x-rays (number 4) on the knee. No crutches were issued and no MD referral was recommended. It is unclear as to the utility of a fourth set of x-rays as no essential changes had been seen on the previous three set of x-rays.

The radiographs of the left knee were performed on November 6, 2017, with indication for pain and swelling. The radiologist read mild soft tissue prominence in the suprapatellar bursal region, consistent with a small effusion. The joint space was relatively preserved, and there were no interval changes since the last set of x-rays. I do not have these x-rays for review.

Mr. White returned to the MD Sick Call on November 16, 2017. He entered the exam room limping. He was not using his crutches as commented upon by Dr. David. However, this should have been no surprise to Dr. David as he didn't issue any crutches on November 4th. Mr. White, again, insisted that he needed an MRI scan because he thought he had a ligament injury. His history was reviewed.

It was noted that he had injured his left knee playing basketball on June 26, 2015, nearly two years and five months earlier. He had been treated conservatively with crutches and anti-inflammatory medications. He had been referred to physical therapy and finished two months of a daily, supervised home exercise program in October and November of 2015. Mr. White continued to have left knee pain and dysfunction.

Repeat radiographs showed no changes.

On physical exam, there was no swelling of the knee. There was slight a limitation of full extension, again with a lack of 20 degrees of extension, unchanged from his previous exams. Twenty degrees lack of knee extension, in my opinion, is not slight but rather a significant loss of range of motion in a 36 year old man. Again, this was a limited physical exam with no documentation of any ligament testing, any painful motion, or tender areas in the knee.

The assessments by Dr. David were osteoarthritis of the left knee and rule out ligament injury. A second request for a left knee MRI scan was made nearly two years and two months after the initial request for an MRI scan. On December 14, 2017, nearly a month later, Shawnee Correctional Center received approval from Wexford for a left knee MRI scan at Union County Hospital.

The MRI scan was performed on December 19, 2017. The MRI scan revealed a large, bucket-handle tear of the medial meniscus involving the portions of the anterior horn, body, and posterior horn, with displacement of the torn portion along the medial intercondylar notch. There was bone marrow edema (or bone swelling) over the medial weight bearing aspect of the medial condyle and over the medial tibial spine. This was present on the MRI 30 months after Mr. White's injuries. There was lateral patellar tilting and subluxation. The patella was high riding and there was a moderate effusion. The radiologist read a high grade, near full thickness, tear of the anterior cruciate ligament.

Over a week later, on December 27, 2017, Mr. White was seen in the MD Sick Call. Mr. White was advised of the MRI results and the recommendations of the radiologist to correlate the MRI findings with his x-rays for comparison.

However, it is unclear to me what difference the x-rays would have impacted the radiologist's reading of the MRI scan. The majority of Mr. White's problems with the left knee were soft tissue in origin, particularly the bucket-handle tear of the medial meniscus and the anterior cruciate ligament tear, findings not seen on an x-ray.

Dr. David documented that the physical exam of Mr. White's left knee was the same. However, he ambulated normally which contradicts his previous physical exam finding. Dr. David's assessment was a left knee large, bucket-handle medial meniscal tear with a high grade partial, near full thickness, tear of the anterior cruciate ligament.

Dr. David elected to send the x-rays of November 6, 2017, to the radiologist for correlation to his MRI scan reading. Dr. David, again, prescribed naproxen for 10 days. Dr. David documented and advised Mr. White of the side effects of the naproxen to Mr. White's stomach. However, in the past, he had never done this before in prescribing multiple anti-inflammatory medications to Mr. White on multiple occasions.

Dr. David recommended follow up after the MRI addendum was received from the radiologist. A referral request was sent to Wexford for an orthopaedic consultation. On January 3, 2018, Dr. David discussed an orthopaedic referral in his collegial review. Dr. David was instructed to wait until the addendum to the MRI scan was received, and then re-present it to the collegial review. On January 17, 2018, Shawnee Correctional Center received approval from Wexford for an orthopaedic evaluation scheduled for January 23, 2018.

On January 23, 2018, Mr. White saw Dr. John Davis of the Orthopaedic Institute of Southern Illinois. Mr. White provided a history of hurting his left knee playing basketball in June of 2015. He had persistent pain, swelling, popping, and locking of the knee since his injury, symptoms Mr. White had always described to the Wexford medical staff.

On physical exam, Dr. Davis found no effusion. There was tenderness along the posteromedial joint line. There was knee pain with hyperflexion. Dr. David documented positive McMurray and Lachman tests. Mr. White had roughly a 2-3 degree flexion contracture of his knee.

Radiographs were examined which showed "some primary osteoarthritis." The MRI scan was reviewed which demonstrated an anterior cruciate ligament tear with a displaced medial meniscal tear. Dr. Davis was concerned about Mr. White's arthritis, and did not recommend pursuing surgery for the anterior cruciate ligament rupture. He felt that Mr. White's symptoms from the medial meniscal tear were unlikely to improve without surgical intervention.

Dr. Davis believed that simple rehabilitation would be sufficient for the anterior cruciate ligament rupture, although it is unclear if Dr. Davis realized that Mr. White underwent a daily exercise program in the Healthcare Unit for two months. Dr. Davis elected to seek approval for a left knee arthroscopy with a partial medial meniscectomy.

Dr. Davis, at the time, did not anticipate the need for anterior cruciate ligament reconstruction at a later date. Dr. Davis also stated that arthroscopic evaluation of Mr. White's articular cartilage at the time of the partial medial meniscectomy would allow further determination of whether he was a suitable candidate for anterior cruciate ligament reconstruction in the future.

On February 6, 2018, Mr. White attended the MD Sick Call. Dr. David explained Dr. Davis's recommendations which were to pursue left knee arthroscopy with a partial medial meniscectomy and not an anterior cruciate ligament reconstruction. Mr. White was told that with his arthritis, Dr. Davis did not recommend surgical intervention for the anterior cruciate ligament tear, and that he did not anticipate the need for such surgery in the future.

Mr. White was very insistent on proceeding with surgery to address both tears of the

left knee. He was very upset and insisted that he wanted both the anterior cruciate ligament tear and the medial meniscal tear addressed with surgery. Dr. David explained to Mr. White, again, the recommendations of Dr. Davis, the orthopaedic specialist. Dr. David submitted a referral to collegial review for Mr. White's surgery, as recommended by Dr. Davis.

On February 25, 2018, Mr. White returned to the LPN. Mr. White complained that his left knee problems were causing him to lean on his right knee, making that knee hurt. He described intermittent throbbing, popping, and stinging. His right knee had been painful for the previous month. He had no pain at the present time, but had 5/10 pain in the right knee when it did occur.

On physical exam, the LPN found Mr. White to be limping. The LPN wrote that Mr. White was using his right leg more due to his left knee injury, and that he was having right leg problems, due to putting all the weight on his right leg. No physician referral was made and the LPN prescribed ibuprofen for three days.

On February 26, 2018, the collegial review's decision regarding Mr. White's surgery was reviewed by Dr. David. Mr. White was scheduled in the MD Sick Call to discuss the decision on March 5, 2018. On March 5, 2018, Mr. White returned to the MD Sick Call. After discussing the approval of the meniscal surgery only by the collegial review, as recommended by the orthopaedic doctor, Mr. White agreed to the surgery. On physical exam, his gait was described as normal. Mr. White's surgery was scheduled for March 22, 2018.

On March 22, 2018, Dr. Davis performed a left knee arthroscopy with a partial medial meniscectomy and complete synovectomy. His pre-operative diagnosis was a left anterior cruciate ligament tear and a left knee traumatic bucket-handle medial meniscal tear. His post-operative diagnoses were the same, in addition to synovitis.

Dr. Davis documented that Mr. White's articular cartilage was normal in the patellofemoral and lateral compartments. Interestingly, he made no comment whatsoever as to the status of the articular cartilage of the medial compartment, despite his concerns pre-operatively about Mr. White's knee arthritis and using this as a justification for not proceeding with reconstruction of the anterior cruciate ligament. The anterior cruciate ligament was torn off its femoral origin and scarred into the posterior cruciate ligament. A traumatic bucket-handle tear of the medial meniscus was excised, compromising of 60-70% of the meniscal tissue.

Mr. White had his first post-operative visit at the Orthopaedic Institute of Southern Illinois on April 4, 2018. He saw a physician assistant. Mr. White still had left knee pain and tightness. The physician assistant wrote that given Mr. White's incarceration as was discussed, it was unlikely that Mr. White would gain adequate physical therapy for an anterior cruciate ligament reconstruction, and "even now" for his non-operative treatment of his anterior cruciate ligament tear.

The physician assistant elected to see how Mr. White progressed with his function over the oncoming months. If Mr. White ultimately had persistent issues with his knee, then the physician assistant would have further discussions of an anterior cruciate ligament reconstruction, although it was not anticipated that Mr. White would have this done while incarcerated.

Mr. White returned to the physician assistant on May 16, 2018. Mr. White still felt weak in his left knee. The physician assistant again recommended non-operative treatment for the anterior cruciate ligament tear. The physician assistant recommended more therapy for an additional month prior to entertaining any surgical reconstruction of the anterior cruciate ligament. The primary concern, according to the physician assistant's note, was that, if Mr. White was not able to complete post-operative rehabilitation, then this would significantly negate the benefit of such a reconstruction.

