044073/19344/TPD/CGT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS, EAST ST. LOUIS DIVISION

RICHARD WHITE, #R14550,

               Plaintiff,

v.

NURSE BLAKE, ALFONSO DAVID,
NURSES JOHN/JANE DOE #1-6, and
WARDEN OF SHAWNEE CORRECTIONAL
CENTER,

               Defendants.

Case Number  3:18-cv-00165-MJR-SCW

Magistrate Judge Mark A. Beatty

## MEMORANDUM IN SUPPORT OF RENEWED MOTION
## FOR SUMMARY JUDGMENT

COME NOW Defendants, BLAKE WOODS, and ALFONSO DAVID, M.D., by and through their attorneys, CASSIDAY SCHADE LLP, and pursuant to Federal Rule of Civil Procedure 56 and SDIL-LR 7.1(D), hereby submit their Memorandum in Support of their Renewed Motion for Summary Judgment, stating as follows:

## I.      INTRODUCTION:

Plaintiff, Richard White, R-14550, an IDOC inmate who is, upon information and belief, currently on parole from Shawnee Correctional Center (Shawnee), filed a Complaint pursuant to 42 U.S.C. § 1983 on February 2, 2018, alleging that Nurse Practitioner Blake Woods, Alfonso David, M.D., and Wexford Health Sources, Inc. (Wexford), were deliberately indifferent to his serious medical condition with regard to their medical treatment for an injury to Plaintiff's left knee that he sustained while playing basketball on June 26, 2015. (Doc. 1, Doc. 6).  Wexford was dismissed from this lawsuit on March 5, 2018. (Doc. 6).  Plaintiff maintains claims against Mr. Woods and Dr. David.

Mr. Woods is no longer employed by Wexford, and no longer working at Shawnee Correctional Center. Dr. David, a Wexford employee, remains the Medical Director at Shawnee.

The Court has previously issued orders addressing the merits of Plaintiff's claims when addressing his Motion for a Preliminary Injunction.  (Doc. 7).  Paragraph 57 of Plaintiff's Complaint (Doc. 1) sought "[a] preliminary and permanent injunction ordering Shawnee Correctional Center and Defendant Wexford Health Sources, Inc. to create a comprehensive plan to ensure Plaintiff, current and future prisoners of Shawnee Correctional Center receive adequate medical treatment under law."  Defendants Woods and David filed a response to the Motion for Preliminary Injunction on September 25, 2018.  (Doc. 39).  On December 5, 2018, the United States Magistrate Judge then assigned to the case, the Honorable Stephen C. Williams, issued his Report and Recommendation, recommending that the District Judge deny the Motion for Preliminary Injunction. (R&R, Doc. 47).  Plaintiff timely objected to the R&R (Doc. 48), Defendants Woods, David, and then-defendant, IDOC Warden Jeffrey Dennison responded to the objections (Docs. 49 and 52), and Plaintiff replied thereto (Doc. 55).  On February 6, 2019, the United States District Judge then assigned to the case, the Honorable Judge Michael Reagan, issued his Order overruling Plaintiff's objections, adopting the Report and Recommendations in its entirety, and denying Plaintiff's Motion for Preliminary Injunction.  (Order, Doc. 59).  The reasons provided by Judge Reagan and Magistrate Judge Williams included that Plaintiff had not shown a likelihood of success on the merits of his deliberate indifference claim.  (Docs. 47 and 59).

This Court originally set a deadline to file dispositive motions on May 1, 2020.  (Doc. 37).  The Court extended certain deadlines, including this one, by 30 days in Administrative Order No. 261.  Defendants timely filed their original Motion for Summary Judgment.  (Docs. 93 and 94).

Plaintiff filed his Motion to Reopen Discovery and Defer or Deny Defendants' Motion for Summary Judgment on July 13, 2020.  (Doc. 98).

After oral argument on Plaintiff's Motion to Reopen Discovery and Defer or Deny Defendants' Motion for Summary Judgment, the Court granted Plaintiff's Motion in its Order dated August 12, 2020.  (Doc. 106).  The Court denied Defendants' Motion for Summary Judgment without prejudice, and set a new deadline for Defendants to file dispositive motions on December 14, 2020.  *Id.*

## II. UNDISPUTED MATERIAL FACTS

1.     Plaintiff's IDOC medical records document that he injured his left knee on June 26, 2015.  (Exhibit A, Declaration of Dr. David, ¶ 5; Exhibit B, WHITE SCC (MR) 0034; Exhibit C, Declaration of Blake Woods, ¶ 6). A Nurse Sick Call (NSC) note indicates that he reported his pain as a 5 (on a pain scale of 0-10), and that she spoke with NP Woods who ordered the nonsteroidal anti-inflammatory agent Motrin to be taken three times a day, and that Plaintiff utilize crutches until seen by Mr. Woods.  *Id*.

