```
 1         IN THE UNITED STATES DISTRICT COURT
 2         FOR THE SOUTHERN DISTRICT OF ILLINOIS
 3   RICHARD WHITE            )
 4         Plaintiff,         )
 5         -vs-               ) No. 18-cv-00165
 6   WEXFORD HEALTH SOURCES,  )
 7   INC., et al.             )
 8         Defendants.        )
 9         The deposition of BLAKE WOODS, DNP called
10   for examination pursuant to Notice and the Rules
11   of Civil Procedure for the United States
12   District Courts pertaining to the taking of
13   depositions, taken before Josephine Lehman, a
14   Certified Shorthand Reporter within and for the
15   County of Cook and State of Illinois, at Cook
16   County, Illinois, on the 3rd day of September,
17   2020, at the hour of 4:58 p.m via vide
18   conference.
19
20
21
22
23   REPORTED BY: Josephine Lehman, CSR
24   LICENSE NO.:  084-002951
                                                    1
```

```
 1   APPEARANCES:
 2         MR. KENNETH N. FLAXMAN LAW OFFICES
 3         BY:  MR. KENNETH N. FLAXMAN
 4         200 South Michigan Avenue, Suite 201
 5         Chicago, Illinois 60604-2430
 6         (312) 427-3200
 7         knf@kenlaw.com
 8               Representing the Plaintiff;
 9
10         CASSIDAY SCHADE LLP
11         BY:  MR. RYAN C. WALLIS
12         222 West Adams, Suite 2900
13         Chicago, Illinois 60606-5312
14         (312) 641-3100
15         rwallis@cassiday.com
16               Representing the Defendants and
17               deponent.
18
19               *************
20
21
22
23
24
                                                    2
```

```
 1                I N D E X
 2   WITNESS                              EXAMINATION
 3   BLAKE WOODS, DNP
 4    By Mr. Flaxman                              5
 5    By Mr. Wallis                              56
 6
 7
 8
 9
10
11             E X H I B I T S
12   NUMBER                             MARKED FOR ID
13
14
15         (No exhibits marked.)
16
17
18
19
20
21
22
23
24
                                                    3
```

```
 1         THE COURT REPORTER:  My name is Josie Lehman,
 2   Certified Shorthand Reporter.  The parties are
 3   present via video conference to take the
 4   deposition of Blake Woods in the matter of
 5   Richard White vs. Wexford Health Sources, Inc.,
 6   et al., Case No. 18-cv-00165, in the United
 7   States District Court for the Southern District
 8   of Illinois.
 9         Today's date is September 3, 2020, and
10   the time is 4:58 p.m.  This deposition is being
11   taken at the instance of the plaintiff.
12         This deposition is being taken by means
13   of video conferencing and the oath will be
14   administered remotely by the court reporter
15   pursuant to Governor Pritzker's Executive Order
16   2020-14.
17         Will all parties present please state
18   your name and agreement with this procedure?
19         MR. FLAXMAN:  I am Kenneth Flaxman, the
20   attorney for the plaintiff, and I agree.
21         MR. WALLIS:  I'm Ryan Wallis, the attorney
22   for defendants, including Mr. Blake Woods, and I
23   agree, defense agrees.
24                (Witness sworn.)
                                                    4
```

**Page 5**

1                BLAKE WOODS, DNP,
2  having been first duly sworn, was examined and
3  testified as follows:
4                DIRECT EXAMINATION
5  BY MR. FLAXMAN:
6      Q.   Good afternoon, sir.  Could you state
7  your name and spell your last name for us,
8  please?
9      A.   Blake Matthew Woods, W-O-O-D-S.
10     Q.   And what's your business or occupation,
11 sir?
12     A.   Nurse practitioner.
13     Q.   And by whom are you currently employed?
14     A.   Baptist Medical Group.
15     Q.   And what is that?
16     A.   It's a primary care medical practice.
17     Q.   And how long have you worked there?
18     A.   Since -- let's see -- September 2019,
19 so right at one year.
20     Q.   Before working at your present place of
21 employment, where were you employed?
22     A.   I was employed with Provider Health
23 Services.
24     Q.   And what is Provider Health Services?

**Page 6**

1      A.   It's a nurse practitioner service
2  that delivers primary care, nurse practitioner
3  services in the long-term care setting such as
4  nursing homes, assisted livings.
5      Q.   And how long did you work there?
6      A.   Since April 2016 through my start of
7  employment in 2019.
8      Q.   Why did you leave that employment?
9      A.   From -- clarify the question.  From
10 Provider Health Services to Baptist?
11     Q.   Yes.
12     A.   I was -- oh, I was contacted by a
13 physician I knew that worked there and asked me
14 to help him out and it looked like a good
15 opportunity.
16     Q.   Okay.  Before working for Provider
17 Health, is that it?  Where were you employed?
18     A.   It cut out.  I didn't get the question.
19 I'm sorry.
20     Q.   That's -- that's life in --
21     A.   Technology.
22     Q.   -- the land of --
23     A.   Yeah.
24     Q.   Yeah, before working at, I think you

**Page 7**

1  said Provider Health?
2      A.   Yes.
3      Q.   -- where were you employed?
4      A.   Wexford Health Source.
5      Q.   How long did you work at Wexford Health
6  Source?
7      A.   From December 2014 to April 2016, I
8  believe, yeah.
9      Q.   Where were you employed before Wexford?
10     A.   Massac Memorial Hospital.
11     Q.   And where is that?
12     A.   That's in Metropolis, Illinois.
13     Q.   And is the work that you did at Wexford
14 different than the work that you do at Baptist?
15     A.   The job title is the same.  There are
16 similarities and differences in the day-to-day
17 activities.
18     Q.   Is there any difference in the standard
19 of care that you provide?
20     MR. WALLIS:  I'm going to object to that as
21 vague, foundation.
22     MR. FLAXMAN:  Could you answer the question?
23     THE WITNESS:  I'm sorry, it cut out.  I
24 didn't hear the question.

**Page 8**

1  BY MR. FLAXMAN:
2      Q.   All right.  Is there any difference in
3  the standard of care that you follow at Baptist
4  than the standard of care you followed at
5  Wexford?
6      A.   No.
7      Q.   Did you look at any documents to
8  prepare for this deposition?
9      A.   Yes.
10     Q.   Do you have them printed out?
11     A.   No.
12     Q.   Do you have them on your computer that
13 you could access them?
14     A.   I have -- the only document I have in
15 front of me is the -- all exhibits, PDF file
16 that was emailed to me today.
17     Q.   Okay.  Are you able to display that on
18 your screen at the same time you're on the Zoom
19 call?
20     A.   Sure.
21     Q.   Okay.  Well that will spare us the --
22 the --
23     A.   Do I have to hold it the whole time?
24     Q.   No, no, no, no.  It's just for you to

**Page 9**

1  look at, but the fact that you have it --
2  A.  Oh.
3  Q.  -- will spare us the screen sharing on
4  Zoom, which is one of the other things that is
5  not yet perfect.
6  A.  Okay.
7  Q.  Okay.  Have you seen the -- all
8  exhibits PDF?
9  A.  Yeah.  I can have it here, yes.
10  Q.  Okay.  Have you seen those documents
11  before?
12  A.  Yes.
13  Q.  Let me ask you to look at Page 1, which
14  I believe is marked at the bottom as Blake
15  Deposition September 3rd, 2020, Exhibit 1.  Are
16  we on the same page?
17      We're not hearing you.  I'm not hearing
18  you.
19  A.  You asked me if I could look at it and
20  I said yes.
21  Q.  Okay.  I didn't hear the yes.
22  A.  Yes.
23  Q.  Does your writing appear on the page
24  that's been marked Exhibit 1?

**Page 10**

1  A.  Yes.
2  Q.  Well, could you read what on Exhibit 1
3  is in your handwriting?
4  A.  It's my signature and it's B. Woods,
5  comma, NP.
6  Q.  And where on the exhibit is your
7  signature?
8  A.  It is under Terry Beegle's signature
9  where it says B. Woods, slash, his name, and
10  then my signature is right below it and then
11  Terry Beegle, LPN, T. Beegle, LPN is right under
12  that, then the nurse signature box in the lower
13  right-hand corner.
14  Q.  Now, before your name, it says VO.
15  What does that mean?
16  A.  Verbal order.
17  Q.  Did you -- and does Exhibit 1 relate to
18  a patient named Richard White?
19  A.  Yes.
20  Q.  Do you recall writing your -- your
21  signature on this form back in September 26,
22  2015?
23  A.  No, I don't remember the exact day, but
24  it's definitely my signature.

**Page 11**

1  Q.  Okay.  Do you recall -- do you recall
2  seeing -- well, do you recall learning about
3  Richard Wright -- White -- let me start over.
4      Do you recall learning about Richard
5  White's medical problem on September --
6  June 26th of 2015?
7  A.  I actually don't remember the
8  encounters.  All I can attest to today is what
9  is in the record.
10  Q.  Do you know who wrote the record other
11  than your signature?
12  A.  All I can tell you 100 percent that
13  Terry Beegle signed it.
14  Q.  And when is the last time you saw Terry
15  Beegle?
16      Well, let me rephrase that.  Have you
17  seen --
18  A.  Did you get that?
19  Q.  No.
20      Did you get it, Madam Reporter?
21  THE WITNESS:  No.  No, I didn't hear it.
22  MR. FLAXMAN:  Okay.
23  BY MR. FLAXMAN:
24  Q.  Well, when is the last time you saw

**Page 12**

1  Terry Beegle?
2  A.  When did I see Terry Beegle last?
3  Q.  Right?
4  A.  I saw him a couple of months ago at
5  Walmart.
6  Q.  Okay.  And did you talk about
7  Mr. White?
8  A.  No.
9  Q.  All right.  Is there any indication on
10  Exhibit 1 that you saw Mr. White on June 26,
11  2015?
12  A.  There's no indication that I saw him in
13  person because this was a nurse sick call visit
14  it looks like, yeah.
15  Q.  Were you on -- on site at the
16  penitentiary on June 26, 2015?
17  A.  I would have had to have been because I
18  gave a verbal order.  That would have been the
19  only way I could have given a verbal order, so
20  yes.
21  Q.  Is -- did you examine Mr. White before
22  you gave that verbal order?
23  A.  No.
24  Q.  Why not?

**Page 13**

1   A.   Because he didn't have an appointment
2   that day.
3   Q.   Is there a way for a prisoner at the --
4   at the Shawnee correctional institution, when
5   you worked there, to see a -- a health care
6   provider without an appointment?
7   A.   You mean they just come over and see me
8   without being on -- on the line?
9   Q.   Right?
10  A.   No.
11  Q.   Okay. Well, did you ever learn why
12  Mr. White was seeing a nurse on June 26th of
13  2015?
14  A.   Yes, I wouldn't have given the order
15  unless I got the full story and assessment from
16  the nurse on duty.
17  Q.   Is there any indication on -- on that
18  exhibit, page -- Exhibit 1 of what the full
19  story was?
20  A.   All I can attest to is what's written
21  on the paper.
22  Q.   Could you read to us what's written on
23  the paper?
24  A.   Starting from the top?