Mr. White was allowed to begin some jogging, running, squatting, and lifting. If Mr. White had any persistent instability, then again the physician assistant felt that further discussion of an anterior cruciate ligament reconstruction was warranted. The physician assistant opined that, if Mr. White was unable to get adequate therapy, then Mr. White may need to delay the anterior cruciate ligament reconstruction until after his release.

Throughout the months of April, May, June, July, and August, Mr. White continued to have pain, dysfunction, and popping in his left knee. This was despite pursuing an exercise program in the Healthcare Unit on a daily basis for nearly four months.

On September 17, 2018, Mr. White came back to the MD Sick Call, complaining of still having left knee pain. He started some running and jogging but could only tolerate this slightly because of his left knee giving out.

On physical exam, his left knee was unstable. He had a negative Lachman test. His gait was normal. The assessment was left knee instability. Mr. White was to continue his daily exercise program in the Healthcare Unit for an additional two months. A submission was made to collegial review for orthopedic follow up. This was approved approximately on September 20, 2018.

Mr. White continued his exercise program in the Healthcare Unit on a daily basis. On September 24, 2018, it was documented that he was complaining of pain and popping in both knees, greater on the left side.

Mr. White returned to the physician assistant at Dr. Davis's office on September 28, 2018. The referral form noted a diagnosis of anterior cruciate ligament insufficiency. Mr. White had failed to improve in terms of his left knee instability. He was getting sharp knee pain from time to time. He also had intermittent left knee swelling. On physical exam, there was no effusion or tenderness. He had normal strength. However, there was a positive Lachman test and a positive pivot shift test.

The physician assistant's assessment was persistent left knee instability with an anterior cruciate ligament tear. Mr. White, again, voiced his wish to proceed with surgery to reconstruct the anterior cruciate ligament. The physician assistant recommended the surgery if Mr. White was able to complete such post-operative protocol for anterior cruciate ligament reconstruction, including bracing, crutches for four weeks, and physical therapy two times a week for six to eight weeks.

The physician assistant wrote that, if Shawnee Correctional Center was not able to meet the requirements for Mr. White's post-operative treatment, then it would be in Mr. White's best interest to defer such surgery until his release. The tentative plan was to proceed with left knee arthroscopy with hamstring autograft tendon anterior cruciate ligament reconstruction.

Mr. White attended the MD Sick Call on October 2, 2018, to discuss the recommendations by the orthopaedic surgeon. The assessment was persistent left knee instability with an anterior cruciate ligament tear. Mr. White continued his daily home exercise program in the Healthcare Unit on a daily basis throughout the months of October and November of 2018.

Eventually on November 26, 2018, a referral request was sent to Wexford for Mr. White's left knee anterior cruciate ligament reconstruction. It is unclear to me as to the reason for a two month delay in submitting this referral as Mr. White voiced his desire to pursue surgery at Dr. Davis's office on September 28, 2018 and his knee clearly had not improved despite months and months of a prescribed exercise program in the Healthcare Unit.

On December 5, 2018, Mr. White's surgery was approved. On December 13, 2018, Dr. Davis was informed that the collegial review was approving a one-time physical therapy referral after surgery and then having Mr. White do an exercise program in the Healthcare Unit. Dr. Davis in his office note accepted the approved one-time post-operative physical therapy evaluation and subsequent rehabilitation treatment. It appears that the physician assistant's concerns of insufficient post-operative rehabilitation after anterior cruciate ligament reconstruction were not a significant concern to Dr. Davis.

Mr. White had a second left knee surgery on January 10, 2019, by Dr. Davis. The pre-operative and post-operative diagnoses were left knee anterior cruciate ligament tear. Mr. White underwent a second left knee arthroscopy with an anterior cruciate ligament reconstruction using hamstring autograft. During the surgery, Dr. Davis discovered a 2+ Lachman test and a positive pivot shift test. Dr. Davis again documented normal appearance of the patellofemoral and lateral compartments. The medial compartment demonstrated a non-focal area of grade 1 to grade 2 chondromalacia changes. He confirmed again that the anterior cruciate ligament was completely torn.

Mr. White followed up with the physician assistant on January 23, 2019. Mr. White was doing his home exercise program in his knee brace. On exam, the knee lacked 2

to 3 degrees of extension. Mr. White was only able to flex the knee to 80 degrees. Radiographs were done of the left knee. At this point in time, Mr. White had not had any physical therapy despite the apparent pre-operative approval by Dr. Garcia in the collegial review. The physician assistant wrote an order for physical therapy. Mr. White was to be weight bearing as tolerated and to wean out of his brace over the next two weeks. The brace was unlocked during this office visit.

The last pertinent record was from the physical therapy evaluation dated January 30, 2019. Mr. White complained of left knee pain. He was unable to bend or straighten the left knee. The knee was described as achy but his symptoms were more severe with movement. He had pain and difficulty with walking and stair climbing.

On physical exam, the physical therapist found that Mr. White tended to shift his weight to his right leg. His left knee was flexed. He had decreased weight bearing on his left leg and he limped. There was decreased knee flexion during the swing phase of gait. Associated swelling was present. Actively, his range of motion was 9 degrees to 105 degrees of flexion and passively from 4 degrees to 124 degrees of flexion. His strength was rated at 4/5 in the left knee. He had decreased quadriceps contraction. Mr. White voiced his concern about having no physical therapy treatment.

Mr. White's deposition occurred on February 7, 2019. Mr. White claimed that Nurse Practitioner Woods was deliberately indifferent to his serious medical needs. Mr. White claimed that Nurse Practitioner Woods did nothing for his left knee injury but prescribe pain pills. Mr. White stated that no matter how serious he described his left knee to Nurse Practitioner Woods, Nurse Practitioner Woods did nothing. At the time of the injury, Mr. White noted that his knee snapped out and he could not walk. He had to be picked up from gym.

He was told that his x-rays showed arthritis. He believed that there were lies throughout the medical records in regards to his left knee injury. He told Nurse Practitioner Woods that his knee snapped out of place on two occasions, and Nurse Practitioner Woods told him to increase his activities.

Mr. White underwent a home exercise program extensively, which helped a little with his strength. However, his knee remained painful, swollen, and unsteady. He was seen by Dr. David in March 2016 and had occasional knee pain, but his exercise program was not doing his knee any good. He claimed that the physician record of March 14, 2016, was a lie because Mr. White had popping throughout movement of his knee and he was not able to fully straighten or bend his left knee.

After his first surgery, Mr. White found that his left knee was still wobbly and threatening to give out. He had seen the physician assistant twice in post-operative follow up. Mr. White told the physician assistant that he was still having knee issues and still had knee pain after his surgery.

Mr. White eventually saw Dr. Davis, who was "okay" with a one-time physical

therapy session after his anterior cruciate ligament surgery. This was inconsistent with what Mr. White was told prior to his anterior cruciate ligament reconstruction surgery by the Dr. Davis and his physician assistant.

At the time of the deposition, Mr. White still had pain, swelling, and weakness in his left knee. Mr. White was emphatic that he told Dr. David and Nurse Practitioner Woods that his left knee was snapping out of place over the course of the years since the injury.

As to the injuries to Mr. White's left knee, it is my opinion that Dr. David and Nurse Practitioner Woods failed to accurately and timely diagnose Mr. White's left knee bucket-handle medial meniscal tear and his anterior cruciate ligament rupture. Their negligence in obtaining a detailed, accurate, and thorough history and physical examination of Mr. White's left knee injury led to the delay in diagnosis by almost 2 1/2 years. Without a doubt, the medical records showed that an anterior cruciate ligament injury was suspected as early as September 18, 2015. As disturbing as it is, this diagnosis was actually made by the physical therapist and not by Dr. David or Nurse Practitioner Woods.

The physical therapist's physical examination of Mr. White's left knee on September 18, 2015, clearly revealed how many abnormal findings were present in Mr. White's left knee as a result of his anterior cruciate ligament tear and bucket-handle medial meniscal tear. These physical exam findings were either missed or ignored by Dr. David and Nurse Practitioner Woods.

At numerous times in the medical records, there were other examples of inconsistent or claimed normal physical exam findings by Nurse Practitioner Woods and Dr. David. These findings do not match or correlate with the abnormal physical exam findings found by other medical staff including the nurses. These findings by the other medical staff were consistent with a large meniscal tear and anterior cruciate ligament tear.

The inadequate physical examinations performed by Dr. David and Nurse Practitioner Woods clearly led to a delay in diagnosis of Mr. White's left knee injuries, as well as a delay in treatment. Their physical examinations of Mr. White's left knee at most times were minimal at best.

Nurse Practitioner Woods claimed in his deposition that he more thoroughly examined Mr. White's left knee on multiple occasions but did not document normal or negative pertinent findings including a lack of pain, tenderness, range of motion, or ligamentous laxity. However, it is my opinion that in the presence of an acute sports injury, particularly one that had caused persistent patient complaints, dysfunction, and loss of mobility, such recorded findings were crucial to ultimately assist in a diagnosis. If, as it appears, Nurse Practitioner Woods did not document specific negative physical exam findings in Mr. White left knee, then it is my opinion that Nurse Practitioner Woods had not examined Mr. White's left knee for these findings.

Re: Richard White
Page 18
September 28, 2020

If Nurse Practitioner Woods performed these tests on Mr. White's left knee, then he should have documented them in the medical record as is the standard of care. I believe, based on the evidence in the medical records, that he didn't do these simple steps as part of the physical exam. Contemporary abnormal findings of the left knee were discovered by other medical staff including the nurses.