2.     Plaintiff was seen by Mr. Woods on June 30, 2015.  (Ex. A, ¶ 6; Ex. B, 0035; Ex. C, ¶ 7). Mr. Woods documented that Plaintiff's gait was slow, and he was walking with a limp. *Id*. On physical examination, Plaintiff had no left knee swelling, no bruising, and no deformity. Mr. Woods advised Plaintiff to use crutches, gave him a slow walk permit for two weeks, sports restriction for one month, and scheduled Plaintiff for a follow-up appointment in 10 days and noted that he would consider an X-ray if Plaintiff was not better. *Id*.

3.     On July 3, 2015, prior to his follow-up appointment, Plaintiff was seen by a nurse and reported that his knee "popped again."  (Ex. A, ¶ 7; Ex. B, 0036; Ex. C, ¶ 8, 9; Transcript of the Deposition of Blake Woods, September 3, 2020, attached hereto as Exhibit "D," at 24:16 to

25:24). The nurse contacted Mr. Woods who ordered Decadron (a steroid) injection, Naproxen (another nonsteroidal anti-inflammatory medication), an X-ray of Plaintiff's left knee, and an ACE wrap.  (Ex. A, ¶ 7; Ex. B, 0036; Ex. C, ¶ 8, 9; Ex. D, 32:3 to 33:9).

4.      An X-ray of Plaintiff's left knee was done on July 6, 2015.  (Ex. A, ¶ 7; Ex. B, 0037, 0298; Ex. C, ¶ 10).

5.      Plaintiff was evaluated by Mr. Woods on July 10, 2015.  (Ex. A, ¶ 8; Ex. B, 0038; Ex. C, ¶ 12; Ex. D, 43:24 to 44:24).  He documented that Plaintiff reported that his left knee was slightly better, and that he was walking without his crutches. He further documented that the X-ray of Plaintiff's left knee showed early arthritis with a small effusion (a collection of fluid, typically due to arthritis, and no fracture). (Ex. A, ¶ 8; Ex. B, 0038; Ex. C, ¶ 12; Ex. D, 44:2 to 45:24). Mr. Woods advised Plaintiff to gradually increase his activity and discontinue use of the crutches, and ordered Indocin (a nonsteroidal anti-inflammatory medication) for one month. (Ex. A, ¶ 8; Ex. B, 0038; Ex. C, ¶ 12; Ex. D, 46:18 to 48:2).

6.      On August 11, 2015, Mr. Woods documented that the Plaintiff told him that his left knee was "worse."  (Ex. A, ¶ 9; Ex. B, 0041; Ex. C, ¶ 16). Mr. Woods documented that Plaintiff left patella (knee cap) was midline, and a drawer test to determine if there was excessive laxity of his anterior cruciate ligament (ACL) was negative.  *Id*. Plaintiff had a moderate amount of left knee swelling and mild warmth, and Mr. Woods entered a note referring Plaintiff to see Dr. David. *Id*.

7.      Dr. David saw the Plaintiff on August 13, 2015, noted that nurses' notes documented that Plaintiff had been noncompliant with use of crutches (was walking and running). (Ex. A, ¶ 10; Ex. B, 0042-0043). Dr. David noted that Plaintiff did not have any significant swelling of his left knee, but was slightly tender around his patella (knee cap), and

was not able to fully extend his knee. *Id*. He diagnosed Plaintiff with a ligament strain, and again placed him in a non-weight-bearing status with use of crutches for three weeks, ordered a nonsteroidal anti-inflammatory medication and a repeat left knee x-ray, and noted that he would see the Plaintiff again after the x-ray report (Ex. A, ¶ 10; Ex. B, 0299) was available. *Id*.

8.     An x-ray of Plaintiff's left knee was conducted on August 27, 2015.  (Ex. B, 0299).   The radiologist reported finding "minimal early degenerative changes without appreciable change since the prior study," with "no acute bony fracture or loose body," and a "small knee joint effusion."  *Id.*

9.     Dr. David saw the Plaintiff again on September 8, 2015. Plaintiff told Dr. David that he still had left knee pain, and certain movements caused his knee to "pop" or "give out," but told Dr. David that he had been using his crutches and not bearing weight.  (Ex. A, ¶ 11; Ex. B, 0045; Transcript of the Deposition of Dr. Alfonso David, September 23, 2020, attached hereto as Exhibit "E," at 29:14 to 30:5). Dr. David noted that Plaintiff walked with a limp, and was not able to fully extend or flex his knee, although a Lachman's test was negative. *Id*. (A Lachman's test is a physical examination intended to detect an injury to the ACL, Ex. E, 50:18-24). Dr. David's diagnosis was to rule out a ligament tear.  (Ex. E, 30:21-24).  Dr. David advised Plaintiff to continue to use his crutches and not bear weight on his left leg.  (Ex. A, ¶ 11; Ex. B, 0045). Dr. David documented that he would present Plaintiff in Collegial and request a referral for an MRI of Plaintiff's left knee. *Id*.