**Page 14**

1   Q.   Yes.
2   A.   "Offender outpatient progress note.
3   Shawnee Correctional/Hardin County Work Camp
4   Center, nonspecific discomfort, White, Richard,
5   IDR 15 -- excuse me, R14550, last name, first
6   name, MI" --
7   Q.   And --
8   A.   "Not much time,
9   subjective/objective" -- do you want me to read
10  the whole page? I mean, can we just admit it to
11  the record?
12  Q.   Well, there's always an issue with
13  reading medical records. There's --
14  A.   Okay.
15  Q.   -- an S, there's an S with a -- is that
16  an apostrophe -- is that a parentheses or --
17  next to it where it says "any allergies?"
18  A.   Yes, yes.
19  Q.   Okay. And what does S stand for?
20  A.   Subjective.
21  Q.   And what was the subjective that the
22  nurse wrote?
23  A.   NKA.
24  Q.   What does NKA stand for?

**Page 15**

1   A.   No known allergies.
2   Q.   Okay. Did the nurse write something
3   for location of pain/discomfort?
4   A.   Left knee or L knee is what they wrote.
5   Q.   And then did the nurse circle something
6   to describe the pain?
7   A.   Yes.
8   Q.   And then what did the nurse write in
9   the next box under, "Have you had this pain
10  before and how was it treated?"
11  A.   "Just happened."
12  Q.   Is there anything on this form that
13  indicates how the pain happened?
14  A.   I don't see anything.
15  Q.   Okay. And then there's a 5 out of 10
16  for the rate pain level scale, is that right?
17  A.   You'll have to repeat the question,
18  please.
19  Q.   That's -- that's --
20  A.   It's the connection, you know.
21  Q.   I'm not -- I understand.
22  A.   Yeah.
23  Q.   Where it says "rate pain level scale,"
24  do you see that?

**Page 16**

1   A.   Yes.
2   Q.   1-10?
3   A.   Yeah.
4   Q.   When you -- well, have you ever
5   recorded a patient's pain level scale when you
6   worked at -- for Wexford?
7   A.   Have I ever recorded a pain level scale
8   when I worked for Wexford, yes.
9   Q.   What would you say to the prisoner to
10  get the information of how the prisoner rated
11  his pain?
12  A.   This is a hypothetical scenario, if I'm
13  doing the pain assessment?
14  Q.   Right. Your customary questions that
15  you would ask to get an answer to that.
16  A.   Please rate your pain 0 to 10, 0 means
17  no pain, 10 means the worst pain ever.
18  Q.   Okay. And am I correct that you don't
19  know what the nurse said to Mr. White before she
20  wrote down 5 out of 10 or 5/10?
21  A.   That is correct, I do not know what the
22  nurse said while I was not in the room.
23  Q.   Underneath that -- well, how far away
24  from where the nurse was, when she was writing



**Page 17**

1  this history, were you back in June 26, 2015?
2     A.   I do not know -- I do not know which
3  room the patient was in.
4     Q.   Is there one central area where medical
5  exams are performed or is there a different
6  sick call in different cell houses?
7     A.   No, there was a health care unit and we
8  had three exam rooms and one emergency area.
9     Q.   So would you have been in the health
10 care unit on June 26 of 2015?
11    A.   Yes.
12    Q.   Okay.  And then what did the nurse
13 write for duration -- I might have asked you
14 this -- for duration of pain?
15    A.   It appears to be "immediately."
16    Q.   And then there's an O parentheses.
17 What does the O stand for?
18    A.   Objective.
19    Q.   And what are those numbers that are in
20 the box that has the O parentheses?
21    A.   Vital signs.
22    Q.   Could you tell us what those were?
23    A.   Temperature 98.3, pulse 82, respiratory
24 rate 18, blood pressure 120 over, looks like 80,

**Page 18**

1  but it could be an 86 because of the copying,
2  I'm not sure, and then I believe the weight is
3  either 125 or 175, and, again, depending on
4  the --
5     Q.   All right.
6     A.   -- copy I'm looking at.  Probably have
7  to look at the original, but -- maybe ask --
8  yeah.
9     Q.   Underneath that box I see it says "size
10 of obvious discomfort?"
11    A.   Uh-huh.
12    Q.   Is that the word yes next to it?
13    A.   Yes.
14    Q.   What does it mean to say that someone,
15 a prisoner is showing "signs of obvious
16 discomfort?"
17    A.   I believe that discomfort to me as a
18 provider is synonymous with pain.
19    Q.   Yeah.  Is the nurse who wrote this, was
20 she an LPN?
21    A.   Actually, it is a he, and I --
22    Q.   I'm sorry.
23    A.   Terry Beegle -- yeah, that's okay.  I
24 do know Terry Beegle to be an LPN at that time,

**Page 19**

1  you know.  I'm assuming he's still an LPN, but
2  we would just have to ask him, you know, his
3  current, you know.
4     Q.   Okay.
5     A.   Yeah.
6     Q.   Is there -- is an LPN capable of
7  performing a physical exam of the knee?
8     A.   I really can't attest to the LPN's
9  scope.  I can attest to the objective findings
10 that I see on this form.
11    Q.   Is there any indication in the
12 objective findings that the LPN did a physical
13 exam of Mr. White?
14    A.   Yes, vital signs are a component of a
15 physical exam, so yes.
16    Q.   Is there any indication that the nurse
17 did a physical exam of the left knee of
18 Mr. White?
19    A.   I don't see anything specific on this
20 piece of paper.
21    Q.   Yeah.  How did the -- well, if you look
22 at the bottom right, does that indicate that you
23 prescribed something -- well, okay.  Is there
24 any indication on Exhibit 1 of what you

**Page 20**

1  prescribe for Mr. White on June 26?
2     A.   That's why I co-signed the chart after
3  the fact, after the visit, because there are
4  orders that I gave.  I ordered crutches
5  and (inaudible).
6     Q.   You're frozen.
7          Still frozen.
8     A.   Okay.  I'll start over.  Can you hear
9  me now?
10    Q.   Yes.
11    A.   As I was saying, I -- my -- since my
12 signature is there, that's why there are orders.
13 It's crutches until seen, follow-up with NP next
14 week, Motrin 600 milligrams, one tablet three
15 times a day, orally times ten days.
16    Q.   Was Mr. White still in the medical unit
17 when you saw him before Exhibit 1?
18    A.   I don't know if he was or not.  All I
19 can tell you is the process.  If I give a verbal
20 order, the chart would end up in -- in a stack
21 for me to sign at a later date.  I don't know if
22 he was present, you know, when I signed the
23 chart the next day, or, you know --
24    Q.   So am I correct that you don't know or

```
 1   that there's no indication on Exhibit 1 of when
 2   you actually signed the chart?
 3       A.   No.
 4       Q.   Okay.  Is there any indication that the
 5   nurse looked for areas of tenderness on
 6   Mr. White's knee?
 7       A.   I can't attest for to what the nurse
 8   did during his visit aside from what's written
 9   on this chart or on this piece of paper.
10       Q.   Is there any indication that the nurse
11   looked for signs of ligament tear?
12       A.   There's no indication on this piece of
13   paper that says that.
14       Q.   Do you know whether or not the nurse
15   was employed by Wexford Health or by Wexford,
16   the same employer you had back in --
17       A.   I'm sorry, it cut out.
18       Q.   That's -- that's -- no need to
19   apologize.
20       A.   Yeah.
21       Q.   Do you know whether or not Nurse Beegle
22   was employed by Wexford back in June of 2015?
23       A.   Yes.  He was a co-worker with Wexford,
24   yes.
                                                    21
```

```
 1   during the plan, and, of course, has my
 2   signature.
 3             And as you can see on top of that,
 4   there's some nurse handwriting where they took
 5   my orders and wrote my vital signs in and put
 6   the date and time of the note, yeah.
 7       Q.   Okay.  Underneath the vital signs,
 8   which would be the second row, the left
 9   column --
10       A.   Uh-huh.
11       Q.   -- is that 10:30?  Is that the time of
12   the visit?
13       A.   10:30, yes, that's the time.
14       Q.   Okay.  Could you read to us what's in
15   the -- the cell next to that?
16       A.   F/U, which is the standard abbreviation
17   for left knee.  It appears to be injury.
18       THE COURT REPORTER:  Excuse me, Blake.
19             (Whereupon, a discussion was had
20              off the record.)
21       THE WITNESS:  Follow-up.
22       THE COURT REPORTER:  Okay.
23       THE WITNESS:  Yeah.
24
                                                    23
```

```
 1       Q.   Now, if we turn the page to the next --
 2   well, turn or scroll to the next page, what's
 3   marked at the bottom, Exhibit 2.
 4       A.   Yeah.
 5       Q.   Does your handwriting appear on this?
 6       A.   It -- yes, my handwriting does appear.
 7            I need just a quick bathroom break
 8   before we dig into the next page.
 9       MR. FLAXMAN:  Yes.
10       THE WITNESS:  It will literally take -- it
11   will literally take me like 30 seconds.
12       MR. FLAXMAN:  Take as long as you need.
13       THE WITNESS:  I'll be right back.
14       MR. FLAXMAN:  Take as long as you need.
15             (Whereupon, a short break was
16              taken.)
17   BY MR. FLAXMAN:
18       Q.   Now let me ask you to look at
19   Exhibit 2.  Tell us where on this page your
20   handwriting is.
21       A.   It looks like the -- starting right
22   under the note heading on the left-hand column
23   S, comma, which we surmised is subjective,
24   that's my note.  The -- my handwriting appears
                                                    22
```

```
 1   BY MR. FLAXMAN:
 2       Q.   Am I correct that what you wrote was --
 3   without using abbreviations -- follow-up left
 4   knee injury per NP?
 5       A.   Yes.
 6       Q.   Who is -- who is NP?
 7       A.   That's per nurse practitioner.  That
 8   would have been per my instruction on the last
 9   exhibit to get him in the office for an
10   appointment.  So that's referring to me.
11       Q.   Now, is there a reason why four days
12   or -- or it took from the first day of June 26
13   to June 30th before you saw Mr. White?
14       A.   Can you -- you were frozen the whole
15   question.
16       Q.   Okay.  Do you know why it took from
17   June 26 to June 30th before you examined
18   Mr. White?
19       A.   I can't attest to anything that has
20   anything to do with scheduling.  You'd have to
21   ask someone at the facility that makes up the
22   schedule.
23       Q.   Okay.  What did you write next to
24   subjective?
                                                    24
```



**Page 25**

1  A.  C/O, which means complains of, L knee
2  pain, that's left knee pain, DT is due to,
3  strike from side, C with a line over it is with
4  sports.  Period.
5  Q.  And what did you write for O?
6  A.  NAD or no acute distress, gait slow
7  with limp, no swelling, bruise, or deformity.
8  Q.  And what did you write next to A?
9  A.  Left knee pain.
10  Q.  Did you touch Mr. White's knee during
11  this examination?
12  A.  What was the question?
13  Q.  Did you touch Mr. White's knee during
14  your examination on June --
15  A.  Yes.
16  Q.  Let me finish the question -- on
17  June 30th, 2015?
18  A.  Yes.
19  Q.  What were you looking for when you
20  touched his knee?
21  A.  Swelling, bruises, or deformity.
22  Q.  Did you look for areas of tenderness?
23  A.  Always with the knee examinations, so
24  yes.