It is my opinion that Nurse Practitioner Woods also failed to treat Mr. White's left knee conditions by refusing to refer him to Dr. David despite Mr. White's persistent complaints of pain, difficulty with weight bearing, and loss of motion. In his deposition, Nurse Practitioner Woods testified that he was not surprised that a 34 year old had arthritis of the knee. As a practicing orthopaedic surgeon for over 25 years, I am surprised by any 34 year old that has knee arthritis.

Certainly, the level of arthritis in Mr. White's left knee at the time was not severe enough to explain his persistent pain, loss of motion, limp, instability, popping, and swelling. The defendants simply attributed Mr. White's knee complaints to his minimal arthritis rather than actually listening to Mr. White's concerns and examining his knee appropriately.

By his own admission in his deposition, Nurse Practitioner Woods stated that he definitely knew about Mr. White's torn anterior cruciate ligament by January 29, 2016. This was 1 year and 11 months BEFORE Mr. White had his MRI scan of the left knee. Nurse Practitioner Woods claimed in his deposition that the only way to objectively diagnose an anterior ligament or meniscal tear would be by an MRI scan. If this was his belief, then Nurse Practitioner Woods should have had Mr. White pursue an MRI of the knee in February of 2016.

Dr. David failed in his role as a physician by not pursuing an MRI scan of Mr. White's left knee at the time of his initial evaluation. Despite Mr. White's complaints of popping and difficulty with weight bearing on his leg, and his documented loss of 20 degrees of extension on physical exam at 2 months after his injuries, Dr. David still did not consider an MRI of the knee to evaluate for significant internal knee injuries.

Dr. David, furthermore, deviated from the standard of care by not ordering an MRI even after Mr. White's failure of the initial conservative management notwithstanding his persistent and chronic complaints regarding his knee. Dr. David failed to treat Mr. White's left knee condition by refusing to see him for follow up in October 2015, despite Mr. White's persistent symptoms and dysfunction of his left knee. Dr. David was not an advocate for his patient.

Dr. David knew or should have known that the appropriate imaging study for Mr. White's continued complaints regarding his left knee after the first set of radiographs would have been an MRI scan and not a second, third, and fourth set of x-rays of the left knee. Clearly, with Dr. David's suspicion for a ligament sprain or injury as early as August 13, 2015, he failed to obtain the appropriate diagnostic testing of Mr. White's left knee injuries.

On March 14, 2016, Dr. David diagnosed an anterior cruciate ligament sprain. However, the records did not show that any ligament testing was performed during his physical examination, and Mr. White continued to complain of problems with his left knee 9 1/2 months after his injury. In addition to Dr. David's failure to diagnose Mr. White's anterior cruciate ligament rupture and the large medial meniscus tear, he negligently failed to refer Mr. White to the appropriate orthopaedic specialist in timely fashion.

As a result of the failures of the defendants to accurately and timely diagnose Mr. White's left knee injuries, as well as their failure to treat the left knee injuries in an appropriate and timely fashion, Mr. White's left knee has been irreversibly and permanently damaged. With such a large bucket-handle tear of the medial meniscus in combination with a completely torn anterior cruciate ligament, Mr. White is at high risk for the development of post-traumatic arthritis in his left knee. As a result of not having these injuries surgically addressed for two years and nine months, Mr. White's left knee arthritis will progress faster than if he had these injuries identified and treated in the summer of 2015.

It is my opinion that as Mr. White's arthritic changes of the knee progress over the course of time, he will ultimately require future treatment including anti-inflammatory medications, pain medications, physical therapy, bracing, corticosteroid injections, viscosupplementation injections, and knee replacement in his lifetime. Mr. White's greatest chance to avoid post-traumatic left knee arthritis and the potential need for future treatment including knee replacement surgery was to have his bucket-handle tear repaired and his anterior cruciate ligament tear reconstructed in a timely fashion.

It is my opinion that this should have been done in less than six weeks and optimally within two weeks of his injury. Even if his bucket-handle medial meniscal tear was not repairable (and there is some question that it may have been, given the percentage involved of the tissue as noted by Dr. Davis in his operative report) having an anterior cruciate ligament reconstruction to restore stability is one of the greatest factor in avoiding post-traumatic arthritis in the future.

In summary, the medical staff failed to take Mr. White's complaints seriously in regards to his left knee, despite his complaints and dysfunction with the left knee for greater than two years. They falsely assumed that Mr. White had only a sprain to his knee or was a malingerer. In fact, Mr. White sustained serious injuries to his left knee, and the medical records clearly showed that the medical staff, including the nurses, the nurse practitioner, and Dr. David, failed in ordering appropriate referrals.

Without question or doubt, Mr. White sustained a left knee anterior cruciate ligament rupture and a large bucket-handle tear of the medial meniscus on June 26, 2015. These serious injuries, although acknowledged by the medical staff in the medical record, were not ultimately confirmed by an MRI until December 19, 2017. Furthermore, these injuries were not surgically addressed until March 18, 2018.

Wexford Health Sources, Inc. and its collegial review including Dr. Ritz deviated from the standard of care in denying Mr. White's MRI scan of the left knee as requested on September 8, 2015. As was noted and conveyed by Dr. David, Mr. White had continued pain, popping, and giving out of the knee. Mr. White had difficulty weight bearing and limped. The knee demonstrated loss of motion of both flexion and extension. Over a 2 1/2 month period of time, Mr. White's left knee did not improve despite time, crutches, and various anti-inflammatory medications.

Clearly, in light of a documented sports injury, an abnormal effusion on radiographs, and the persistent abnormal physical exam findings months later, an MRI scan should have been approved by Wexford Health Sources, Inc. and its employees. Its refusal in authorizing the MRI despite the primary concern by Dr. David of anterior cruciate ligament tear unmistakably shows its indifference in the treatment and diagnosis of Mr. White's serious left knee injuries.

The defendants' failures to order an MRI scan for his acute injuries of the left knee and their excessive non-operative treatment of Mr. White's surgical injuries despite his chronic complaints of the left knee, have a direct causal connection to Mr. White's poor prognosis in the future regarding his left knee.

Should you have any further questions or concerns in regards to this Medical Case Report, please do not hesitate to contact me. I do declare under penalty of perjury under the laws of the United States of America that the information contained within this report was prepared and is the work product of myself and is true and correct to the best of my knowledge and information. The opinions rendered in this report are made within a reasonable degree of medical and orthopedic surgical certainty.

Sincerely,

Vincent Cannestra, MD

**VINCENT P. CANNESTRA, M.D.**
Orthopedic and Spine Surgery Associates, Ltd.
Midwest Bone and Joint Institute
2350 Royal Blvd., Suite 200
Elgin, Illinois 60123-5021
(847) 931-5300 (work), 931-9072 (fax)

## CURRENT PRACTICE:

Orthopedic and Spine Surgery Associates, Ltd.; single-specialty private group
practice, Elgin, Illinois; general orthopaedic and adult reconstruction surgery.
August 23rd, 1999 to present.

## MEDICAL STAFF PRIVILEGES:

Sherman Hospital; Elgin, Illinois
St. Joseph's Hospital; Elgin, Illinois
Good Shepherd Hospital; Barrington, Illinois
Delnor Community Hospital; Geneva, Illinois, Honorary Staff, October 11, 2019
Valley Ambulatory Surgery Center; St. Charles, Illinois

## FELLOWSHIP:

Jorge O. Galante, M.D.; Aaron G. Rosenberg, M.D.; Joshua J. Jacobs, M.D.; and
    Richard A. Berger, M.D.; Joint Replacement, Rush-Presbyterian-St. Luke's
    Medical Center, Chicago, Illinois;
Wayne G. Paprosky, M.D., F.A.C.S., Adult Joint Reconstruction, Central DuPage
    Hospital, Winfield, Illinois;
August 1998 to July 1999.

## RESIDENCY:

Orthopaedic Surgery, Northwestern University Medical School, Chicago, Illinois;
    Northwestern Memorial Hospital, Evanston Hospital, Children's Memorial
    Hospital, Lutheran General Hospital, Lakeside Veterans Affairs Medical
    Center;
Michael F. Schafer, M.D., Chairman;
June 1994 to June 1998.

## INTERNSHIP:

Internal Medicine, State University of New York at Buffalo, Buffalo, New York;
    Buffalo General Hospital, Erie County Medical Center, Veterans Affairs
    Medical Center;
June 1993 to June 1994.

## EDUCATION:

**M.D.** Northwestern University Medical School, June 1993
**B.A.** Northwestern University, Neurobiology and Physiology, June 1989, with
distinction GPA: 3.76/4.00
Phi Beta Kappa Honor Society
Phi Eta Sigma Honor Society


## BOARD CERTIFICATION:

National Board of Medical Examiners, May 1994


## SPECIALTY BOARD:

Certified by the American Board of Orthopaedic Surgery, July 12, 2001
Recertified by the American Board of Orthopaedic Surgery through December 31,
2031


## LICENSURE:

Illinois, # 036-093781, expires July 31, 2020
DEA Certified
Controlled Substance Registered


## HOSPITAL STAFF APPOINTMENTS:

Chairman, Department of Surgery, Sherman Hospital, July 2008-June
2010.

Chairman, Surgical Medical Care Evaluation Subcommittee, Sherman Hospital,
July 2006-June 2008.

Assistant Chairman, Department of Surgery, Sherman Hospital, July 2006-June
2008.

Member, Board of Directors, Provena Saint Joseph Hospital Orthopedic Clinical
Co-Management Company, Elgin, Illinois, January 2019 to present.