10.     On September 9, 2015, Dr. David documented that his request for a referral for an MRI had not been approved, but an alternative treatment plan of a physical therapy (PT) evaluation to develop a home exercise program (HEP) that would be done for four to six weeks was provided. (Ex. A, ¶ 12; Ex. B, 0046, 0182, 0183).

11.     Plaintiff had a PT evaluation on September 18, 2015 (Ex. A, ¶ 13; Ex. B, 0184-0187), and participated in monitored PT in the HCU from September 24, 2015, through November 27, 2015. (Ex. B, 0049-0073).

12.     On November 30, 2015, Dr. David examined Plaintiff and found that his left knee was unremarkable, with no limitation of motion of his left leg and good strength, and Plaintiff was able to walk normally and squat without any problems. (Ex. A, ¶ 13; Ex. B, 0074). Dr. David discontinued Plaintiff's monitored PT, and advised him to continue the HEP exercises on his own and to follow-up in three to four months. *Id.*

13.     Plaintiff was seen by Mr. Woods on January 29, 2016. (Ex. A, ¶ 14; Ex. B, 0077; Ex. C, ¶ 17). Mr. Woods documented that Plaintiff complained of knee pain, and reported that he was not doing his HEP exercises all the time. *Id.* Mr. Woods prescribed a nonsteroidal anti-inflammatory medication and advised Plaintiff to do his exercises as previously prescribed. *Id.* That was the last time that Mr. Woods saw Plaintiff.  (Ex. C, ¶ 17).

14.     Plaintiff was seen by Dr. David on March 14, 2016 and reported that he was doing his HEP, and had occasional left knee pain. (Ex. A, ¶ 15; Ex. B, 0079). At that time Plaintiff was walking normally, his left knee was not tender or swollen, he had no limitation in movement, no crepitation, and was able to squat without problems. *Id.* Dr. David advised him to continue the HEP for range of motion. *Id.*

15.     Plaintiff was seen in NSC and by Dr. David for other issues, and refused NSC several times, but was not seen for left knee pain again until July 14, 2017.  (Ex. A, ¶ 16; Ex. B, 0080-0086).

16.     Plaintiff was seen in NSC on July 14, 2017, for complaints of left knee pain; he was not referred to see Dr. David. (Ex. A, ¶ 16; Ex. B, 0087).

17.     He was seen in NSC for left knee pain again on August 19, 2017, and Dr. David was notified by the nurse. (Ex. A, ¶ 16; Ex. B, 0348). Dr. David ordered a nonsteroidal anti-inflammatory medication, a repeat X-ray of Plaintiff's left knee, low bunk, low gallery permits, and that Plaintiff use crutches again for two weeks. *Id*.

18.     Plaintiff's left knee X-rays was done on August 21, 2017. (Ex. A, ¶ 16; Ex. B, 0093, 0300).

19.     A nurse's note entered on August 22, 2017, documents that the nurse saw the Plaintiff walking without using his crutches.  (Ex. A, ¶ 17; Ex. B, 0095).

20.     On August 26, 2016, a nurse documented that Plaintiff had come to the HCU without his crutches, and had a normal gait. (Ex. A, ¶ 17; Ex. B, 0096).

21.     Dr. David saw the Plaintiff on August 30, 2017, at which time Plaintiff told Dr. David that he had stopped using his crutches two days before. (Ex. A, ¶ 18; Ex. B, 0097-0098). Plaintiff was walking normally, his left knee was not swollen or tender, he had no limitation of movement of his left leg, and a Lachman test was negative. *Id*. Dr. David documented the results of Plaintiff's left knee X-ray showing only mild early arthritis and a small joint effusion, and advised Plaintiff that he could stop using his crutches, and should follow-up as needed. *Id*.

22.     Plaintiff was seen in NSC for left knee pain on November 4, 2017. (Ex. A, ¶ 19; Ex. B, 0103). The nurse contacted Dr. David who ordered an anti-inflammatory medication, and a left knee X-ray. *Id*.

23.     Plaintiff saw Dr. David in follow-up on November 16, 2017. (Ex. A, ¶ 20; Ex. B, 0104, 0105). Dr. David noted that Plaintiff's left knee X-ray was unchanged (Ex. A, ¶ 20; Ex. B, 0301), but he was again unable to fully extend his leg. *Id*. Dr. David documented that he would submit a request for an MRI to Collegial. *Id*.