**Page 26**

1  Q.  Did you document your findings from
2  your hands-on exam for areas of tenderness?
3  A.  That is not on the record.  The word
4  tenderness is not on the record.
5  Q.  Is there a reason why you did not
6  document your findings about tenderness?
7  A.  What was the question?
8  MR. FLAXMAN:  Could you read it back?
9          (Whereupon, the record was read
10          as requested.)
11  THE WITNESS:  We chart it by exception and
12  many times we would try to chart as many
13  pertinent negatives as we could, such as no
14  swelling, bruise, or deformity, as I listed in
15  this chart, but I can assure you if there was
16  tenderness, if there was a positive finding, it
17  would be in the note.
18  BY MR. FLAXMAN:
19  Q.  Did you ask Mr. White if he was able to
20  straighten his knee?
21  A.  I don't remember the conversation.  All
22  I can attest (inaudible).
23  Q.  You were frozen, so let's go -- let's
24  go back.  I heard you say -- I don't know what I

**Page 27**

1  heard you say.
2  THE COURT REPORTER:  All I can attest and
3  then blank.  So what did you say after all I can
4  attest?
5  THE WITNESS:  All I can attest to is what is
6  in the subjective of the note.  Of course the
7  subjective is what I hear from the patient, so I
8  don't have that as a specific question, so I
9  don't remember the conversation.
10  BY MR. FLAXMAN:
11  Q.  Well, did you measure Mr. White's range
12  of motion on his left knee?
13  A.  I -- as I said, I don't remember the
14  specific encounter, but if, again, if there was
15  a positive finding in the knee exam, it would be
16  in the objective section, so, you know --
17  Q.  Well, when you worked -- in your work
18  now for Baptist, do you document checking for
19  range of motion when somebody comes in with a
20  knee injury?
21  A.  Yeah, only if there's a positive
22  finding with decreased range of motion, you
23  know.
24  Q.  Well, as you sit here now, do you

**Page 28**

1  recall measuring the range of motion that
2  Mr. White was able to achieve with his left knee
3  back in June 30th of 2015?
4  A.  I don't remember the encounter.  All I
5  can attest to today as to be 100 percent
6  truthful is what's on this piece of paper and --
7  and how I operate, so, again, if there was a
8  positive finding, I would have put it in the
9  note.
10      Yeah, we don't write every single
11  negative finding on everybody.  It would be
12  like -- I don't know.  A good example would be
13  just to make -- help you understand, the color
14  of someone's skin, I don't have the color of
15  their skin on the note because it's a normal
16  finding.  It doesn't mean -- it doesn't mean --
17  it doesn't make a difference in the care.
18  Q.  Is there -- did you document whether or
19  not Mr. White was able to straight -- hold his
20  knee straight?
21  A.  I did not write that in this note.
22  Q.  Did you document in the note that you
23  asked Mr. White about popping and clicking in
24  his knee?



**Page 29**

1    A.   I didn't write that in this note.
2    Q.   Back in June of 2015, was your
3  understanding that getting clipped on the side
4  of the knee is typical for ACL and meniscus
5  tear?
6    A.   Can you say the question again?
7  MR. FLAXMAN:  Could you read it back?
8            (whereupon, the record was read
9             as requested.)
10  MR. WALLIS:  I'm going to object to the form
11 of that question as confusing and vague, but you
12 can answer if you understand.
13  THE WITNESS:  I -- I think I understand what
14 he's asking.  Here's the deal.  Any time
15 someone's -- any injury -- it -- it doesn't
16 matter if it's a clip to the side of the knee or
17 the front.  You know, an injury is an injury,
18 and pain is pain.  You know, if -- you know, you
19 can't -- I don't know.  I guess I really don't
20 understand the question either.  I'm sorry.
21 BY MR. FLAXMAN:
22   Q.   Well, is there any indication on
23 Exhibit 2 that when you saw Mr. White on
24 June 30th of 2015, you evaluated the possibility

**Page 30**

1  that the injury from strike from side during
2  sports had caused an ACL or meniscus tear?
3    A.   I don't see any objective finding.  You
4  know, all I can attest is to there was no
5  swelling, bruise, or deformity, so that --
6  that's the only exam finding I can tell you
7  today.
8    Q.   Do you recall asking Mr. White to -- to
9  stand while you looked at his knee?
10   A.   Again, if -- if there were pertinent
11 findings, they would be in the note.  I -- you
12 know, we don't list what questions we ask the
13 patient during the subjective.  We don't write
14 verbatim everything we ask them to do.
15        All I can attest is there -- that I
16 looked at his gait, obviously, because I
17 mentioned that it was slow, so he was standing
18 during, so he was standing at some point of the
19 exam, but I don't know -- your question was did
20 I ask him to stand, I don't know if I asked him
21 to stand or not.
22   Q.   Did you palpate his knee?
23   A.   Yes.
24   Q.   Could you describe for us the manner in

**Page 31**

1  which you palpated his knee?
2    A.   I use my hands to palpate for swelling
3  and deformities, which I noted there were none.
4    Q.   Did you later learn that Mr. White had
5  a torn ACL and a torn meniscus?
6    A.   Did I later learn -- are you talking
7  about, you know, after he went to the orthopedic
8  institute and all that?
9    Q.   At any time while you continued to work
10 for Wexford, did you ever learn that Mr. White
11 had a torn ACL and a torn meniscus?
12   A.   I'd have to review my future notes.
13   Q.   Just as you sit here now, if you don't
14 remember, you don't remember, that's fine.
15   A.   Well I just want to give you an honest
16 answer.  If I could have a minute to review my
17 notes.
18   Q.   Sure.
19   A.   It appears that in 2016, 1-29-16 the
20 note said ACL unresolved, and I noted about --
21 so, yes, I found out about it.  I don't know
22 what day I found out about it, but all I can
23 tell you is what's in the record.  I definitely
24 knew about it on 1-29-2016.