Member, Board of Directors, Presence Health Partners, Presence St. Joseph
Hospital, Elgin, Illinois, May 2016 to present.

## HOSPITAL STAFF APPOINTMENTS (continued):

Chairman, Provena Saint Joseph Hospital Orthopedic Clinical Co-Management Company, Elgin, Illinois, January 1, 2020 to present.

Medical Director of Inpatient Orthopedic Service Line, Provena Saint Joseph Hospital Orthopedic Clinical Co-Management Company, Elgin, Illinois, January 12, 2012 to present.

Surgeon Champion for ERAS protocols for AMITA Health St. Joseph Hospital Elgin, Illinois, March 2019 to present.

## FACULTY APPOINTMENTS:

Feinberg School of Medicine of Northwestern University, Health System Clinician
April 1, 2017 to present.

## MEDICAL STAFF APPOINTMENTS:

Director of Orthopedic Rehabilitation Medical Program, Claremont of Hanover Park, LLC, Hanover Park, Illinois, December 1, 2011 to present.

Member, Board of Directors, Midwest Orthopaedic Network, Chicago, Illinois, December 2008 to 2016.

Member, Board of Directors, Tri-County/HealthSelect Independent Physician Association, Elgin, Illinois, 2006 to 2016.

## SUPPLEMENTAL SUBSPECIALTY TRAINING:

MIS 2-Incision Total Hip Replacement Surgeon Training, The Zimmer Institute, Warsaw, Indiana, November 7-8, 2003.

## HONORS AND AWARDS:

***Advocate Sherman Hospital, Advocate Physician Partners Exemplary Physician,*** For Top Performance in Achieving Exceptional Clinical Integration Outcomes, 2014.

***Provena Saint Joseph Hospital Guardian Angel Award***
For Providing Excellent, Compassionate Care to Patients
July 28, 2011.

## HONORS AND AWARDS (continued):

***Elks Distinguished Citizenship Award***

For Outstanding and Meritorious Service to Humanity.
Grand Lodge Benevolent and Protective Order of Elks
March 24, 2001.

***"Cortical Remodeling and Bone Apposition to a Textured Canine Hip Implant With and Without Hydroxyapatite."***
        Dallas B. Phemister Prize for Excellence in Medical Writing
                Mid-America Orthopaedic Association, Annual Meeting,
                Acapulco, Mexico, April 22-26, 1998.

        Howard Schneider Memorial Award Paper Competition Winner
                Illinois Orthopaedic Society, 1997.

## PUBLICATIONS:

**Cannestra, V.:** Will I Lose Weight After My Hip or Knee Replacement?, Kane County Medical Society Resource Guide, Kane County Daily Herald, March 30, 2016.

**Cannestra, V.:** What's New in Joint Replacement Surgery?, Kane County Medical Society Resource Guide, Kane County Daily Herald, March 30, 2015.

**Cannestra, V.:** When Is Joint Replacement Surgery Necessary?, Kane County Medical Society Resource Guide, Kane County Daily Herald, March 30, 2014.

**Cannestra, V.:** Meniscal tears of the knee with underlying preexisting arthritis, OrthoCentrix Workers' Compensation Monthly Newsletter, May 2012.

**Cannestra, V.:** Dodge Common Sports Injuries, *Destinations,* Fall 2007, published by Sherman Health Systems.

**Cannestra, V.:** When Is Knee Replacement Surgery Necessary?, *Destinations,* Spring/Summer 2007, published by Sherman Health Systems.

**Cannestra, V.:** Thromboprophylaxis Rounds No. 2, A case study on anticoagulation with Fragmin during total hip arthroplasty, sponsored and published by Eisai Inc. and Pfizer Inc., January 2007.

**Cannestra, V. P.**; Agins, H. J.; Bauer, T. W.; Jiang, M.; and Kudrna, J. C.: Cortical Remodeling and Bone Apposition to a Textured Canine Hip Implant With and Without Hydroxyapatite. *Northwestern University Medical School Department of Orthopaedic Surgery Journal*, Vol. 4, 1999, pp. 8-18, 2001.

## PUBLICATIONS (continued):

**Cannestra, V. P.**; Quigley, L. R.; Berger, R. A.; Jacobs, J. J.; Rosenberg, A.R.; and Galante, J. O.: Hybrid Total Hip Arthroplasty Using a Precoated Offset Stem:

4- to 9-Year Results. *The Journal of Bone and Joint Surgery*, Vol. 82-A, No. 9, pp. 1291-1299, September 2000.

**Cannestra, V.**: Results of Semiconstrained Total Knee Arthroplasty Implants. *The Arthritic Knee*, CD-ROM, American Academy of Orthopaedic Surgeons, ed. Rosenberg, A. G.; Mabrey, J. D.; Woolson, S. T.; and Cole, B. J., 2000.

**Cannestra, V. P.** and Rosenberg, A. G.: Choice of Implants in Total Knee Arthroplasty. *Seminars in Arthroplasty*, Volume 10, Number 4, pp. 225-234, October 1999.

## RESEARCH:

 *"Revision Total Knee Arthroplasty Using a Modular Constrained Condylar Prosthesis When Lesser Constraint was Inadequate."*
    **Vincent P. Cannestra, M.D.**; Regina M. Barden, R.N., B.S.N.; Richard A. Berger, M.D.; Joshua J. Jacobs, M.D.; Aaron G. Rosenberg, M.D.; and Jorge O. Galante, M.D.
    Submitted to The Journal of Arthroplasty, July 2001.

*"Revision Total Hip Arthroplasty Using Proximal Femoral Allograft Prosthetic Composites."*
    **Vincent P. Cannestra, M.D.**; Laura R. Quigley, M.S.; Richard A. Berger, M.D.; Steven Gitelis, M.D.; Mitchell B. Sheinkop, M.D.; Aaron G. Rosenberg, M.D.; and Jorge O. Galante, M.D.
    Pending submission to The Journal of Bone and Joint Surgery, April 2000.

*"Surface Damage in Retrieved Polyethylene Tibial Inserts: Conforming Versus Nonconforming Geometries."*
    Aivars Berzins, M.D.; Joshua J. Jacobs, M.D.; Clare M Rimnac, Ph.D.; **Vincent P. Cannestra, M.D.**; Raghu N. Natarajan, Ph.D.; Richard A. Berger, M.D.; Thomas P. Andriacchi, Ph.D.; Sabine Schmitt, M.D.; Victor M. Goldberg, M.D.; and Jorge O. Galante, M.D.
    Pending submission to the Journal of Bone and Joint Surgery, June 1999.

*"Cortical Remodeling and Bone Apposition to a Textured Canine Hip Implant With and Without Hydroxyapatite."*
    Howard J. Agins, M.D.; Thomas W. Bauer, M.D., Ph.D.; **Vincent P. Cannestra, M.D.**; Ming Jiang, M.D.; and James C. Kudrna, M.D.
    Submitted to The Journal of Bone and Joint Surgery, June 1997.

## RESEARCH (continued):

*"Suprascapular Nerve Palsy: A Complication of Axillary Nerve Block Anesthesia."*
    **Vincent P. Cannestra, M.D.** and Leon S. Benson. M.D.

***"Combined Monteggia and Galeazzi Fractures in the Same Limb. A Case Study and Literature Review."***
    **Vincent P. Cannestra, M.D.** and Leon S. Benson. M.D.

Vertebral Pedicle Screw Ultrasound Project
    John F. Sarwark, M.D.; Geoffrey Van Flandern, M.D.; and **Vincent P. Cannestra, B.A.**
    Children's Memorial Hospital, Chicago Illinois, Northwestern University Medical School; Spring 1993.

Transient Synovitis Project
    John F. Sarwark, M.D. and **Vincent P. Cannestra, B.A.**
    Children's Memorial Hospital, Chicago Illinois, Northwestern University Medical School; Spring 1992.

## <u>SCIENTIFIC</u> <u>PRESENTATIONS</u>:

***"Peroneal Nerve Entrapment after Total Knee Replacement."***
    Joint Replacement Institute Grand Rounds, Northwestern Medicine, Cadence Health, Delnor Community and Central DuPage Hospitals, August 25, 2016.

***"Iliotibial Band Syndrome – Evaluation and Treatment."***
    Joint Replacement Institute Grand Rounds, Northwestern Medicine, Cadence Health, Delnor Community and Central DuPage Hospitals, April 24, 2015.

***"Improving clinical outcomes and decreasing length of stay for total hip and total knee patients through an interdisciplinary orthopedic co-management collaborative."***
    Vincent Cannestra, M.D.; Patricia Gawrys, R.N.; and Karen Ramos, R.N. Presented at the Annual Meeting of the National Association of Orthopedic Nurses (NAON), Las Vegas, Nevada, March 25, 2015.

**Faculty, Fragmin Speaker Training Webcast**
    "Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", sponsored by Eisai Inc., St. Charles, Illinois, December 12, 2008.

## <u>SCIENTIFIC</u> <u>PRESENTATIONS</u> <u>(continued)</u>:

**Faculty, Fragmin Speaker Training Webcast**

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Replacement Surgery", sponsored by Eisai Inc., St. Charles, Illinois, September 29, 2008.

**Faculty, Fragmin Speaker Training Meeting**
*"American Academy of Orthopaedic Surgeons Clinical Guideline on Prevention of Symptomatic Pulmonary Embolism in Patients Undergoing Total Hip or Knee Arthroplasty", "2007-08 AAOS, ASCO/NCCN, and CHEST Guidelines: Updates and Debates"*, Sponsored by Eisai Inc., JW Marriott Hotel, Miami, Florida, June11-12, 2008.