24.     Dr. David's Collegial Review request for an MRI of the knee was approved, and Plaintiff underwent an MRI of his left knee on December 19, 2017. (Ex. A, ¶ 20; Ex. B, 0106, 188-189). The MRI showed a large bucket-handle tear of his medial meniscus, and a partial/near full thickness tear of his ACL. The radiologist recommended obtaining additional knee X-rays for comparison. *Id*.

25.     Dr. David saw Plaintiff on December 27, 2017, and advised him of the MRI results, and requested that Plaintiff's left knee X-rays from November 6, 2017, be sent to the radiologist for comparison. Dr. David also sent a recommendation for a referral to an orthopedic surgery consultation to Collegial. (Ex. A, ¶ 21; Ex. B, 0109).

26.     Dr. David's recommendation to refer Mr. White for an orthopedic surgery consultation was approved on January 17, 2018, and Plaintiff was scheduled for an orthopedic consultation on January 23, 2018. (Ex. A, ¶ 21; Ex. B, 0110, 0112, 0113).

27.     As of January 19, 2018, the date Plaintiff signed his Complaint, Dr. David had recommended a referral to the orthopedic surgeon, a fact omitted from Plaintiff's Complaint. (*See* Ex. B, 0113).

28.     On January 23, 2018, Plaintiff saw Dr. J.T. Davis at The Orthopedic Institute of Southern Illinois. (Ex. A, ¶ 22; Ex. B, 0190-0192). Dr. Davis recommended that Plaintiff undergo a repair of his meniscus, but did not recommend surgical intervention for his ACL. *Id*.

29.     Dr. David saw Plaintiff on February 6, 2018, and advised him of the surgeon's recommendations. (Ex. A, ¶ 23; Ex. B, 0116-0117).

30.     Dr. David submitted a request to Collegial for the recommended surgical procedure that same day. *Id*.  That request was approved on February 26, 2018. (Ex. A, ¶ 23; Ex. B, 120).

31.     On March 5, 2018, Plaintiff was advised of the consultant's recommendation, and agreed to have the recommended surgery. (*See* Ex. B, 0122).

32.     Plaintiff underwent a left knee arthroscopic partial medial meniscectomy, left knee arthroscopic complete synovectomy of patellofemoral, medial, and lateral compartments, and left knee injection of Marcaine and Decadron on March 22, 2018. (Ex. A, ¶ 23; Ex. B, 0120, 0122, 0125, 0126, 0194-0196, 0197, 0199).

33.     Plaintiff was admitted to the Infirmary upon return to Shawnee after surgery, and remained there until March 27, 2018. (Ex. A, ¶ 24; Ex. B, 0128-0133, 0135-0141).

34.     Plaintiff was seen by Dr. David in follow-up for his surgery on April 4, 2018, and May 16, 2018. (Ex. A, ¶ 25; Ex. B, 0200-0204, 0205-0209).

35.     On May 16, 2018, no surgery for Plaintiff's left ACL was recommended by the orthopedic surgeon, and Plaintiff was advised that he could start PT and increase his activity. (Ex. A, ¶ 25; Ex. B, 0205-0209).

36.     Dr. David evaluated Plaintiff on May 21, 2018, and discussed the surgeon's recommendation and treatment Plan with the Plaintiff. (Ex. A, ¶ 26; Ex. B, 0152). Plaintiff' was walking normally, and doing well postoperatively. *Id*. Dr. David wrote an order that the surgeon's office as to be contacted regarding recommendations for the type, and frequency, of exercises that Plaintiff should do. *Id*.

37.     Plaintiff was evaluated by Dr. David on June 21, 2018, after finishing a course of PT as recommended by the orthopedic surgeon. (Ex. A, ¶ 27; Ex. B, 0162). Plaintiff told Dr. David that his left knee still felt weak, and he would like to do the HEP PT for another month. On exam, Dr. David found that Plaintiff's knee was not swollen or tender, he had no limitation of movement, and all his muscle strength was good. He advised Plaintiff to do his HEP exercises

daily in the HCU, monitored by a nurse, for two more months and to follow-up once that was completed. *Id*.

38.     Plaintiff completed his HEP exercises, monitored by nursing staff, from June 22, 2018, through July 23, 2018. (Ex. A, ¶ 28; Ex. B, 0163-0172).

39.     On July 28, 2018, he was seen in NSC for left knee pain; he was not referred to see Dr. David. (Ex. A, ¶ 28; Ex. B, 0177).

40.     Plaintiff continued his monitored PT from August 1, 2018, through August 27, 2018. (Ex. A, ¶ 28; Ex. B, 0178-0181, 0349-0355).