**Page 32**

1    Q.   Okay.
2    A.   Yes.
3    Q.   Did you ever consider the possibility
4  that you should have suspected a torn ACL when
5  you saw Mr. White on June 30th, of 2015?
6    A.   No.
7    Q.   Why not?
8    A.   He -- he had -- he had no swelling,
9  bruise, or deformity.
10   Q.   Have you ever measured range of motion
11 of the knee?
12   A.   The knee, like anybody's knee?
13   Q.   Right?
14   A.   Yes.
15   Q.   And did you ever do that of a prisoner
16 while you worked at the -- for Wexford?
17   A.   Yes, many times.
18   Q.   Did you -- do you recall doing that on
19 Mr. White?
20   A.   As I said, there are no positive
21 findings in this exam, and I don't remember the
22 one-on-one interaction.
23   Q.   What's -- well going back to
24 Exhibit 2 --



```
 1     A.   Uh-huh.
 2     Q.   -- does your writing appear in the
 3  right-hand column under plans?
 4     A.   Yes.
 5     Q.   Could you read to us what you wrote?
 6     A.   "Advised crutches, slow walk for two
 7  weeks, sports restriction for a month, follow-up
 8  in ten days, and I will consider an X-ray if not
 9  better."
10     Q.   And why did you write that you would
11  consider an X-ray if not better?
12     A.   That's standard treatment for knee
13  injuries.  If you try medicine, rest, and they
14  don't work, you -- you have to go to the next
15  step, which is a flat plate X-ray.
16     Q.   Was there a physician who worked at
17  Shawnee back in June of 2015?
18     A.   Yes.
19     Q.   Could you have asked the physician to
20  examine Mr. White?
21     A.   I could have if I wasn't comfortable
22  with my own exam, as long as he was there, so,
23  hypothetically, yes, I could have had him come
24  to my exam room.
                                               33
```

```
 1     Q.   Okay.  And you might have answered
 2  this, but let me ask the question directly.
 3     A.   Okay.
 4     Q.   Why didn't you ask a physician to
 5  examine Mr. White back on June 30th, 2015?
 6     A.   Because I was comfortable with my exam
 7  and orders.
 8     Q.   Could you tell us what you did to look
 9  for a ligament tear in your examination of
10  June 30th, 2015?
11     A.   You're asking me how I examined his
12  knee?
13     Q.   Yes.
14     A.   Yes, I observed -- it looks like in the
15  note I observed his gait and I visualized for
16  swelling, bruises, and deformity, and I palpated
17  for swelling and deformity.
18     Q.   When you say visualized, what -- what
19  did you mean by that?
20     A.   It means I use my eyesight.  It's what
21  I can see.
22     Q.   Is there anything else you did to
23  examine Mr. White's knee back in June 30th of
24  2015?
                                               34
```

```
 1     A.   All I can attest to is what's written
 2  in the record, which I just read you.
 3     Q.   Okay.  Was it your view back in
 4  June 30th of 2015 that the signs and symptoms
 5  you observed did not point to a massive
 6  derangement of the knee?
 7     A.   I -- I don't think I would have made a
 8  prejudgment on that.  All I can attest to is
 9  that my diagnosis was pain and I treated it and
10  knowing, you know, I wanted to recheck him and
11  see, so, you know --
12     Q.   All right.  Let's look at Exhibit 3,
13  which is the next page.
14     A.   Sure.
15     Q.   Does your handwriting appear on this
16  one?
17     A.   Yes.
18     Q.   Is -- is -- is there any part of it
19  that is not in your handwriting?
20     A.   It's all not my handwriting with the
21  exception of my signature.
22     Q.   Who wrote your signature?
23     A.   No, I think you misunderstood me.
24  Maybe I -- I stated it strange.  My signature is
                                               35
```

```
 1  the only part of the note that is my
 2  handwriting.
 3     Q.   Do you know whose handwriting is the
 4  rest of the note?
 5     A.   It appears that Ethan Wilke wrote and
 6  signed the note.
 7     Q.   And who is Ethan Wilke?
 8     A.   He was a registered nurse at Wexford.
 9     Q.   And why did you -- why did you sign
10  this note?
11     A.   Because I gave orders.
12     Q.   Could you -- are you able to read
13  Mr. Wilke's handwriting, and, if so, could you
14  read to us what he wrote on the form?
15     A.   Yes, "RN note, subjective:  My knee
16  popped again, objective:  Inmate health care
17  unit on crutches complaining of noise heard
18  while walking it out."  Period, I believe.
19          Inmate unable to extend leg fully,
20  unable to bend to 90 degrees, no swelling noted,
21  no obvious deformity, assess (inaudible).
22     THE COURT REPORTER:  I'm sorry, assess?
23     THE WITNESS:  Call to B. Woods.
24
                                               36
```



```
 1  BY MR. FLAXMAN:
 2      Q.  And then second column, could you read
 3  that to us?
 4      A.  "Telephone order, B. Woods, Decadron 8
 5  milligrams, I am now naproxen 500 milligram,
 6  twice a day for ten days, X-ray, Ace wrap,
 7  follow-up."
 8      Q.  Is it your -- does the fact that you
 9  signed the note after giving a telephone order
10  mean that you did not see Mr. White on July 3rd
11  of 2015?
12      A.  Yes, that was after hours.  If you note
13  the time at 8:30 (inaudible.)
14      THE COURT REPORTER:  I'm sorry, after hours?
15      THE WITNESS:  I would not have been in the
16  building.
17  BY MR. FLAXMAN:
18      Q.  Does that mean that Mr. White did not
19  go to the medical unit at a regular sick call at
20  8:30 p.m.?
21      A.  I don't -- I don't know the foundation
22  of the question.  I -- I don't -- I wasn't
23  there.  I don't know where Ethan filled the note
24  out, whether it was in the unit, in the health
                                                 37
```

```
 1  care unit.  The note doesn't say the location of
 2  his interaction with Mr. White.
 3      Q.  Well was there ever a sick call at
 4  8:30 p.m. while you worked at Shawnee?
 5      A.  I don't know what happened at 8:30.  I
 6  don't know how they handled injuries.  You know,
 7  sometimes the nurses sometimes assessed injuries
 8  on site, you know.
 9      Q.  Okay.  Did you recall Nurse Wilke
10  relating the information that we just read on --
11  you just read on Exhibit 3?
12      A.  The question?
13      Q.  Let me reask it.  Do you recall the --
14  having conversations with Nurse Wilke on
15  September 3rd -- excuse me, on July 3rd, 2015,
16  at about 8:30 p.m.?
17      A.  I do not remember the conversation, but
18  I do know that I would not have signed telephone
19  orders had I not had a telephone conversation.
20      Q.  Okay.  Did you -- well, the reference
21  on the exhibit to noise heard while walking or
22  working it out, did that suggest to you that
23  Mr. White was having a -- an ACL or meniscus
24  problem?
                                                 38
```

```
 1      A.  We can't diagnose based on noise being
 2  heard.
 3      Q.  You were -- you were frozen, so we
 4  might have missed something.  Could you do the
 5  question again?  We will pray.
 6      THE COURT REPORTER:  Do you want me to read
 7  back the question?
 8      THE WITNESS:  Yes.
 9              (Whereupon, the record was read
10              as requested.)
11      THE WITNESS:  Not specific or particularly
12  even given a specific location to a tear based
13  on a noise heard, but that being said, any noise
14  heard is abnormal and should be investigated.
15  BY MR. FLAXMAN:
16      Q.  Can you -- did you ascribe any
17  significance to the fact that Mr. White was
18  unable to extend his leg fully?
19      A.  Yes, that's an abnormal finding.
20      Q.  Is that abnormal finding consistent
21  with an ACL or meniscus tear?
22      A.  Sometimes.
23      Q.  Did you -- okay.
24          Did you do anything else on July 3rd of
                                                 39
```

```
 1  2015 other than what's written on this document,
 2  Exhibit 3 --
 3      A.  Not that I can recall.
 4      Q.  I'm not -- let me -- let me finish the
 5  question -- in reference to Mr. White?  I'm
 6  sure --
 7      A.  Not that I recall.
 8      Q.  Thank you.
 9          Could you have directed that Mr. White
10  come to sick call to see a physician for another
11  hands-on examination of his knee?
12      A.  The order says to follow up.
13      Q.  And what -- what does follow up mean?
14      A.  It means come see me.
15      Q.  Okay.
16      A.  It means he needs an appointment.  It
17  means he needs an appointment with myself or
18  Dr. David, which ever provider he can see.
19      Q.  Could you have ordered that the follow
20  up be as soon as possible?
21      A.  As I said, I didn't do my scheduling.
22      Q.  Okay.  Let me ask you to look at
23  Exhibit 4.
24      A.  Yes.
                                                 40
```

**Page 41**

1  Q.  Does your handwriting appear on this
2  exhibit?
3  A.  Exhibit 4, I don't see my handwriting
4  anywhere on Exhibit 4.
5  Q.  Do you know whose handwriting appears
6  on Exhibit 4?
7  A.  Yeah, it's -- the note is signed by
8  Carol Aguilar and she's a registered nurse with
9  Wexford at the time.
10  Q.  So is there any indication on Exhibit 4
11  that you were in communication with the RN,
12  Wexford RN on June -- July 6 of 2015?
13  A.  Let me read the note.  I don't see
14  anything in the note where they called me or
15  anything.
16  Q.  Okay.  If we go to the next page,
17  Exhibit --
18  A.  Okay.
19  Q.  Well, that wasn't -- it was the last
20  page, Exhibit 10.  That appears to be a
21  radiology report.
22  A.  Uh-huh.
23  Q.  Have you -- is that -- is there any
24  indication on this -- on Exhibit 10 that you

**Page 42**

1  reviewed the radiology report back in July
2  of 2015?
3  A.  Please restate the question.  It cut
4  out.
5  Q.  Is there any indication on Exhibit 10
6  that you reviewed the radiology report in July
7  of 2015?
8  A.  Yes.
9  Q.  And what is that?  What indicates that?
10  A.  That my signature and the checkmark
11  that says to follow the report.
12  Q.  Is that your signature to the left of
13  where it says "pull chart?"
14  A.  Yes.
15  Q.  And why did you review this radiology
16  report?
17  A.  Because it ended up in my basket of
18  things to review.
19  Q.  Now to the right of your signature,
20  there's "pull chart" checkbox, there's "see
21  patient" checkbox, and there's "file" checkbox.
22  Why did you check the box file rather than any
23  of the other two?
24  A.  Why did I what?

**Page 43**

1  Q.  Well, okay.  Why did you not want to
2  see Mr. White after the radiology report came
3  back?
4  MR. WALLIS:  Objection, foundation.
5  BY MR. FLAXMAN:
6  Q.  Okay.  Why did you -- let me rephrase
7  the question.  Why did you check the file
8  checkbox rather than one or more of the other
9  two checkboxes?
10  A.  When we check the file, that means it's
11  on my line to follow-up.  Everytime we ordered
12  an X-ray, they automatically got a follow-up
13  appointment to go over (inaudible).
14  Q.  I think even though we lost that, it's
15  good enough.
16      Let's go to Page 5, Exhibit 5.
17  A.  Okay.
18  Q.  Does your handwriting appear on this
19  page?
20  A.  Yes.
21  Q.  Where?
22  A.  In the middle column and the right
23  column.
24  Q.  Okay.  Did you see -- did you -- does

**Page 44**

1  this document, Exhibit 5, show you examined
2  Mr. White on July, either 10th or 18th of 2015?
3  A.  Yes.
4  Q.  Do you know whether it's a 10 --
5  whether it was July 10th or July 18th?
6  A.  It looks like --
7  Q.  Yeah --
8  A.  It looks like the 10th to me.
9  Q.  Right, let me -- on the bottom right it
10  says noted or dated 7-10-15.  Is that consistent
11  with this having been prepared on July 10?
12  A.  Yeah, I see July 10.  Where are you
13  getting the 18th?  I'm confused.
14  Q.  No, I mean -- okay.  On your date and
15  time on the top left it says 7-1, and there's a
16  number next to it which could be a 10 or it
17  could be an 8, on the bottom right there's
18  7-10-15, so can we agree that this is a record
19  that -- of a visit you had with Mr. White on
20  July 10th of 2015?
21  A.  I don't see an 8 anywhere.
22  Q.  Okay.  Well, it's July -- what was the
23  date that you prepared this document?
24  A.  July 10th, 2015.

**Page 45**

Q. Okay. Did you prepare it after you examined or in the course of examining Mr. White?
A. Yes.
Q. What were the subjective things that you wrote?
A. "Self relates pain to left knee, slightly better but still swollen, seen 6-30-2015 with sports injury."
Q. Yeah. Had you ever noted before that Mr. White was reporting that his knee was swollen?
A. Before this note?
Q. Right?
A. I -- no, I didn't see anything in my notes before this note.
Q. Okay. Is there anything in the note that indicates that you observed swelling of Mr. White's knee on July 10th of 2015?
A. No.
Q. What did you write for O?
A. No acute distress, walking, not using crutches, X-rays 7-8-15, no fracture, early osteoarthritis with small effusion.

**Page 46**

Q. Do you recall how old Mr. White was in 2015?
A. I do not recall.
Q. Now, would osteoarthritis be consistent with someone who is 34 years of age?
A. Yes.
Q. And why is that?
A. It's consistent with him because the X-ray said it was there.
Q. Any other reason that you would not be surprised to see osteoarthritis in -- in someone who is 34 years of age?
A. No, that's not a surprising diagnosis.
Q. Okay. Would the X-ray have indicated whether there was a -- an ACL tear or a meniscus tear in Mr. White's knee?
A. No.
Q. Is there any indication on Exhibit 5 that you did anything on July 10, 2015 to rule out an ACL tear or a meniscus tear?
A. No, the only objective way to diagnose would be to have me put him in an MRI machine and I -- I didn't have one and I couldn't order one --

**Page 47**

Q. Who --
A. -- so no.
Q. Who could order an MRI?
A. Dr. David.
Q. And did you ask Dr. David to order an MRI of Mr. White?
A. Not at this point in his care. It -- it wasn't time to do one yet. We had just done -- can I finish?
Q. Oh, please.
A. Yeah, we -- the normal progression is to start with flat plate X-rays and we just got that, there was a finding that is treatable, and as I have in my plan, gradually increase activity, do some more pain medicine and antiinflammatories to help dry up that effusion, and wasn't using his crutches so we discontinued the crutches. We can't have crutches out in the population if they're considered a weapon if the patient isn't using them for what they're intended for.
    And then follow-up as needed. And when there's a follow-up as needed, that means that I cared enough for your client that I'm willing to