**"*Choice of Implants During Total Knee Arthroplasty.*"**
Sponsored by Eisai, Inc., Grand Rounds, Department of Orthopaedic Surgery, Ingham Regional Medical Center, Lansing, Michigan, January 19, 2007.

**Fragmin Speakers' Bureau Training Program**, sponsored by Eisai and Pfizer Pharmaceuticals, InterContinental Hotel, Miami, Florida, May 20-21, 2006.

**"*New Advances in Total Joints*"**, National Association of Orthopedic Nurses (NAON), Chicago Metropolitan Chapter, Rolling Meadows Holiday Inn, Rolling Meadows, Illinois, September 19, 2003.

**"*Minimally Invasive Hip Surgery*"**, presented to the operating room nursing staff, Sherman Hospital, Elgin, Illinois, April 24, 2003.

**"*The Results of Semi-Constrained (CCK) Total Knee Design in Revision Total Knee Arthroplasty.*"**
Richard A. Berger, M.D.; Joshua J. Jacobs, M.D.; Mitchell B. Sheinkop, M.D.; Aaron G. Rosenberg, M.D.; **Vincent P. Cannestra, M.D.**; Jorge O. Galante, M.D.; and Regina M. Barden, R.N., Presented at the American Academy of Orthopaedic Surgeons 69th Annual Meeting, February 14, 2002, Dallas, Texas.

**North American Fragmin Trial Educators Program**, sponsored by Pharmacia Corporation, Hyatt Regency, Scottsdale, Arizona, May 4-8, 2001.


<u>**SCIENTIFIC PRESENTATIONS (continued)**</u>:

**"*Intramedullary Nailings*"**, Continuing Education for Licensed Radiologic Technologists, Medical Imaging Department, Sherman Hospital, Elgin,

Illinois, April 11, 2001.

*"A Video View of Surgery: Total Hip Arthroplasty"*, Breaking News in
Orthopaedics, National Association of Orthopedic Nurses (NAON),
Rolling Meadows Holiday Inn, Rolling Meadows, Illinois, March 9, 2001.

*"Issues in Arthritis"*, Medicine for Today, Illinois Academy of Family
Physicians, St. Alexius Medical Center, Hoffman Estates, Illinois,
February 14, 2001.

*"Video View of Surgery"*, Keeping in Step: Current Issues in Total Joint
Replacement, National Association of Orthopedic Nurses (NAON),
McDonald's Hamburger University, Oak Brook, Illinois, October 6, 2000.

*"The Grit-Blasted Precoated Stem at 4 to 9 Years Follow-up."*
**Vincent P. Cannestra, M.D.**; Laura R. Quigley, M.S.; Richard A. Berger,
M.D.; Joshua J. Jacobs, M.D.; Aaron G. Rosenberg, M.D.; and Jorge O.
Galante, M.D. Presented at the Mid-America Orthopaedic Association
18th Annual Meeting, April 27, 2000, Scottsdale, Arizona.

 *"Revision Total Hip Arthroplasty Using Proximal Femoral Allograft Prosthetic
Composites."*
**Vincent P. Cannestra, M.D.**; Laura R. Quigley, M.S.; Richard A. Berger,
M.D.; Steven Gitelis, M.D.; Mitchell B. Sheinkop, M.D.; Aaron G.
Rosenberg, M.D.; Jorge O. Galante, M.D. Presented at the American
Academy of Orthopaedic Surgeons 67th Annual Meeting, March 17, 2000,
Orlando, Florida.

*"Surface Damage in Retrieved Polyethylene Tibial Inserts: Conforming Versus
Nonconforming Geometries."*
Aivars Berzins, M.D.; Joshua J. Jacobs, M.D.; Clare M Rimnac, Ph.D.;
**Vincent P. Cannestra, M.D.**; Raghu N. Natarajan, Ph.D.; Richard A.
Berger, M.D.; Thomas P. Andriacchi, Ph.D.; Sabine Schmitt, M.D.; Victor
M. Goldberg, M.D.; and Jorge O. Galante, M.D. Presented at the
American Academy of Orthopaedic Surgeons 67th Annual Meeting,
March 16, 2000, Orlando, Florida.

*"Cortical Remodeling and Bone Apposition to a Textured Canine Hip Implant
With and Without Hydroxyapatite."*

## SCIENTIFIC PRESENTATIONS (continued):

Howard J. Agins, M.D.; Thomas W. Bauer, M.D., Ph.D.; **Vincent P.
Cannestra, M.D.**; Ming Jiang, M.D.; and James C. Kudrna, M.D.

Presented at the American Academy of Orthopaedic Surgeons, 64th
Annual       Meeting, San Francisco, California, February 13-17, 1997;

Presented at the Illinois Orthopaedic Society Clinical Scientific Meeting, Rosemont, Illinois, October 24, 1997;
Presented at the Mid-America Orthopaedic Association, 16th Annual Meeting, Acapulco, Mexico, April 22-26, 1998.

**"Initial Experience with a new Technique for the Correction of Kyphosis in Children with Myelomeningocele."**
Geoffrey Van Flandern, M.D.; Michael Swank, M.D., John F. Sarwark, M.D., Luciano Dias, M.D.; and **Vincent P. Cannestra, B.A.**
Presented at the Annual Meeting of the Pediatric Orthopaedic Society of North America, May 1993.

## <u>ORTHOPAEDIC</u> <u>SURGERY</u> <u>CONSULTING</u>:

INSPE Associates, Ltd., Chicago, Illinois, expert medical case reviewer, 2006-present.

VC Viper, LLC, Elgin, Illinois, medical expert case reviewer and independent medical examiner, 2014 to present.

"Elective Medical Device Procedures in COVID Hotspots", Webcast hosted by Cantor Fitzgerald & Company, St. Charles, Illinois, May 27, 2020.

Advisory Board, Panoramic Healthcare Communications, American Academy of Orthopedic Surgeons, Las Vegas, Nevada, March 24, 2015.

Orthopaedic Market Assessment and Advisory Board Meeting, Iroko Pharmaceuticals, LLC, Chicago, Illinois, March 10, 2015.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", internet PharmCAST, sponsored by Eisai Inc., St. Charles, Illinois, March 10, 2011.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", sponsored by Eisai Inc., Dallas, Texas, September 8, 2010.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", sponsored by Eisai Inc., Methodist Charlton Medical Center, Dallas, Texas, September 8, 2010.

## <u>ORTHOPAEDIC</u> <u>SURGERY</u> <u>CONSULTING</u> **(continued):**

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", sponsored by Eisai Inc., Montgomery, Alabama, July 8, 2010.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", sponsored by Eisai Inc., St. Louis, Missouri, June 9, 2010.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", internet PharmCAST, sponsored by Eisai Inc., St. Charles, Illinois, May 26, 2010.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", internet PharmCAST, sponsored by Eisai Inc., St. Charles, Illinois, April 14, 2010.

Naproxcinod Advisory Board Meeting, sponsored by NicOx, Inc., Chicago, Illinois, April 8-9, 2010.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", sponsored by Eisai Inc., Syracuse, New York, March 10, 2010.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", internet PharmCAST, sponsored by Eisai Inc., St. Charles, Illinois, March 9, 2010.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", internet PharmCAST, sponsored by Eisai Inc., St. Charles, Illinois, February 4, 2010.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", internet PharmCAST, sponsored by Eisai Inc., St. Charles, Illinois, December 10, 2009.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", sponsored by Eisai Inc., Birmingham, Michigan, December 8, 2009.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", sponsored by Eisai Inc., Greenwich, Connecticut, December 3, 2009.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", sponsored by Eisai Inc., Hartford, Connecticut, December 2, 2009.

**ORTHOPAEDIC SURGERY CONSULTING (continued):**

NicOX Advisory Board Meeting, Naproxcinod, sponsored by NicOx, Inc., Hyatt Regency DFW, DFW Airport, Texas, November 8, 2009.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", internet PharmCAST, sponsored by Eisai Inc., St. Charles, Illinois, November 5, 2009.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", internet PharmCAST, sponsored by Eisai Inc., St. Charles, Illinois, October 15, 2009.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", internet PharmCAST, sponsored by Eisai Inc., St. Charles, Illinois, August 19, 2009.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", internet PharmCAST, sponsored by Eisai Inc., St. Charles, Illinois, June 30, 2009.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", sponsored by Eisai Inc., Gainesville, Georgia, June 18, 2009.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", sponsored by Eisai Inc., Greenwich, Connecticut, June 4, 2009.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", internet PharmCAST, sponsored by Eisai Inc., St. Charles, Illinois, June 2, 2009.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", internet PharmCAST, sponsored by Eisai Inc., St. Charles, Illinois, May 28, 2009.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", internet PharmCAST, sponsored by Eisai Inc., St. Charles, Illinois, May 19, 2009.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", sponsored by Eisai Inc., Chicago, Illinois, April 22, 2009.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", sponsored by Eisai Inc., Birmingham, Michigan, March 5, 2009.