41.     Plaintiff was scheduled to see a Nurse Practitioner on August 31, 2018, but did not come to health care for his appointment. (Ex. A, ¶ 28; Ex. B, 0355).

42.     Plaintiff was rescheduled to be seen at 10:00 AM on September 5, 2018, but went to the commissary and came to the HCU late, at 11:48 AM. (Ex. A, ¶ 28; Ex. B, 0356).

43.     Dr. David saw the Plaintiff on September 17, 2018, and Plaintiff claimed he still had pain in his left knee. He was walking normally, but said that his knee would give out on him after doing slight jogging and running.  (Ex. A, ¶ 29; Ex. B, 0365-0366).

44.     Dr. Alfonso David reviewed the recommendation of the orthopedic surgeon, Dr. J.T. Davis, from May 16, 2018.  *Id*.  Dr. J.T. Davis expressed concern that Plaintiff would not be able to complete post-op rehab if he did an ACL reconstruction surgery, thus significantly negating the benefit of such procedure.  However, he indicated that he would like to follow up with him if Plaintiff had persistent left knee instability to further discuss ACL reconstruction. *Id*.

45.     Dr. Alfonso David then submitted to Collegial Review a request for follow up with Dr. J.T. Davis. *Id*. The request was approved by Dr. Garcia of Collegial Review on

September 19, 2018, and on September 20, 2018, Plaintiff was scheduled for a follow-up appointment with Dr. J.T. Davis on September 28, 2018. (Ex. A, ¶ 29; Ex. B, 0369).

46.    Mr. White was sent to Dr. J.T. Davis for his follow up appointment on September 28, 2018.  (Ex. A, ¶ 30; Ex. B, 0384-0391).  On physical examination, Dr. Davis found that the incision from the surgery on Mr. White's meniscus was healing well, and he had no joint line tenderness in his knee, which indicated that the meniscus was not the source pain.  Dr. J.T. Davis found that Mr. White had normal strength in his extremities.  Dr. J.T. Davis reported a positive finding in a Lachman test, which indicated ACL injury.  His assessment was that Mr. White had persistent left knee instability, with an ACL tear.  Dr. J.T. Davis reported that he had a lengthy discussion with Mr. White on the potential benefits and risks of ACL surgery, versus continued home exercises.  After that discussion, Dr. J.T. Davis reported, Mr. White stated that he would like to proceed with the ACL surgery.

47.    Dr. J.T. Davis's reported that he would notify the medical staff at Shawnee of the requirements for the measures that would need to be taken by and for Mr. White after ACL surgery to facilitate his recovery.  (Ex. A, ¶ 31; Ex. B, 0390).  He stated that if such measures were not available at Shawnee, it would be in Mr. White's interest to defer the ACL surgery until Mr. White was released from prison.  *Id.*

48.    On October 2, 2018, Dr. Alfonso David met with Plaintiff to discuss the findings and recommendations of Dr. J.T. Davis with him.  (Ex. A, ¶ 32; Ex. B, 0378).  The same day, Dr. Alfonso David also requested that nursing staff follow up with Dr. J.T. Davis's office to obtain the information about the requirements for recovery from ACL surgery.  *Id.*

49.    Dr. J.T. Davis's office responded that Mr. White would need physical therapy beyond his HEP after ACL surgery.   (Ex. A, ¶ 33; Ex. B, 0411).   After receiving this

information, Dr. Alfonso David requested Collegial Review to discuss the physical therapy and surgery. Dr. Alfonso David participated in Collegial Review on December 12, 2018, at which time it was decided to ask Dr. J.T. Davis to consult with a Wexford orthopedist, and to inform Dr. J.T. Davis that Shawnee staff could not be sure that Mr. White would have consistent access to physical therapy, due to factors beyond the control of the medical staff (such as security lockdowns or disciplinary confinement). *Id.*

50.     On December 13, 2018, Dr. Alfonso David spoke to an assistant to Dr. J.T. Davis, and asked her to relay the concern to him that Mr. White would not have consistent access to physical therapy offsite from the prison after the ACL surgery. (Ex. A, ¶ 34; Ex. B, 0412-0413). Dr. Alfonso David stated that Shawnee staff could ensure that Plaintiff received one physical therapy session after the surgery, and that Plaintiff could continue with his HEP. *Id.*

51.     On December 13, 2018, Dr. J.T. Davis's staff informed the Shawnee medical staff that the single physical therapy session after the ACL surgery, supplemented by Mr. White doing his HEP, would be sufficient to make the surgery advisable. (Ex. A, ¶ 35; Ex. B, 0480). Mr. White was then scheduled for ACL surgery on January 10, 2019. (Ex. A, ¶ 35; Ex. B, 414).