**Page 48**

see him any time it's not going well and consider the next step.
Q. You talk about effusion --
A. Yes.
Q. -- in your answer. Could you tell us what effusion is?
A. It froze. I believe he was asking what effusion is?
Q. That was my question.
A. Yeah, it's just -- it's a small collection of fluid.
Q. Had you achieved or obtained an indication that there was an effusion?
A. Yeah, the X-ray said it is.
Q. Were you -- had you been able to detect the effusion through a hands-on exam?
A. I -- I very well doubt it, especially with an X-ray finding of a small effusion. A hands-on exam is very limited. I don't believe I would have been able to palpate that effusion. If I did, I would have put it in the objective findings as we talked about before, but, you know, it's just one of those deep findings that, you know --

```
 1    Q.   Let me ask you about the next
 2  exhibit --
 3    A.   Sure.
 4    Q.   -- Exhibit 6.  Does your handwriting
 5  appear on this at all?
 6    A.   I don't see my handwriting anywhere on
 7  Exhibit 6.
 8    Q.   Do you know whose handwriting --
 9    A.   No.
10    Q.   -- it is --
11    A.   It looks like -- yeah, it looks like
12  Terry Beegle.
13    Q.   And could you read to us what
14  Mr. Beegle wrote on -- next to S?
15    A.   I still walk with a limp and --
16              (Off the record due to technical
17               difficulties.)
18              (Whereupon, the record was read
19               as requested.)
20    THE WITNESS:  I still walk with a limp and
21  continue -- and can't straighten my left leg
22  out.
23  BY MR. FLAXMAN:
24    Q.   And what did you write next to O?
                                              49
```

```
 1    A.   Offender seen in, I believe it says NP,
 2  sick call, it's my best guess, 7-10-15 with
 3  prescription prescribed, and I don't know what
 4  the next word is.  The next line says "Self
 5  relates he started the Indocin yesterday."
 6    Q.   Could you tell us what Indocin is?
 7    A.   It is a nonsteroidal antiinflammatory
 8  medication.
 9    Q.   Is it different than naproxen?
10    A.   Yes.
11    Q.   Is it given by injection?
12    A.   No.
13    Q.   Okay.  And what's next to A?
14    A.   It looks like complaint of left leg
15  issues.
16    Q.   All right.  And then the right hand
17  column, could you read to us what's there?
18    A.   "Advised by NP, B. Woods to continue
19  prescription as scheduled, follow-up with NP.
20  He noted that that was scheduled for 8-13."
21    Q.   And B. Woods, is that you?
22    A.   Yes, I was the only B. Woods there.
23    Q.   Do you recall a conversation with a
24  nurse on July 17, 2015 about Richard White?
                                              50
```

```
 1    A.   I don't recall but I don't have any
 2  reason to believe any different than what's on
 3  this piece of paper.
 4    Q.   Okay.  Let's look at Exhibit 7.  Does
 5  your handwriting appear on this form?
 6    A.   I have Exhibit 7.
 7    Q.   Does your handwriting appear on the
 8  form?
 9    A.   No.
10    Q.   Is there any indication that you were
11  consulted by whoever filled out that form --
12  as -- as they were filling it out?
13    A.   I don't see anything.  This order is on
14  the side lay in for five days, crutches for five
15  days, but I'm not the only one that could have
16  ordered that, and my signature isn't under it,
17  so I don't have any way of saying whether I gave
18  those orders or not --
19    Q.   Do you know who's handwriting --
20    A.   -- just based on this.
21    Q.   Do you know who's --
22    A.   Terry Beegle.
23         Terry Beegle.
24    Q.   Let's look at Exhibit 8.  Does your
                                              51
```

```
 1  handwriting appear on this document?
 2    A.   Yes.
 3    Q.   The first in dark -- dark writing it
 4  says "unresolved left knee pain."  Is that your
 5  writing?
 6    A.   No.
 7    Q.   Do you know whose writing it is?
 8    A.   No.
 9    Q.   Did you write the information to the
10  right of the S parentheses?
11    A.   Yes.
12    Q.   Could you read to us what you wrote?
13    A.   "Complains of left knee, worse, seen
14  6-20-15 with complaints of side strike with
15  sports, tried NSAIDs and was followed up with an
16  X-ray with small effusion."
17         I don't know if that's a TX or DX, but
18  I -- I have a feeling it was a DX, meaning
19  diagnosis.
20    Q.   What did you write underneath or next
21  to O?
22    A.   (No response.)
23    MR. WALLIS:  You may need to repeat that
24  again, Ken.
                                              52
```



```
 1  BY MR. FLAXMAN:
 2      Q.  Oh, what did you write next to O, O
 3  parentheses?
 4      A.  Okay.  "No acute distress, left knee
 5  with in-line patella, swelling, and mild warmth.
 6      Q.  I didn't hear what you said after
 7  patella.
 8      A.  Drawer.
 9      MR. WALLIS:  Would you just read the whole
10  note after patella, please?
11      THE WITNESS:  Drawer negative for excessive
12  laxicity, (sic) swelling, and mild warmth.
13  BY MR. FLAXMAN:
14      Q.  Okay.  You skipped a word after
15  toxicity.  Could you read what it says after
16  toxicity?
17      MR. WALLIS:  That's laxicity, (sic) I
18  believe.
19      THE WITNESS:  Yeah, laxicity, (sic) comma,
20  moderate amount, swelling, and mild warmth.
21  BY MR. FLAXMAN:
22      Q.  And the A you wrote left knee pain?
23      A.  Yes.
24      Q.  Did you refer Mr. White to see the
                                                    53
```

```
 1  physician?
 2      A.  Yes.
 3      Q.  Why did you make the referral to see
 4  the physician?
 5      A.  Yes.
 6      Q.  Could you tell us why you referred
 7  Mr. White to see the physician?
 8      A.  Because I exhausted everything I could
 9  do for him, including medication, and then
10  giving a little bit more potent medication,
11  rest, X-ray, and at that point I knew that he
12  would probably need something more than I could
13  give him, which at that point would have been
14  likely a specialty referral or an MRI, things --
15  things that I couldn't order at the facility as
16  a nurse practitioner.
17      Q.  Let's look at Exhibit 9, the next page,
18  does your handwriting appear on this form?
19      A.  Yes.
20      Q.  Is it -- did you write on this form?
21      A.  What was the question?
22      Q.  Could you read to us what you wrote on
23  this form?
24      A.  Yes, "Still complained of knee pain,
                                                    54
```

```
 1  self relates not doing home exercise program all
 2  of the time, complains of herpes outbreak times
 3  three days ago, self relates still has lesions.
 4  Objective is" --
 5      Q.  Go ahead.
 6      A.  Do you want me to --
 7      Q.  Please.
 8      A.  "Objective:  No acute distress, able to
 9  walk, no knee swelling, Nurse L. Crank present,
10  genital exam within normal limits, no lesions.
11  History -- Assessment:  History, left ACL
12  sprain, history of herpes simplex virus."
13      Q.  And --
14      A.  And then --
15      Q.  The plan?
16      A.  -- the plan is advice and educated,
17  naproxen.  The plan, advice and educated,
18  naproxen 500 milligrams PO twice a day, 14 days
19  advised, complaints with self home exercise
20  program, follow-up as scheduled.
21      Q.  And at the bottom underneath your name,
22  is that your writing?
23      A.  I see my signature down there.
24      Q.  It looks to me like given some stock
                                                    55
```

```
 1  noted 1-29-16, is that your writing?
 2      A.  No.
 3      MR. FLAXMAN:  I have nothing further.
 4      THE WITNESS:  Thank you.
 5      MR. WALLIS:  I don't have any questions.
 6            (whereupon, a discussion was had
 7             off the record.)
 8      MR. WALLIS:  We are going to waive anyway.
 9  Actually, I do want -- I did think of a question
10  I want to ask, or two.
11      MR. FLAXMAN:  Okay.
12                CROSS EXAMINATION
13  BY MR. WALLIS:
14      Q.  Mr. Woods, when preparing for this
15  deposition, did you review the declaration that
16  you executed in this case?
17      A.  Yes.
18      Q.  Did you see any statements that you
19  made in your declaration that you think is
20  false?
21      A.  I believe when we proofread it, there
22  was the words Mr. Smith, which needs to be
23  white, but the statements are concerning
24  Mr. white.
                                                    56
```

```
 1     Q.   And I apologize, I think that might
 2  have been a proofing error on my part, but aside
 3  from Mr. -- from the name Mr. Smith should have
 4  been Mr. White, your answer was that the
 5  statements were all accurate, correct?
 6     A.   Right.
 7          MR. WALLIS:  Okay.  That's all I have.  Thank
 8  you.
 9          MR. FLAXMAN:  I have nothing based on that
10  and I'd like it written.
11          (Proceedings concluded at 6:21 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
                                                    57
```

```
 1  STATE OF ILLINOIS    )
 2                       ) SS:
 3  COUNTY OF C O O K    )
 4    I, Josephine Lehman, a Certified Shorthand
 5  Reporter, in the State of Illinois, do hereby
 6  certify that heretofore, to-wit, on the
 7  September 3, 2020, personally appeared before me
 8  via video conference, Cook County, Illinois,
 9  BLAKE WOODS, DPN, in a cause now pending and
10  undetermined in the United States District Court
11  for the Southern District of Illinois, wherein
12  RICHARD WHITE is the Plaintiff, and WEXFORD
13  HEALTH SOURCES, INC., et al. are the Defendants.
14    I further certify that the said witness was
15  first duly sworn to testify the truth, the whole
16  truth and nothing but the truth in the cause
17  aforesaid; that the testimony then given by said
18  witness was reported stenographically by me in
19  the presence of the said witness, and afterwards
20  reduced to typewriting by Computer-Aided
21  Transcription, and the foregoing is a true and
22  correct transcript of the testimony so given by
23  said witness as aforesaid.
24    I further certify that the taking of this
                                                    58
```

```
 1  deposition was pursuant to Notice, and that
 2  there were present at the deposition the
 3  attorneys hereinbefore mentioned.
 4    I further certify that I am not counsel for
 5  nor in any way related to the parties to this
 6  suit, nor am I in any way interested in the
 7  outcome thereof.
 8    IN TESTIMONY WHEREOF:  I have hereunto set my
 9  hand and affixed my notarial seal this 10th day
10  of September, 2020.
11
12
13        Josephine Lehman
14       _____
15       CERTIFIED SHORTHAND REPORTER
16       CSR CERTIFICATE NO. 084-002951
17
18
19
20
21
22
23
24
                                                    59
```



Case 3:18-cv-00165-MAB   Document 114-5   Filed 12/14/20   Page 16 of 19   Page ID #1740

Blake Woods, DNP 09/03/2020

**0**

**0**
16:16

**1**

**1**
9:13,15,24 10:2,17
12:10 13:18 19:24
20:17 21:1
**1-10**
16:2
**1-29-16**
31:19
**1-29-2016**
31:24
**10**
15:15 16:16,17,20
41:20,24 42:5 44:4,
11,12,16 46:19
**100**
11:12 28:5
**10:30**
23:11,13
**10th**
44:2,5,8,20,24 45:19
**120**
17:24
**125**
18:3
**14**
55:18
**15**
14:5
**17**
50:24
**175**
18:3
**18**
17:24
**18-cv-00165**
4:6
**18th**
44:2,5,13