## **ORTHOPAEDIC** **SURGERY** **CONSULTING** **(continued):**

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", sponsored by Eisai Inc., Pine Bluff, Arkansas, February 3, 2009.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", sponsored by Eisai Inc., St. Louis, Missouri, January 28, 2009.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery" and "Prophylaxis of Deep Vein Thrombosis in Medical Patients With Severely Restricted Mobility During Acute Illness", sponsored by Eisai Inc., Butler, Pennsylvania, December 10, 2008.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", internet PharmCAST, sponsored by Eisai Inc., St. Charles, Illinois, December 4, 2008.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", internet PharmCAST, sponsored by Eisai Inc., St. Charles, Illinois, November 5, 2008.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", internet PharmCAST, sponsored by Eisai Inc., St. Charles, Illinois, October 14, 2008.

"Prophylaxis of Deep Vein Thrombosis in Medical Patients With Severely Restricted Mobility During Acute Illness", sponsored by Eisai Inc., Lombard, Illinois, May 22, 2008.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", sponsored by Eisai Inc., Cleveland, Ohio, April 24, 2008.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", sponsored by Eisai Inc., Pittsburgh, Pennsylvania, November 7, 2007.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", University of Illinois at Chicago Medical School, sponsored by Eisai Inc., Chicago, Illinois, September 5, 2007.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", sponsored by Eisai Inc., Louisville, Kentucky, August 30, 2007.


**ORTHOPAEDIC SURGERY CONSULTING (continued):**

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", internet PharmCAST, sponsored by Eisai Inc., St. Charles, Illinois, July 18, 2007.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement Surgery", sponsored by Eisai Inc., Chicago, Illinois, July 17, 2007.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement
Surgery", internet PharmCAST, sponsored by Eisai Inc., St. Charles,
Illinois, June 21, 2007.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement
Surgery", sponsored by Eisai Inc., Chattanooga, Tennessee, May 30, 2007.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement
Surgery", internet PharmCAST, sponsored by Eisai Inc., St. Charles,
Illinois, May 8, 2007.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement
Surgery", internet PharmCAST, sponsored by Eisai Inc., St. Charles,
Illinois, April 25, 2007.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement
Surgery", internet PharmCAST, sponsored by Eisai Inc., St. Charles,
Illinois, March 22, 2007.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement
Surgery", internet PharmCAST, sponsored by Eisai Inc., St. Charles,
Illinois, March 14, 2007.

FRAGMIN National Advisory Board Meeting, sponsored by Eisai Inc. and Pfizer
Inc., Naples, Florida, March 1-3, 2007.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement
Surgery", sponsored by Eisai Inc., Washington, D.C., February 22,
2007.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement
Surgery", sponsored by Eisai Inc., Pittsburgh, Pennsylvania, February 7,
2007.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement
Surgery", internet PharmCAST, sponsored by Eisai Inc., Vail, Colorado,
January 25, 2007.

## ORTHOPAEDIC SURGERY CONSULTING (continued):

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement
Surgery", internet PharmCAST, sponsored by Eisai Inc., Vail, Colorado,
January 23, 2007.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement
Surgery", sponsored by Eisai Inc., Ingham Regional Medical Center,
Lansing, Michigan, January 19, 2007.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement
     Surgery", sponsored by Eisai Inc., Lansing, Michigan, January 18, 2007.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement
     Surgery", sponsored by Eisai Inc., Fort Wayne, Indiana, January 11, 2007.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement
     Surgery", sponsored by Eisai Inc., Carmel, Indiana, December 14, 2006.

"Prophylaxis of Deep Vein Thrombosis in Patients Undergoing Hip Replacement
     Surgery", sponsored by Eisai Inc., Chicago, Illinois, November 8, 2006.

"A New Cox II Alternative: Bextra. Package Insert Review", sponsored by Pfizer
     Pharmaceuticals, West Dundee, Illinois, September 8, 2003.

"Latest Strategies in the Treatment of Arthritis", sponsored by Pharmacia
     Corporation, West Dundee, Illinois, April 14, 2003.

"Latest Strategies in the Treatment of Arthritis", sponsored by Pharmacia
     Corporation, Schaumburg, Illinois, March 12, 2003.

"Latest Strategies in the Treatment of Arthritis", sponsored by Pharmacia
     Corporation, West Chicago, Illinois, June 5, 2002.

"The North American Fragmin Trial Review for Loyola University Medical
School
     Orthopaedic Residents", sponsored by Pharmacia Corporation, Chicago,
     Illinois, May 21, 2002.

 "Orthopedic Educational Speakers Workshop", sponsored by Pharmacia
     Corporation, Las Vegas, Nevada, May 17-19, 2002.

"The North American Fragmin Trial Review", sponsored by Pharmacia
     Corporation, Columbus, Ohio, May 16, 2002.


**<u>ORTHOPAEDIC</u> <u>SURGERY</u> <u>CONSULTING</u> (continued):**

"The North American Fragmin Trial Review for The Cleveland Clinic",
     sponsored by Pharmacia Corporation, Cleveland, Ohio, April 13, 2002.

"A New Cox II Alternative: Bextra. Package Insert Review", sponsored by Pfizer
     and Pharmacia Corporations, Hoffman Estates, Illinois, March 27, 2002.

"A New Cox II Alternative: Bextra. Package Insert Review", sponsored by Pfizer

and Pharmacia Corporations, Geneva, Illinois, February 21, 2002.

"Orthopedics in a Primary Care Setting", Good Shepherd Hospital, sponsored by Merck Pharmaceuticals, Barrington, Illinois, April 7, 2001.

"Allograft Prosthetic Composites in Revision Total Hip Arthroplasty", Midwest Orthopedic Surgery Consultant Symposium, sponsored by Pfizer Pharmaceuticals, Chicago, Illinois, October 28th, 2000.

"Issues in Arthritis", sponsored by Pfizer Pharmaceuticals, St. Charles, Illinois June 21, 2000.

"Issues in Arthritis", sponsored by Pfizer Pharmaceuticals, West Dundee, Illinois April 20, 2000.


## ORTHOPAEDIC INSTRUMENT INVENTIONS

Cannestra Hip Revision Acetabular Liner Osteotomes, manufactured and marketed by InnoMed Inc., 2015.

Cannestra Extended Femoral Osteotomy Guide, manufactured and marketed by InnoMed Inc., 2011.

Cannestra Hip Positioner, developed with InnoMed Inc., June 2010.

Cannestra Tibia Alignment Assembly, manufactured and marketed by InnoMed Inc., 2008.

Cannestra Subtrochanteric Clamp, manufactured and marketed by InnoMed Inc., 2008.

Cannestra Hip Length Gauge, manufactured and marketed by InnoMed Inc., 2005.


## COMMUNITY PRESENTATIONS:

Iliotibial Band Syndrome: Evaluation and Treatment, OrthoCentrix Solutions, for case managers and claim representatives/examiners, Oakbrook, Illinois, May 16, 2018.

Transforming Orthopedic Treatment to Orthopedic Care, Presence Saint Joseph Hospital, December 5, 2017.

Arthritis and Total Joint Replacement: Myths and Miracles, Presence Saint Joseph Hospital, November 14, 2013.

Arthritis and Joint Replacement Surgery for Claremont Hanover Park, sponsored by NuCARE Services Corp., Hanover Park, Illinois, June 21, 2012.

Arthritis and Joint Replacement Surgery for area internists and chiropractors, Maggiano's Restaurant, Algonquin, Illinois, March 13, 2012.

Knee Arthritis: Non-surgical Treatment and Replacement Surgery, Provena Saint Joseph Hospital, September 20, 2011.

Total Joint Replacement for Worker's Compensation Case Management and Disability Insurance Case Management, sponsored by Accelerated Rehabilitation Centers, Sedgwick CMS, Chicago, Illinois, March 11, 2010.

Arthritis: How to manage the Pain and Improve your Life, sponsored by Delnor Community Hospital, Geneva, Illinois, September 10, 2008.

Arthritis: How to manage the Pain and Improve your Life, sponsored by Delnor Community Hospital, Delnor Wellness and Fitness Center, Geneva, Illinois, May 29, 2007.

Arthritis and Total Hip Replacement, sponsored by Delnor Community Hospital, Delnor Wellness and Fitness Center, Geneva, Illinois, April 28, 2007.

Arthritis: How to Manage the Pain and Improve your Life, sponsored by Sherman Health Systems, Elgin Recreational Center, Elgin, Illinois, April 23, 2007.

Mini 2-Incision Total Hip Replacement Surgery Seminar, for hospital and home physical therapists, occupational therapists, discharge planners, orthopaedic surgery unit nurses, John Graham Pavilion 2, Sherman Hospital, Elgin, Illinois March 23, 2004.

**COMMUNITY PRESENTATIONS (continued):**

Treatment of Knee and Hip Arthritis, Calvary Lutheran Church Service Guild, Elgin, Illinois, March 18, 2004.

Mini 2-Incision Total Hip Arthroplasty Conference, for physical and occupational therapists, Sherman Hospital Immediate Care Center, Algonquin, Illinois, February 24, 2004.

Minimally-Invasive Hip Arthroplasty Seminar, for hospital staff: nurses, physical therapists, radiology and operating room technicians, physicians, and discharge planners, Provena Saint Joseph Hospital, Elgin, Illinois, January 19, 2004.

Mini 2-Incision Total Hip Arthroplasty Conference, for hospital staff: nurses, physical therapists, radiology and operating room technicians, physicians, and discharge planners, Delnor Community Hospital, Geneva, Illinois, December 11, 2003.

Mini 2-Incision Total Hip Arthroplasty Conference, for nurses, physical therapists, radiology and operating room technicians, physicians, and discharge planners, Sherman Hospital, Elgin, Illinois, December 1, 2003.