52.     Dr. J.T. Davis performed the ACL surgery on January 10, 2019. (Ex. A, ¶ 36; Ex. B, 0478-0483). Per Dr. J.T. Davis's surgical report, he conducted a left knee arthroscopic ACL reconstruction, grafting tissue from his hamstring onto the injured ACL. *Id.* The surgical report suggests that the surgery was successful, and without undue complications. *Id.* Upon his return to Shawnee, Mr. White was kept in the infirmary to recover from his surgery, and he was given a knee brace. (Ex. A, ¶ 36; Ex. B, 0434-0509).

53.     Mr. White was scheduled for a follow up appointment with Dr. J.T. Davis on January 23, 2019. Dr. Alfonso David met Mr. White before he was sent off site, and discussed

with him how his left leg was feeling.  (Ex. A, ¶ 37; Ex. B, 0472).  Dr. Davis had ordered that the surgical dressing on his leg not be removed at that time.  *Id.*

54.     Dr. J.T. Davis examined Mr. White on January 23, 2019.  (Ex. A, ¶ 38; Ex. B, 0491-0493).  He reported that Mr. White was healing well from the ACL surgery, and that he could stop using the knee brace within two weeks.  *Id.*

55.     Also on January 23, 2019, Dr. Alfonso David participated in Collegial Review to gain approval for a physical therapy session for Mr. White after his initial recovery from his surgical wound, and approval for a second follow up appointment with Dr. J.T. Davis.  (Ex. A, ¶ 39; Ex. B, 0495).  The request was approved.  *Id.*

56.     Mr. White received the physical therapy session at Union County Hospital with Cody Hubble, DPT, on January 30, 2019.  (Ex. A, ¶ 40; Ex. B, 0515-0520).  Dr. Hubble noted that he took extra time to explain the Home Exercise Program for Mr. White to follow to assist in his recovery.  *Id.*

57.     Mr. White participated in his HEP to aid in his healing from the ACL surgery. (Ex. A, ¶ 41).

### III. SUMMARY JUDGMENT STANDARD

Summary Judgment is proper if the pleadings, discovery documents and affidavits "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.,* 447 U.S. 242, 248 (1986).

The moving party carries the burden of producing "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Carett,* 477 U.S. 317, 323 (1986).   The moving party may meet their burden by "showing …an absence of evidence to support the non-moving party's case." (*Id.* at 325).   After the moving party has successfully met their burden, the non-moving must plead specific facts to show there is a genuine issue. Fed. R. Civ. P. 56; *Anderson*, 477 U.S. at 250.   Disputes that would not affect the outcome of the suit will not satisfy the requirement to show there is a genuine material issue of fact for trial.   *McGinn v. Burlington Northern R.R. Co.,* 102 F. 3d 295, 298 (7th Cir. 1996).   If the Plaintiff does not show that evidence exists that would reasonably allow a fact-finder to find in the Plaintiff's favor regarding a material issue, the court must enter summary judgment against the Plaintiff.   *Waldridge v. Am. Hoechst Corp.,* 24 F. 3d 918, 920 (7th Cir. 1994).

"A prisoner plaintiff's medical testimony cannot create a genuine issue of material fact sufficient to defeat summary judgment where his testimony is clearly controverted by the clear medical evidence." *Cesal v. Molina*, No.: 12-1524-SLD, 2015 U.S. Dist. LEXIS 189821, *15, 2015 WL 13357438 (C.D. Ill. March 19, 2015). *See also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When, however, the parties tell conflicting stories, 'one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'"); *Vicks v. Knight*, 380 Fed. Appx. 847, 852 (11th Cir. 2010) (holding that when resolving factual disputes in summary judgment motions, a district court may ignore the plaintiff's version of the facts when it is clearly contradicted by the other evidence of record, including the defendants' affidavits, incident reports, and medical records); *Benitez v. Pecenco*, 1995 WL 444352, * 5 (S.D.N.Y July 27, 1995) (conclusory claim that plaintiff was   ever issued medication was

directly contradicted by medical records and was insufficient to create a factual dispute on that issue) (*citing Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")).   The non-movant "must do more than simply show that there is some metaphysical doubt as to the material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256-57 (1986) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986)); *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 818 (7th Cir. 1999). "[S]ummary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Koszola v. Board of Education of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004).

## IV. ARGUMENT

### A. Dr. David and Mr. Woods are entitled to summary judgment on Count 1 because they were deliberately indifferent to Plaintiff's knee injury.