**2**

**2**
22:3,19 29:23 32:24
**2014**
7:7
**2015**
10:22 11:6 12:11,16
13:13 17:1,10 21:22
25:17 28:3 29:2,24
32:5 33:17 34:5,10,
24 35:4 37:11 38:15
40:1 41:12 42:2,7
44:2,20,24 45:19
46:2,19 50:24
**2016**
6:6 7:7 31:19
**2019**
5:18 6:7
**2020**
4:9 9:15
**2020-14**
4:16
**26**
10:21 12:10,16 17:1,
10 20:1 24:12,17
**26th**
11:6 13:12

**3**

**3**
4:9 35:12 38:11 40:2

**30**
22:11
**30th**
24:13,17 25:17 28:3
29:24 32:5 34:5,10,
23 35:4
**34**
46:5,12
**3rd**
9:15 37:10 38:15
39:24

**4**

**4**
40:23 41:3,4,6,10
**4:58**
4:10

**5**

**5**
15:15 16:20 43:16
44:1 46:18
**5/10**
16:20
**500**
37:5 55:18

**6**

**6**
41:12 49:4,7
**6-20-15**
52:14
**6-30-2015**
45:9
**600**
20:14

**7**

**7**
51:4,6
**7-1**
44:15
**7-10-15**
44:10,18 50:2
**7-8-15**
45:23

**8**

**8**
37:4 44:17,21 51:24
**8-13**
50:20
**80**
17:24
**82**
17:23
**86**
18:1
**8:30**
37:13,20 38:4,5,16

**9**

**9**
54:17
**90**
36:20
**98.3**
17:23

**A**

**abbreviation**
23:16

**abbreviations**
24:3
**abnormal**
39:14,19,20
**access**
8:13
**Ace**
37:6
**achieve**
28:2
**achieved**
48:12
**ACL**
29:4 30:2 31:5,11,20
32:4 38:23 39:21
46:15,20 55:11
**activities**
7:17
**activity**
47:15
**acute**
25:6 45:22 53:4 55:8
**administered**
4:14
**admit**
14:10
**advice**
55:16,17
**advised**
33:6 50:18 55:19
**afternoon**
5:6
**age**
46:5,12
**agree**
4:20,23 44:18
**agreement**
4:18
**agrees**
4:23
**Aguilar**
41:8
**ahead**
55:5
**allergies**
14:17 15:1
**amount**
53:20
**antiinflammatories**
47:16
**antiinflammatory**
50:7
**anybody's**
32:12
**apologize**
21:19
**apostrophe**
14:16
**appears**
17:15 22:24 23:17
31:19 36:5 41:5,20
**appointment**
13:1,6 24:10 40:16,
17 43:13
**April**
6:6 7:7
**area**
17:4,8
**areas**
21:5 25:22 26:2
**ascribe**
39:16
**assess**
36:21,22
**assessed**
38:7
**assessment**
13:15 16:13 55:11
**assisted**
6:4

**assuming**
19:1
**assure**
26:15
**attest**
11:8 13:20 19:8,9
21:7 24:19 26:22
27:2,4,5 28:5 30:4,
15 35:1,8
**attorney**
4:20,21
**automatically**
43:12

**B**

**back**
10:21 17:1 21:16,22
22:13 26:8,24 28:3
29:2,7 32:23 33:17
34:5,23 35:3 39:7
42:1 43:3
**Baptist**
5:14 6:10 7:14 8:3
27:18
**based**
39:1,12 51:20
**basket**
42:17
**bathroom**
22:7
**Beegle**
10:11 11:13,15 12:1,
2 18:23,24 21:21
49:12,14 51:22,23
**Beegle's**
10:8
**bend**
36:20
**bit**
54:10
**Blake**
4:4,22 5:1,9 9:14
23:18
**blank**
27:3
**blood**
17:24
**bottom**
9:14 19:22 22:3
44:9,17 55:21
**box**
10:12 15:9 17:20
18:9 42:22
**break**
22:7,15
**bruise**
25:7 26:14 30:5 32:9
**bruises**
25:21 34:16
**building**
37:16
**business**
5:10

**C**

**C/O**
25:1
**call**
8:19 12:13 17:6
36:23 37:19 38:3
40:10 50:2
**called**
41:14
**Camp**
14:3
**capable**
19:6

**care**
5:16 6:2,3 7:19 8:3,4
13:5 17:7,10 28:17
36:16 38:1 47:7
**cared**
47:24
**Carol**
41:8
**Case**
4:6
**caused**
30:2
**cell**
17:6 23:15
**Center**
14:4
**central**
17:4
**Certified**
4:2
**chart**
20:2,20,23 21:2,9
26:11,12,15 42:13,
20
**check**
42:22 43:7,10
**checkbox**
42:20,21 43:8
**checkboxes**
43:9
**checking**
27:18
**checkmark**
42:10
**circle**
15:5
**clarify**
6:9
**clicking**
28:23
**client**
47:24
**clip**
29:16
**clipped**
29:3
**co-signed**
20:2
**co-worker**
21:23
**collection**
48:11
**color**
28:13,14
**column**
22:22 23:9 33:3 37:2
43:22,23 50:17
**comfortable**
33:21 34:6
**comma**
10:5 22:23 53:19
**communication**
41:11
**complained**
54:24
**complaining**
36:17
**complains**
25:1 52:13 55:2
**complaint**
50:14
**complaints**
52:14 55:19
**component**
19:14
**computer**
8:12
**conference**
4:3

**conferencing**
4:13
**confused**
44:13
**confusing**
29:11
**connection**
15:20
**considered**
47:19
**consistent**
39:20 44:10 46:4,8
**consulted**
51:11
**contacted**
6:12
**continue**
49:21 50:18
**continued**
31:9
**conversation**
26:21 27:9 38:17,19
50:23
**conversations**
38:14
**copy**
18:6
**copying**
18:1
**corner**
10:13
**correct**
16:18,21 20:24 24:2
**correctional**
13:4
**Correctional/
hardin**
14:3
**County**
14:3
**couple**
12:4
**court**
4:1,7,14 23:18,22
27:2 36:22 37:14
39:6
**Crank**
55:9
**crutches**
20:4,13 33:6 36:17
45:23 47:17,18
51:14
**current**
19:3
**customary**
16:14
**cut**
6:18 7:23 21:17 42:3

**D**

**dark**
52:3
**date**
4:9 20:21 23:6
44:14,23
**dated**
44:10
**David**
40:18 47:4,5
**day**
10:23 13:2 20:15,23
24:12 31:22 37:6
55:18
**day-to-day**
7:16
**days**
20:15 24:11 33:8
37:6 51:14,15 55:3,
18