Tri-City Youth Football Coaches First Aid Clinic, sponsored by Sherman Hospital Resource Center, Education and Community Wellness Program, Bartlett Park District Community Center, Bartlett, Illinois, April 30, 2003.

Tri-City Youth Football Coaches First Aid Clinic, sponsored by Sherman Hospital Resource Center, Education and Community Wellness Program, St. Charles, Illinois, September 12, 2002.

Tri-City Youth Football Coaches First Aid Clinic, sponsored by Sherman Hospital Resource Center, Education and Community Wellness Program, St. Charles, Illinois, June 19, 2002.

St. Charles Boys Baseball Coaches First Aid Clinic, sponsored by Sherman Hospital Resource Center, Education and Community Wellness Program, St. Charles, Illinois, May 5, 2002.

"Managing Acute Pain in Adults", Sherman Hospital, sponsored by Merck Pharmaceuticals, Elgin, Illinois, September 11, 2001.

"Housecalls with Dr. Chris Mueller", WRMN 1410 AM radio, 14 N. Douglas Avenue, Elgin, Illinois, Hip Fractures: Prevention, Treatment, and Rehab, January 31, 2001.

## COMMUNITY PRESENTATIONS (continued):

Breeze into a Healthy Summer Senior Wellness Fair: Total Hip and Total Knee Replacements, Sherman Hospital, Elgin, Illinois, June 1999.

## COMMUNITY CHARITY AND VOLUNTEER WORK:

Free Children's Orthopedic Clinic, sponsored by the Illinois Elks Crippled Children's Program, Sherman Hospital, Elgin, Illinois, Feb 12, 2001 to

present.

Team Physician, East Dundee High School Football, East Dundee, Illinois, 2003.

Team Physician, East Dundee High School Football, East Dundee, Illinois, 2002.

Team Physician, Jacobs High School Football, Algonquin, Illinois, 2000.

Physician for Athlete Physical Exams, Barrington High School, Barrington, Illinois, 2000.

## **PERSONAL BIOGRAPHY:**

Hometown: St. Charles, Illinois     Place of Birth: LaGrange, Illinois

Date of Birth: June 17th, 1967     Marital Status: Married

Updated 5-28-20

## Vincent Cannestra, MD/V.C. Viper, LLC
## Medical expert work outside of INSPE

August 13, 2014
Thomas J. Olson
Daniel G. Suber & Associates
77 West Washington Street, Suite 623
Chicago, Illinois 60602
Re:  Hector Exclusa vs. Scott Rosenzweig, et al.
   Case No. 2012 L 1094 Cook County

March 29, 2015
Richard E. Foss and James G. Stiefbold, Attorneys at Law
American Family Mutual Insurance Company
400 North Lakeview Parkway, Suite 180
Vernon Hills, Illinois  60061
Re:  DeBusman v. Quinn
    Case Number: 13L4
    Claim Number: 00-521-290091
    Date of Loss: January 24th, 2011

October 22, 2015
Joseph Vito
American Family Mutual Insurance Company
400 North Lakeview Parkway, Suite 180
Vernon Hills, Illinois  60061
Re:  Diana Mosley v. American Family Mutual Insurance Company
    Claim Number: 00-645-009209
    Date of Loss: October 31, 2012

January 7, 2016
Kelly Hassenfelt
American Family Mutual Insurance Company
400 North Lakeview Parkway, Suite 180
Vernon Hills, Illinois 60061
(847) 247-9548 Office
(877) 822-9803 Fax
Re: Michael Iven vs Douglas Erbe
    Case No: 2011 L 294
    Claim No: 00-271-530261
    Date of Loss: September 15, 2009

January 9, 2016
Ryan T. Armour
Cassiday Schade LLP

120 West State Street, Suite 401
Rockford, Illinois 61101
(815) 962-8301 Office
(815) 962-8401 Fax
Re: Nadeane Reed and Frank Reed v. John Gluscic, MD and Freeport Health Network
    Court No.: 14 L27
    File No.: 38695/10498/WWR/RTA
    Date of Loss: December 5, 2012

April 11, 2016
James Keane
American Family Mutual Insurance Company
1901 South Meyers Road, Suite 155
Oakbrook Terrace, Illinois 60181
(630) 282-0820 Office
(877) 822-9806 Fax
Re: Emma D'Amico vs Michael Favia
    Case No.: 14 L 566
    Claim No.: 00-645-016395
    Date of Loss: January 21, 2013

May 7, 2016
Thomas B. Borton
Livingston, Barger, Brandt & Schroeder, LLP
2918 Crossing Court, Suite E
Champaign, Illinois 61822-6163
(217) 351-7479 Office
(217) 351-6870 Fax
Re: Carol Owen v. Carle Foundation Hospital, et al.
    Champaign County No. 14-L-143

May 30, 2016
Tara Thompson                                    For the Plaintiff
Loevy & Loevy
The Exoneration Project at the University of Chicago Law School
311 North Aberdeen Street, Suite 2E
Chicago, Illinois 60607
(312) 588-7276 Office
Re: People v. Donald Lucas
    Case No.: 98 CR 20577

October 26 and November 11, 2016
Andrea Olness
Lucas and Associates, Ltd.
State Farm Mutual Automobile Insurance Company
1014 North Seminary Avenue

Woodstock, Illinois 60098
(815) 338-6501 Fax
Re:  Diana Sotelo vs. Paul Silverman, Special Administrator of Estate of Alison Brett
    Lake County No: 15 L 468
    Date of Loss: March 29, 2011

January 16, 2017
John P. Kelly
Mountcastle, Kelly, and Dyer, P.C.
American Family Mutual Insurance Company
1725 South Naperville Road, Suite 200
Wheaton, Illinois 60189
Re: James Raymond vs. Carol Lynn Rogers
    Case No.: 14 LA 85
    Date of Loss: June 14, 2013

March 10, 2017
Gregory A. Morse
Lucas & Associates, LTD.
State Farm Mutual Automobile Insurance Company
1014 North Seminary Avenue
Woodstock, Illinois 60098
(815) 338-6501 Fax
Re: Regina Hall vs. Roxanne Purucker
    Court No. 14 L 252
    Date of Loss: May 22, 2012

April 13, 2017
Mia Lucas
Lucas & Associates, LTD.
State Farm Mutual Automobile Insurance Company
1014 North Seminary Avenue
Woodstock, Illinois 60098
(815) 338-6501 Fax
Re: James Balstrode vs. Matthew Jaroszewski
    Court No. 15 L 253
    Date of Loss: May 9, 2013

April 13, 2017
Zeke Katz
Hepler Broom LLC
30 North LaSalle, Suite 2900
Chicago, Illinois 60602
(312) 205-7739 Office
(312) 230-9201 Fax
Re: Dwayne Wilson v. Lowe's Home Centers, LLC
    Court No.: 1:16-cv-07654

May 3, 2017
Marla Izbicky
Smith Blake Hill LLC
20 North Clark Street, Suite 1700
Chicago, Illinois 60602
(312) 471-8065 Office
(312) 471-8081 Fax
Re: Larry Young, executor of the Estate of Glenn Young, Decedent v. Frankfort Healthcare
               & Rehabilitation Center, LLC, & Kindred Rehab Services, Inc., d/b/a Rehabcare
  Case No.: 2015 L 74
  Date of Loss: September 26, 2014

August 16, 2017                                For the Plaintiff
William O'Hara
Kirkland & Ellis, LLP
300 North LaSalle
Chicago, Illinois 60654
(312) 862-3517 Office
Re: Alnoraindus Burton vs. Dr. Partha Ghosh and Wexford Health Sources, Inc.
  Case No.: 12-cv-8443
  Date of Loss: February 14, 2009

September 5, 2017
Daniel Trachtman
Wooden McLaughlin
211 North Pennsylvania Street
One Indiana Square, Suite 1800
Indianapolis, Indiana 46204
(317) 639-6151 Office
(317) 639-6444 Fax
Re: Kathy Spyrka vs. Aldi
  Date of Loss: March 13, 2013

October 5, 2017
David J. Olmstead
Meachum, Boyle & Trafman
225 West Washington Street, Suite 500
Chicago, Illinois 60606
(312) 726-6317 Office
(603) 334-9766 Fax
Re: Lula Gardner vs. JJ 43 Inc., a/k/a Chatham Coin Laundry
  File No.: 23203945001
  Court No.: 16 L 005158
  Date of Loss: June 21, 2014

October 27, 2017
Chris A. Tomczyk
Roddy Law, Ltd., No. 445
303 West Madison Street, 19th floor
Chicago, Illinois 60606
(312) 645-0606 Office
(312) 645-0033 Fax
Re: Mary Martin vs. Menards, Inc.
   Court No.: 13 WC 32896
   Date of Injury: September 2, 2013

May 30, 2018
Jamie V. Harrmann
Attorney I – Metra Law Department, 15th Floor
547 West Jackson Boulevard
Chicago, Illinois 60661
(312) 322-8002
(312) 322-6698 fax
jharrmann@metrarr.com
Re: Lynell Williams vs. Northeast Illinois Regional Commuter Railway Company d/b/a Metra
   Court No.: 16 L 005009
   Date of loss: December 17, 2013