#### 1. The deliberate indifference standard.

In order to succeed in his underlying claim, Plaintiff must demonstrate that the defendant acted with "deliberate indifference" that transforms ordinary instances of malpractice into constitutional violations.   *Farmer v. Brennan*, 511 U.S. 825, 837-838, 114 S. Ct. 1970, 128 L.Ed.2d 811 (1994).   Deliberate indifference exists only where an official "knows of and disregards an excessive risk to inmate health or safety; the official must be both aware of the facts from which the inference would be drawn that a substantial risk of serious harm exists, and he must also draw the inference."   *Id*.   A plaintiff must show two things:  that he had a serious medical need and that a defendant was deliberately indifferent to it.   *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

The Seventh Circuit has held that, a difference of opinion as to how a condition should be treated does not give rise to a constitutional violation." *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001), citing *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254 (7th Cir. 1996). Additionally, a prisoner is not entitled to demand specific care or receive the best possible case. *Forbes v. Edar* 112 F.3d 262, 267 (7th Cir. 1997). In *Garvin*, a prisoner asserted a §1983 claim against the medical director of a county jail, alleging that the defendant health care provider acted with deliberate indifference in not allowing the prisoner to carry his asthma inhaler. *Id* at 897. The Defendant ordered that the prisoner be allowed to use the inhaler within four minutes of so requesting. *Id* at 898. The Court recognized that the defendant health care providers' continued treatment and accommodation of the prisoner's condition negated any claim of deliberate indifference. *Id.*

Furthermore, negligence, even gross negligence, does not constitute deliberate indifference. *Garvin*, 236 F.3d at 898; *Thomas v. Walton* 461 F.Supp.2d 786, 783 (*S.D. Ill. 2006). Deliberate indifference "is merely a synonym for intentional or criminally reckless conduct." *Thomas*, 461 F.Supp. 2d at 793 (citing *Salazar v. City of Chicago*, 940 F.2d 233, 238 (7th Cir. 1991). The inadvertent failure to provide adequate medical care does not constitute deliberate indifference. *Thomas*. 461 F.Supp. 2d at 793. The Eight Amendment does not require that inmates receive unqualified access to health care. *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). Instead, inmates are entitled only to "adequate medical care." *Boyce v. Moore*, 314 F.3d 884, 888-89 (7th Cir. 2002). An inmate is entitled only to reasonable measures to meet a substantial risk of substantial harm – not to demand specific care or to receive the best possible care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Neither negligent diagnosis nor treatment is an Eighth Amendment violation: "[m]edical malpractice does not become a

constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 104. A court examines the totality of care an inmate received to determine whether prison officials have been deliberately indifferent to the inmate's serious medical needs. *Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000).

> **2. Dr. David and Mr. Woods were not deliberately indifferent to Plaintiff's knee injury: They provided adequate care in the form of prompt assessment and treatment of Plaintiff's symptoms, ultimately arranging for Plaintiff to undergo two surgeries and physical therapy performed by specialists.**

Plaintiff's medical records show that after his initial knee injury on June 26, 2015 he was treated, including being given non-weight bearing status, crutches, an x-ray, and a prescription for pain medication by Mr. Woods. When he failed to improve, Mr. Woods referred Plaintiff to Dr. David. Dr. David ensured that Plaintiff received a PT consultation, and followed the recommended exercise program which, when Plaintiff complied, was effective. From January – March 2016, in spite of Plaintiff's poor compliance, his left knee examination failed to show any abnormalities. During this period, Dr. David observed that Plaintiff had a negative Lachman's test (for ACL injury), no significant swelling of the knee, and an x-ray of the knee that showed only early arthritis and a small effusion. All of these together suggested no ACL or meniscus injury. Mr. Woods left employment at Shawnee in April 2016.

Plaintiff did not see Dr. David again, nor did Dr. David have any indication that Plaintiff had continuing knee complaints, for a period of 17 months. When notified on August 19, 2017 that Plaintiff was seen in NSC for left knee pain, Dr. David promptly took action and again placed Plaintiff back on crutches (non-weight bearing status), and ordered nonsteroidal anti-inflammatory medications. When the treatments did not improve Plaintiff's symptoms, Dr. David referred Plaintiff for an MRI, a surgical consultation, the two surgeries ultimately recommended by the orthopedic surgeon, and the recommended postoperative PT.

Judge Michael Reagan concisely summarized why the facts on record, as of September 2018, showed that Plaintiff's claim is unmeritorious in his Order denying Plaintiff's Motion for Preliminary Injunction:

> The record here reveals that in the immediate aftermath of the injury, Plaintiff (who reported his pain as a "5" on a scale of 1 to 10) was treated appropriately by HCU staff – given anti-inflammatory medicine and crutches, later given a slow-walk permit and a sports restriction, and at a follow-up appointment given an x-ray and an ace bandage wrap for the knee. When Plaintiff failed to improve, physician's assistant Woods referred Plaintiff to Dr. David, who — over time — got Plaintiff a physical therapy consult, renewed his pain medication prescriptions, ordered a repeat x-ray, examined Plaintiff several times, requested an MRI twice (successfully the second time), referred Plaintiff for an outside orthopedic surgery consult (which occurred in January 2018), requested approval for the procedures recommended by the orthopedic surgeon (a surgery that occurred in March 2018), and followed up with Plaintiff regarding post-operative rehab. Ultimately, Plaintiff was approved for and received another evaluation by the orthopedic surgeon in late September 2018.