McCorkle Litigation Services, Inc.
Chicago, Illinois   (312) 263-0052

1

| | | | | | |
|---|---|---|---|---|---|
| **deal** 29:14 **Decadron** 37:4 **December** 7:7 **decreased** 27:22 **deep** 48:23 **defendants** 4:22 **defense** 4:23 **deformities** 31:3 **deformity** 25:7,21 26:14 30:5 32:9 34:16,17 36:21 **degrees** 36:20 **delivers** 6:2 **depending** 18:3 **deposition** 4:4,10,12 8:8 9:15 **derangement** 35:6 **describe** 15:6 30:24 **detect** 48:15 **diagnose** 39:1 46:21 **diagnosis** 35:9 46:13 52:19 **difference** 7:18 8:2 28:17 **differences** 7:16 **difficulties** 49:17 **dig** 22:8 **DIRECT** 5:4 **directed** 40:9 **directly** 34:2 **discomfort** 14:4 18:10,16,17 **discontinued** 47:17 **discussion** 23:19 **display** 8:17 **distress** 25:6 45:22 53:4 55:8 **District** 4:7 **DNP** 5:1 **document** 8:14 26:1,6 27:18 28:18,22 40:1 44:1, 23 52:1 **documents** 8:7 9:10 **doubt** 48:17 **Drawer** 53:8,11 **dry** 47:16 **DT** 25:2 | **due** 25:2 49:16 **duly** 5:2 **duration** 17:13,14 **duty** 13:16 **DX** 52:17,18 ___ **E** ___ **early** 45:23 **educated** 55:16,17 **effusion** 45:24 47:16 48:3,6, 8,13,16,18,20 52:16 **emailed** 8:16 **emergency** 17:8 **employed** 5:13,21,22 6:17 7:3, 9 21:15,22 **employer** 21:16 **employment** 5:21 6:7,8 **encounter** 27:14 28:4 **encounters** 11:8 **end** 20:20 **ended** 42:17 **et al** 4:6 **Ethan** 36:5,7 37:23 **evaluated** 29:24 **Everytime** 43:11 **exact** 10:23 **exam** 17:8 19:7,13,15,17 26:2 27:15 30:6,19 32:21 33:22,24 34:6 48:16,19 55:10 **examination** 5:4 25:11,14 34:9 40:11 **examinations** 25:23 **examine** 12:21 33:20 34:5,23 **examined** 5:2 24:17 34:11 44:1 45:2 **examining** 45:2 **exams** 17:5 **exception** 26:11 35:21 **excessive** 53:11 **excuse** 14:5 23:18 38:15 **Executive** 4:15 **exercise** 55:1,19 **exhausted** 54:8 | **exhibit** 9:15,24 10:2,6,17 12:10 13:18 19:24 20:17 21:1 22:3,19 24:9 29:23 32:24 35:12 38:11,21 40:2, 23 41:2,3,4,6,10,17, 20,24 42:5 43:16 44:1 46:18 49:2,4,7 51:4,6,24 54:17 **exhibits** 8:15 9:8 **extend** 36:19 39:18 **eyesight** 34:20 ___ **F** ___ **F/u** 23:16 **facility** 24:21 54:15 **fact** 9:1 20:3 37:8 39:17 **feeling** 52:18 **file** 8:15 42:21,22 43:7, 10 **filled** 37:23 51:11 **filling** 51:12 **finding** 26:16 27:15,22 28:8, 11,16 30:3,6 39:19, 20 47:13 48:18 **findings** 19:9,12 26:1,6 30:11 32:21 48:22,24 **fine** 31:14 **finish** 25:16 40:4 47:9 **flat** 33:15 47:12 **Flaxman** 4:19 5:5 7:22 8:1 11:22,23 22:9,12,14, 17 24:1 26:8,18 27:10 29:7,21 37:1, 17 39:15 43:5 49:23 53:1,13,21 **fluid** 48:11 **follow** 8:3 40:12,13,19 42:11 **follow-up** 20:13 23:21 24:3 33:7 37:7 43:11,12 47:22,23 50:19 55:20 **form** 10:21 15:12 19:10 29:10 36:14 51:5,8, 11 54:18,20,23 **found** 31:21,22 **foundation** 7:21 37:21 43:4 **fracture** 45:23 **front** 8:15 29:17 **froze** 48:7 **frozen** 20:6,7 24:14 26:23 39:3 | **full** 13:15,18 **fully** 36:19 39:18 **future** 31:12 ___ **G** ___ **gait** 25:6 30:16 34:15 **gave** 12:18,22 20:4 36:11 51:17 **genital** 55:10 **give** 20:19 31:15 54:13 **giving** 37:9 54:10 **good** 5:6 6:14 28:12 43:15 **Governor** 4:15 **gradually** 47:14 **Group** 5:14 **guess** 29:19 50:2 ___ **H** ___ **hand** 50:16 **handled** 38:6 **hands** 31:2 **hands-on** 26:2 40:11 48:16,19 **handwriting** 10:3 22:5,6,20,24 23:4 35:15,19,20 36:2,3,13 41:1,3,5 43:18 49:4,6,8 51:5, 7,19 52:1 54:18 **happened** 15:11,13 38:5 **heading** 22:22 **health** 4:5 5:22,24 6:10,17 7:1,4,5 13:5 17:7,9 21:15 36:16 37:24 **hear** 7:24 9:21 11:21 20:8 27:7 53:6 **heard** 26:24 27:1 36:17 38:21 39:2,13,14 **hearing** 9:17 **herpes** 55:2,12 **history** 17:1 55:11,12 **hold** 8:23 28:19 **home** 55:1,19 **homes** 6:4 **honest** 31:15 **Hospital** 7:10 **hours** 37:12,14 | **houses** 17:6 **hypothetical** 16:12 **hypothetically** 33:23 ___ **I** ___ **IDR** 14:5 **Illinois** 4:8 7:12 **immediately** 17:15 **in-line** 53:5 **inaudible** 20:5 26:22 36:21 37:13 43:13 **including** 4:22 54:9 **increase** 47:14 **indication** 12:9,12 13:17 19:11, 16,24 21:1,4,10,12 29:22 41:10,24 42:5 46:18 48:13 51:10 **Indocin** 50:5,6 **information** 16:10 38:10 52:9 **injection** 50:11 **injuries** 33:13 38:6,7 **injury** 23:17 24:4 27:20 29:15,17 30:1 45:9 **Inmate** 36:16,19 **instance** 4:11 **institute** 31:8 **institution** 13:4 **instruction** 24:8 **intended** 47:21 **interaction** 32:22 38:2 **investigated** 39:14 **issue** 14:12 **issues** 50:15 ___ **J** ___ **job** 7:15 **Josie** 4:1 **July** 37:10 38:15 39:24 41:12 42:1,6 44:2,5, 11,12,20,22,24 45:19 46:19 50:24 **June** 11:6 12:10,16 13:12 17:1,10 20:1 21:22 24:12,13,17 25:14, 17 28:3 29:2,24 32:5 33:17 34:5,10,23 35:4 41:12 | ___ **K** ___ **Ken** 52:24 **Kenneth** 4:19 **knee** 15:4 19:7,17 21:6 23:17 24:4 25:1,2,9, 10,13,20,23 26:20 27:12,15,20 28:2,20, 24 29:4,16 30:9,22 31:1 32:11,12 33:12 34:12,23 35:6 36:15 40:11 45:7,11,19 46:16 52:4,13 53:4, 22 54:24 55:9 **knew** 6:13 31:24 54:11 **knowing** 35:10 ___ **L** ___ **land** 6:22 **laxicity** 53:12,17,19 **lay** 51:14 **learn** 13:11 31:4,6,10 **learning** 11:2,4 **leave** 6:8 **left** 15:4 19:17 23:8,17 24:3 25:2,9 27:12 28:2 42:12 44:15 45:7 49:21 50:14 52:4,13 53:4,22 55:11 **left-hand** 22:22 **leg** 36:19 39:18 49:21 50:14 **Lehman** 4:1 **lesions** 55:3,10 **level** 15:16,23 16:5,7 **life** 6:20 **ligament** 21:11 34:9 **limited** 48:19 **limits** 55:10 **limp** 25:7 49:15,20 **list** 30:12 **listed** 26:14 **literally** 22:10,11 **livings** 6:4 **location** 15:3 38:1 39:12 **long** 5:17 6:5 7:5 22:12, 14 33:22 **long-term** 6:3 |



looked
  6:14 21:5,11 30:9,16
lost
  43:14
lower
  10:12
LPN
  10:11 18:20,24 19:1,
  6,12
LPN's
  19:8

**M**

machine
  46:22
Madam
  11:20
made
  35:7
make
  28:13,17 54:3
makes
  24:21
manner
  30:24
marked
  9:14,24 22:3
Massac
  7:10
massive
  35:5
matter
  4:4 29:16
Matthew
  5:9
meaning
  52:18
means
  4:12 16:16,17 25:1
  34:20 40:14,16,17
  43:10 47:23
measure
  27:11
measured
  32:10
measuring
  28:1
medical
  5:14,16 11:5 14:13
  17:4 20:16 37:19
medication
  50:8 54:9,10
medicine
  33:13 47:15
Memorial
  7:10
meniscus
  29:4 30:2 31:5,11
  38:23 39:21 46:15,
  20
mentioned
  30:17
Metropolis
  7:12
MI
  14:6
middle
  43:22
mild
  53:5,12,20
milligram
  37:5
milligrams
  20:14 37:5 55:18
minute
  31:16
missed
  39:4

misunderstood
  35:23
moderate
  53:20
month
  33:7
months
  12:4
motion
  27:12,19,22 28:1
  32:10
Motrin
  20:14
MRI
  46:22 47:3,6 54:14

**N**

NAD
  25:6
named
  10:18
naproxen
  37:5 50:9 55:17,18
needed
  47:22,23
negative
  28:11 53:11
negatives
  26:13
NKA
  14:23,24
noise
  36:17 38:21 39:1,13
nonspecific
  14:4
nonsteroidal
  50:7
normal
  28:15 47:11 55:10
note
  14:2 22:22,24 23:6
  26:17 27:6 28:9,15,
  21,22 29:1 30:11
  31:20 34:15 36:1,4,
  6,10,15 37:9,12,23
  38:1 41:7,13,14
  45:13,16,17 53:10
noted
  31:3,20 36:20 44:10
  45:10 50:20
notes
  31:12,17 45:16
NP
  10:5 20:13 24:4,6
  50:1,18,19
NSAIDS
  52:15
number
  44:16
numbers
  17:19
nurse
  5:12 6:1,2 10:12
  12:13 13:12,16
  14:22 15:2,5,8
  16:19,22,24 17:12
  18:19 19:16 21:5,7,
  10,14,21 23:4 24:7
  36:8 38:9,14 41:8
  50:24 54:16 55:9
nurses
  38:7
nursing
  6:4

**O**

oath
  4:13

object
  7:20 29:10
Objection
  43:4
objective
  17:18 19:9,12 27:16
  30:3 36:16 46:21
  48:22 55:4,8
observed
  34:14,15 35:5 45:18
obtained
  48:12
obvious
  18:10,15 36:21
occupation
  5:10
Offender
  14:2 50:1
office
  24:9
one-on-one
  32:22
operate
  28:7
opportunity
  6:15
orally
  20:15
order
  4:15 10:16 12:18,19,
  22 13:14 20:20 37:4,
  9 40:12 46:23 47:3,5
  51:13 54:15
ordered
  20:4 40:19 43:11
  51:16
orders
  20:4,12 23:5 34:7
  36:11 38:19 51:18
original
  18:7
orthopedic
  31:7
osteoarthritis
  45:24 46:4,11
outbreak
  55:2
outpatient
  14:2

**P**

p.m.
  4:10 37:20 38:4,16
pain
  15:6,9,13,16,23
  16:5,7,11,13,16,17
  17:14 18:18 25:2,9
  29:18 35:9 45:7
  47:15 52:4 53:22
  54:24
pain/discomfort
  15:3
palpate
  30:22 31:2 48:20
palpated
  31:1 34:16
paper
  13:21,23 19:20 21:9,
  13 28:6 51:3
parentheses
  14:16 17:16,20
  52:10 53:3
part
  35:18 36:1
parties
  4:2,17
patella
  53:5,7,10

patient
  10:18 17:3 27:7
  30:13 42:21 47:20
patient's
  16:5
PDF
  8:15 9:8
penitentiary
  12:16
percent
  11:12 28:5
perfect
  9:5
performed
  17:5
performing
  19:7
Period
  25:4 36:18
person
  12:13
pertinent
  26:13 30:10
physical
  19:7,12,15,17
physician
  6:13 33:16,19 34:4
  40:10 54:1,4,7
piece
  19:20 21:9,12 28:6
  51:3
place
  5:20
plaintiff
  4:11,20
plan
  23:1 47:14 55:15,16,
  17
plans
  33:3
plate
  33:15 47:12
PO
  55:18
point
  30:18 35:5 47:7
  54:11,13
popped
  36:16
popping
  28:23
population
  47:19
positive
  26:16 27:15,21 28:8
  32:20
possibility
  29:24 32:3
potent
  54:10
practice
  5:16
practitioner
  5:12 6:1,2 24:7
  54:16
pray
  39:5
prejudgment
  35:8
prepare
  8:8 45:1
prepared
  44:11,23
prescribe
  20:1
prescribed
  19:23 50:3
prescription
  50:3,19

present
  4:3,17 5:20 20:22
  55:9
pressure
  17:24
primary
  5:16 6:2
printed
  8:10
prisoner
  13:3 16:9,10 18:15
  32:15
Pritzker's
  4:15
problem
  11:5 38:24
procedure
  4:18
process
  20:19
program
  55:1,20
progress
  14:2
progression
  47:11
provide
  7:19
provider
  5:22,24 6:10,16 7:1
  13:6 18:18 40:18
pull
  42:13,20
pulse
  17:23
pursuant
  4:15
put
  23:5 28:8 46:22
  48:21

**Q**

question
  6:9,18 7:22,24 15:17
  24:15 25:12,16 26:7
  27:8 29:6,11,20
  30:19 34:2 37:22
  38:12 39:5,7 40:5
  42:3 43:7 48:9 54:21
questions
  16:14 30:12
quick
  22:7