June 1, 2018 and January 16, 2019                 For the Plaintiff
Gary Newland and Erin Walgrave
Newland and Newland, LLP
121 South Wilke Road, Suite 301
Arlington Heights, Illinois 60005
(847) 797-8000
(847) 797-9090 fax
gary@newlandlaw.com
erin@newlandlaw.com
Re: Martin Price vs. Rosa Martinez and Roberto Martinez
   Court No.: 15 L 063028
   Date of loss: September 13, 2013

April 8, 2019
Heather E. Shea
O'Hagan Meyer
1 East Wacker Drive, Suite 3400
Chicago, Illinois 60601
(312) 619-5015, (312) 726-6317
(603) 334-9766 fax
Re: Tahera Khan vs. Walmart
   Court No.: 2018 L 265
   File No.: 25929

Date of Loss: March 13, 2015


May 17, 2019
Cathleen M. Hobson
Meachum, Boyle, Trafman, Marek, and Parker
225 West Washington Street, Suite 500
Chicago, Illinois 60606
(312) 726-6317
(603) 334-9766
Re: William Startz et al. v. Tolliver, Degeatano Enterprises, Inc, D&S Oil Services Inc., et al.
   Court No: Cook County 16 L 12473
   Claim No.: 23303765002
   ExamWorks Case No.: 20756189
   Date of Injury: May 16, 2015

June 14, 2019
Kisa Sthankiya
Rusin & Maciorowski
10 South Riverside Plaza, Suite 1925
Chicago, Illinois 60606-3705
Re:  Keith Rollene vs. Lake Villa Fire Protection District
   Case No: 16 WC 30456
   Claim No.: 16C08G529553
   Genex No.: DEMYLS
   Date of Injury: January 17, 2016
   Event ID: 257976A
   File No.: 2619.9627

July 25, 2019 and January 3, 2020
Randall Monroe and Teresa R. Maher
Brenner, Monroe, Scott & Anderson, Ltd.
33 North Dearborn, Suite 300
Chicago, Illinois 60602-3102
(312) 781-1970, (312) 924-7506
(312) 781-9202 fax
Re: Maryann Elam vs. Premier Pain Specialists, LLC
   Court No.: 16 L 12505
   Claim No.: 66658/61555
   Date of Occurrence: January 20, 2015

August 9, 2019                                      For the Plaintiff
Joel and Kenneth Flaxman
Law Offices of Kenneth N. Flaxman, P.C.
200 South Michigan Avenue, Suite 201
Chicago, Illinois 60604

(312) 427-3200
(312) 427-3930 fax
Re: Johnny Jones vs. Wexford Health Sources, Inc. and Dr. Marshall James
    Court No.: 17 CV 8218
    Date of Injury: November 14, 2015

October 14, 2019
Amy Kelly
Law Offices of Meachum, Starck, Boyle, and Trafman
225 West Washington Street, Suite 500
Chicago, Illinois 60606
(312) 619-5015, (312) 726-6317
(603) 334-9766 fax
Re: Joanna Stoch vs Sid Harvey Industries, Inc., Jeremy Lee Reynolds, and Reginald Hester
    Case No: 15 L 10602
    Claim No.: AB346-049520-04
    Date of Occurrence: September 1, 2015

October 18, 2019
John P. Kelly
Mountcastle, Kelly, and Dyer, P.C.
1761 South Naperville Road, Suite 202
Wheaton, Illinois 60189
(630) 690-9900
(630) 690-6640
Re: Renee Bridgeman (Garza) vs. Michael Kosiba
    Case No.: 18 L 144
    Date of Loss: April 6, 2017

Vincent Cannestra, M.D., has testified at trial or arbitration on the following cases reviewed through V.C. Viper, LLC:

October 4, 2016                                   For the Plaintiff
Theresa Kleinhaus
Loevy & Loevy, Attorneys at Law
312 North May Street, Suite 100
Chicago, Illinois 60607
(312) 243-5900 Office
(312) 243-5902 Fax
Re: Matthew Pekrun vs. City of Milwaukee, Puente, et al.
    Case Number: 13-CV-1397
    U.S. District Court, Eastern District of Wisconsin

January 22, 2018
John P. Kelly
Mountcastle, Kelly, and Dyer, P.C.
American Family Mutual Insurance Company
1725 South Naperville Road, Suite 200
Wheaton, Illinois 60189
Re: Mehdi Tazangi vs. American Family Mutual Insurance
    Case No.: 10L11995
    File No.: 3714
    Date of Loss: October 5, 2010

November 14, 2019
Tara Thompson                          For the Plaintiff
Loevy & Loevy
The Exoneration Project at the University of Chicago Law School
311 North Aberdeen Street, Suite 2E
Chicago, Illinois 60607
(312) 588-7276 Office
Re: People v. Donald Lucas
    Case No.: 98 CR 20577

**I N S P E   A S S O C I A T E S, LTD**

123 W. Madison St, Suite 800
Chicago, Illinois 60602

(312) 782-3121        fax: (312) 899-1283
toll free: 1-800-360-9993
admin@inspeltd.com

November 4, 2019

To Whom it may concern:

We advise that Vincent Cannestra, M.D., gave deposition testimony on the following cases reviewed through INSPE ASSOCIATES LTD. between 01/01/14 through present.

| LAW FIRM | ATTORNEY | CASE NAME | MO/YR |
|---|---|---|---|
| Bruce Farrel Dorn & Assoc | Cali-Grabow, Joni | Armstrong, Beth v. State Farm | 12/2015 |
| Bruce Farrel Dorn & Assoc | Grabow, Joni | Gregg, Emma v. State Farm | 09/2015 |
| Bruce Farrel Dorn & Assoc | Shearn, Scott | Kalcsics, Catherine v.Putignano | 05/2014 |
| City of Chicago - Torts | Tobin, Mary | Bennett, Olivia v. City | 12/2015 |
| City of Chicago Dept. of | Wangler, Daniel | Kelly, Darnell | 05/2018 |
| Fabrizio, Hanson, Peyla, | O'Connor, Jeremiah | Elizondo, Philip v. Templin | 07/2017 |
| LaRose & Bosco | Kusper, Brian | Wolska, Anna v. Nahra | 03/2016 |
| Law Office of John Currie | Coppler, Alison | Ceyer, Mariola v. Sandoval | 02/2017 |
| Morse, Bolduc & Dinos | Bolduc, Gregory | Colello, Joseph v. Country Mutual | 09/2019 |
| Morse, Bolduc & Dinos | Kowals, Matthew | Gretz, Patricia v. County Mutual | 03/2018 |
| Morse, Bolduc & Dinos | Young, Brian | Haddad, Haitham (2) v. Ponce | 10/2017 |
| Morse, Bolduc & Dinos | Kowals, Matthew | Palffy, Edward v. Allstate | 10/2015 |
| Morse, Bolduc & Dinos | Kowals, Matthew | Suppo, Martin v. Allstate | 04/2014 |
| State Auto Insurance Hous | O'Brien, Mary Beth | Pough, Delores v. Monteverde | 11/2017 |
| Taylor Miller LLC | Tinkham, Brent | Haywood, Willie et al. v. State Farm | 06/2016 |

We advise that Vincent Cannestra, M.D., has testified at trial on the following cases reviewed through INSPE ASSOCIATES LTD. between 01/01/14 through present.

| LAW FIRM | ATTORNEY | CASE NAME | MO/YR |
|---|---|---|---|
| Taylor Miller LLC | Tinkham, Brent | Haywood, Willie et al. v. State Farm | 08/2016 |

*(You have requested a list of cases that Dr. Cannestra has provided expert services. We can only provide a list of those cases in which we know that Dr. Cannestra was named as a testifying expert. These would be the cases in which they testified in a deposition, arbitration, or trial. In the other cases, we have no way of knowing if they were declared, and if not, they would be a consulting expert. As I am sure you know, discovery concerning the identity, opinions and work product of consultants is proscribed, except under special circumstances by Supreme Court Rule 201 (b)(3).)*

Kenneth Flaxman
Law Offices of Kenneth N. Flaxman P.C.
200 South Michigan Avenue, Suite 201
Chicago, Illinois 60604
(312) 427-3200
(312) 427-3930 (fax)
jaf@kenlaw.com

September 28, 2020

Re: Richard White v. Nurse Blake Woods, Alfonso David, MD, Shawnee Correctional
Center et al.
Case No.: 3:18-cv- 00165-MJR-SCW

| August 30 | Review of additional medical records | 2 hours 50 minutes |
|---|---|---|
| August 31 | Telephone call with Kenneth Flaxman | 10 minutes |
| September 3 | Telephone call with Kenneth Flaxman | 5 minutes |
| September 4 | Review of additional medical records | 2 hours 20 minutes |
| September 6 | Review of additional medical records | 4 hours 35 minutes |
| September 9 | Telephone call with Kenneth Flaxman | 10 minutes |
| | Preparation of medical report | 2 hours 10 minutes |
| September 10 | Preparation of medical report | 2 hours |
| September 16 | Preparation of medical report | 2 hours |
| September 18 | Telephone call with Kenneth Flaxman | 5 minutes |
| September 19 | Preparation of medical report | 2 hours 10 minutes |
| September 23 | Review of Woods deposition | 1 hour |
| September 25 | Preparation of medical report | 2 hours 45 minutes |
| September 26 | Preparation of medical report | 2 hours 15 minutes |
| September 27 | Correction and transcription of medical report | 2 hours 15 minutes |

Rush Job    $450/hr.    Total:    26 hours 50 minutes

**TOTAL:    $12,075**

<span style="color:red">PAYMENT DUE WITHIN 30 DAYS</span>