> The record does not disclose any foot-dragging or insouciance toward Plaintiff's medical needs by Shawnee medical staff. Dr. David promptly took action when examination or tests warranted. Plaintiff received and continues to receive treatment for his left knee pain/condition, including treatment by an "outside" physician (Dr. J.T. Davis of the Orthopedic Institute of Southern Illinois). After the January 23, 2018 consult with Plaintiff, the orthopedic surgeon recommended repair of the meniscus *but no surgical intervention for the ACL.* Dr. David conveyed this to Plaintiff on February 6, 2018 and made a recommendation for the meniscus surgery the same day. The request was approved February 26, 2018; the surgery occurred on March 22, 2018. Plaintiff had follow-up appointments in April and May 2018, was evaluated by Dr. David again in June 2018, and continued physical therapy through August 27, 2018. When Plaintiff reported left knee pain to Dr. David in mid-September 2018, he was scheduled for another appointment with the outside orthopedic surgeon for September 28, 2018.

(Order, Doc. 59, pp. 8-9).

The record from September 2018 forward reveals that Dr. David continued to take the actions warranted by Plaintiff's medical conditions (Mr. Woods had ceased to work at Shawnee as of April 2016). After Dr. David paved the way for Plaintiff see the orthopedic specialist to be evaluated for potential ACL surgery on September 28, 2018, Dr. David engaged in an exchange with the orthopedic surgeon to determine whether Shawnee could deliver the requirements that the orthopedist gave for recovery from ACL surgery. Notably, the orthopedic surgeon considered the

ACL surgery unadvisable unless Plaintiff could be ensured physical therapy after the surgery—a requirement that could pose difficulty because of factors that can arise in the prison setting that could affect Plaintiff's schedule and ability to access therapy on an extended basis that Dr. David feared could arise outside of the control of medical staff. By December 14, 2018, however, Dr. David had worked with the orthopedic specialist to formulate a plan for Plaintiff to receive sufficient physical therapy to enable Plaintiff's ACL surgery to proceed. Dr. David then arranged for Plaintiff to receive the ACL surgery and the follow up physical therapy, which he received on January 10, 2019, and January 30, 2019, respectively.

Dr. David and Mr. Woods provided and facilitated medical care that addressed Mr. White's left knee injury that was attentive and within the standard of care.

## V. CONCLUSION

Plaintiff bears the burden of proving each element of his deliberate indifference claim. The failure to establish any one element of the claim results in defeat. As recognized by Judge Reagan, "the record does not disclose any foot-dragging or insouciance toward Plaintiff's medical needs by Shawnee medical staff," as of September 2018. The record since then was characterized by Dr. David's conscientious facilitation of Plaintiff receiving surgery and physical therapy per the orthopedic specialist's recommendations. On this record, there is no evidence that could support a finding of fact that Dr. David or Mr. Woods was deliberately indifferent to Plaintiff's medical needs, and summary judgment is warranted.

WHEREFORE, Defendants respectfully request that this Court grant judgment in their favor, dismiss Plaintiff's claim against them with prejudice, and for such further relief as this Court deems just and proper.

Respectfully submitted,

CASSIDAY SCHADE LLP

By: /s/ Ryan C. Wallis
One of the Attorneys for Defendant, BLAKE
WOODS, and ALFONSO DAVID, M.D.

Ryan C. Wallis
ARDC No. 6288689
CASSIDAY SCHADE LLP
100 North Broadway, Suite 1580
St. Louis, MO 63102
(314) 241-1377
(314) 241-1320 (Fax)
rwallis@cassiday.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 14, 2020, I electronically filed the foregoing

Memorandum in Support of Motion for Summary Judgment with the Clerk of the Court using

the CM/ECF system.   The electronic case filing system sent a "Notice of E-Filing" to the

following:

Kyrstin Beasley
Assistant Attorney General
Metro East Office
201 West Pointe Drive, Suite 7
Belleville, IL 62226
KBeasley@atg.state.il.us


Kenneth Flaxman
200 S. Michigan Ave., Suite 201
Chicago, IL 60604
(312) 427-3200
(312) 427-3930 Fax
knf@kenlaw.com



<u>/s/ Ryan C. Wallis</u>