**R**

R14550
  14:5
radiology
  41:21 42:1,6,15 43:2
range
  27:11,19,22 28:1
  32:10
rate
  15:16,23 16:16
  17:24
rated
  16:10
read
  10:2 13:22 14:9
  23:14 26:8,9 29:7,8
  33:5 35:2 36:12,14
  37:2 38:10,11 39:6,9
  41:13 49:13,18
  50:17 52:12 53:9,15
  54:22
reading
  14:13

reask
  38:13
reason
  24:11 26:5 46:10
  51:2
recall
  10:20 11:1,2,4 28:1
  30:8 32:18 38:9,13
  40:3,7 46:1,3 50:23
  51:1
recheck
  35:10
record
  11:9,10 14:11 23:20
  26:3,4,9 29:8 31:23
  35:2 39:9 44:18
  49:16,18
recorded
  16:5,7
records
  14:13
refer
  53:24
reference
  38:20 40:5
referral
  54:3,14
referred
  54:6
referring
  24:10
registered
  36:8 41:8
regular
  37:19
relate
  10:17
relates
  45:7 50:5 55:1,3
relating
  38:10
remember
  10:23 11:7 26:21
  27:9,13 28:4 31:14
  32:21 38:17
remotely
  4:14
repeat
  15:17 52:23
rephrase
  11:16 43:6
report
  41:21 42:1,6,11,16
  43:2
reporter
  4:1,2,14 11:20
  23:18,22 27:2 36:22
  37:14 39:6
reporting
  45:11
requested
  26:10 29:9 39:10
  49:19
respiratory
  17:23
response
  52:22
rest
  33:13 36:4 54:11
restate
  42:3
restriction
  33:7
review
  31:12,16 42:15,18
reviewed
  42:1,6
Richard
  4:5 10:18 11:3,4
  14:4 50:24



| | | | | | |
|---|---|---|---|---|---|
| **right-hand**<br>10:13 33:3<br>**RN**<br>36:15 41:11,12<br>**room**<br>16:22 17:3 33:24<br>**rooms**<br>17:8<br>**row**<br>23:8<br>**rule**<br>46:19<br>**Ryan**<br>4:21<br><br>― **S** ―<br>**scale**<br>15:16,23 16:5,7<br>**scenario**<br>16:12<br>**schedule**<br>24:22<br>**scheduled**<br>50:19,20 55:20<br>**scheduling**<br>24:20 40:21<br>**scope**<br>19:9<br>**screen**<br>8:18 9:3<br>**scroll**<br>22:2<br>**seconds**<br>22:11<br>**section**<br>27:16<br>**September**<br>4:9 5:18 9:15 10:21<br>11:5 38:15<br>**service**<br>6:1<br>**services**<br>5:23,24 6:3,10<br>**setting**<br>6:3<br>**sharing**<br>9:3<br>**Shawnee**<br>13:4 14:3 33:17 38:4<br>**short**<br>22:15<br>**Shorthand**<br>4:2<br>**show**<br>44:1<br>**showing**<br>18:15<br>**sic**<br>53:12,17,19<br>**sick**<br>12:13 17:6 37:19<br>38:3 40:10 50:2<br>**side**<br>25:3 29:3,16 30:1<br>51:14 52:14<br>**sign**<br>20:21 36:9<br>**signature**<br>10:4,7,8,10,12,21,24<br>11:11 20:12 23:2<br>35:21,22,24 42:10,<br>12,19 51:16 55:23<br>**signed**<br>11:13 20:22 21:2<br>36:6 37:9 38:18 41:7<br>**significance**<br>39:17<br>**signs**<br>17:21 18:15 19:14 | 21:11 23:5,7 35:4<br>**similarities**<br>7:16<br>**simplex**<br>55:12<br>**single**<br>28:10<br>**sir**<br>5:6,11<br>**sit**<br>27:24 31:13<br>**site**<br>12:15 38:8<br>**size**<br>18:9<br>**skin**<br>28:14,15<br>**skipped**<br>53:14<br>**slash**<br>10:9<br>**slightly**<br>45:8<br>**slow**<br>25:6 30:17 33:6<br>**small**<br>45:24 48:10,18<br>52:16<br>**someone's**<br>28:14 29:15<br>**Source**<br>7:4,6<br>**Sources**<br>4:5<br>**Southern**<br>4:7<br>**spare**<br>8:21 9:3<br>**specialty**<br>54:14<br>**specific**<br>19:19 27:8,14 39:11,<br>12<br>**spell**<br>5:7<br>**sports**<br>25:4 30:2 33:7 45:9<br>52:15<br>**sprain**<br>55:12<br>**stack**<br>20:20<br>**stand**<br>14:19,24 17:17 30:9,<br>20,21<br>**standard**<br>7:18 8:3,4 23:16<br>33:12<br>**standing**<br>30:17,18<br>**start**<br>6:6 11:3 20:8 47:12<br>**started**<br>50:5<br>**starting**<br>13:24 22:21<br>**state**<br>4:17 5:6<br>**stated**<br>35:24<br>**States**<br>4:7<br>**step**<br>33:15 48:2<br>**stock**<br>55:24<br>**story**<br>13:15,19<br>**straight**<br>28:19,20 | **straighten**<br>26:20 49:21<br>**strange**<br>35:24<br>**strike**<br>25:3 30:1 52:14<br>**subjective**<br>14:20,21 22:23<br>24:24 27:6,7 30:13<br>36:15 45:5<br>**subjective/<br>objective**<br>14:9<br>**suggest**<br>38:22<br>**surmised**<br>22:23<br>**surprised**<br>46:11<br>**surprising**<br>46:13<br>**suspected**<br>32:4<br>**swelling**<br>25:7,21 26:14 30:5<br>31:2 32:8 34:16,17<br>36:20 45:18 53:5,12,<br>20 55:9<br>**swollen**<br>45:8,12<br>**sworn**<br>4:24 5:2<br>**symptoms**<br>35:4<br>**synonymous**<br>18:18<br><br>― **T** ―<br>**tablet**<br>20:14<br>**talk**<br>12:6 48:3<br>**talked**<br>48:22<br>**talking**<br>31:6<br>**tear**<br>21:11 29:5 30:2 34:9<br>39:12,21 46:15,16,<br>20<br>**technical**<br>49:16<br>**Technology**<br>6:21<br>**telephone**<br>37:4,9 38:18,19<br>**Temperature**<br>17:23<br>**ten**<br>20:15 33:8 37:6<br>**tenderness**<br>21:5 25:22 26:2,4,6,<br>16<br>**Terry**<br>10:8,11 11:13,14<br>12:1,2 18:23,24<br>49:12 51:22,23<br>**testified**<br>5:3<br>**things**<br>9:4 42:18 45:5<br>54:14,15<br>**time**<br>4:10 8:18,23 11:14,<br>24 14:8 18:24 23:6,<br>11,13 29:14 31:9<br>37:13 41:9 44:15<br>47:8 48:1 55:2 | **times**<br>20:15 26:12 32:17<br>55:2<br>**title**<br>7:15<br>**today**<br>8:16 11:8 28:5 30:7<br>**Today's**<br>4:9<br>**top**<br>13:24 23:3 44:15<br>**torn**<br>31:5,11 32:4<br>**touch**<br>25:10,13<br>**touched**<br>25:20<br>**toxicity**<br>53:15,16<br>**treatable**<br>47:13<br>**treated**<br>15:10 35:9<br>**treatment**<br>33:12<br>**truthful**<br>28:6<br>**turn**<br>22:1,2<br>**TX**<br>52:17<br>**typical**<br>29:4<br><br>― **U** ―<br>**Uh-huh**<br>18:11 23:10 33:1<br>41:22<br>**unable**<br>36:19,20 39:18<br>**underneath**<br>16:23 18:9 23:7<br>52:20 55:21<br>**understand**<br>15:21 28:13 29:12,<br>13,20<br>**understanding**<br>29:3<br>**unit**<br>17:7,10 20:16 36:17<br>37:19,24 38:1<br>**United**<br>4:6<br>**unresolved**<br>31:20 52:4<br><br>― **V** ―<br>**vague**<br>7:21 29:11<br>**verbal**<br>10:16 12:18,19,22<br>20:19<br>**verbatim**<br>30:14<br>**video**<br>4:3,13<br>**view**<br>35:3<br>**virus**<br>55:12<br>**visit**<br>12:13 20:3 21:8<br>23:12 44:19<br>**visualized**<br>34:15,18<br>**vital**<br>17:21 19:14 23:5,7 | **VO**<br>10:14<br><br>― **W** ―<br>**W-O-O-D-S**<br>5:9<br>**walk**<br>33:6 49:15,20 55:9<br>**walking**<br>36:18 38:21 45:22<br>**Wallis**<br>4:21 7:20 29:10 43:4<br>52:23 53:9,17<br>**Walmart**<br>12:5<br>**wanted**<br>35:10<br>**warmth**<br>53:5,12,20<br>**weapon**<br>47:19<br>**week**<br>20:14<br>**weeks**<br>33:7<br>**weight**<br>18:2<br>**Wexford**<br>4:5 7:4,5,9,13 8:5<br>16:6,8 21:15,22,23<br>31:10 32:16 36:8<br>41:9,12<br>**White**<br>4:5 10:18 11:3 12:7,<br>10,21 13:12 14:4<br>16:19 19:13,18 20:1,<br>16 24:13,18 26:19<br>28:2,19,23 29:23<br>30:8 31:4,10 32:5,19<br>33:20 34:5 37:10,18<br>38:2,23 39:17 40:5,9<br>43:2 44:2,19 45:3,11<br>46:1 47:6 50:24<br>53:24 54:7<br>**White's**<br>11:5 21:6 25:10,13<br>27:11 34:23 45:19<br>46:16<br>**Wilke**<br>36:5,7 38:9,14<br>**Wilke's**<br>36:13<br>**Woods**<br>4:4,22 5:1,9 10:4,9<br>36:23 37:4 50:18,21,<br>22<br>**word**<br>18:12 26:3 50:4<br>53:14<br>**work**<br>6:5 7:5,13,14 14:3<br>27:17 31:9 33:14<br>**worked**<br>5:17 6:13 13:5 16:6,<br>8 27:17 32:16 33:16<br>38:4<br>**working**<br>5:20 6:16,24 38:22<br>**worse**<br>52:13<br>**worst**<br>16:17<br>**wrap**<br>37:6<br>**Wright**<br>11:3<br>**write**<br>15:2,8 17:13 24:23<br>25:5,8 28:10,21 29:1<br>30:13 33:10 45:21 | 49:24 52:9,20 53:2<br>54:20<br>**writing**<br>9:23 10:20 16:24<br>33:2 52:3,5,7 55:22<br>**written**<br>13:20,22 21:8 35:1<br>40:1<br>**wrote**<br>11:10 14:22 15:4<br>16:20 18:19 23:5<br>24:2 33:5 35:22<br>36:5,14 45:6 49:14<br>52:12 53:22 54:22<br><br>― **X** ―<br>**X-RAY**<br>33:8,11,15 37:6<br>43:12 46:9,14 48:14,<br>18 52:16 54:11<br>**X-RAYS**<br>45:23 47:12<br><br>― **Y** ―<br>**year**<br>5:19<br>**years**<br>46:5,12<br>**yesterday**<br>50:5<br><br>― **Z** ―<br>**Zoom**<br>8:18 9:4 |



McCorkle Litigation Services, Inc.
Chicago, Illinois   (312) 263-0052                4