# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RICHARD WHITE, #R-14550<br><br>Plaintiff,<br><br>v.<br><br>BLAKE WOODS and ALFONSO DAVID, MD,<br><br>Defendants. | Case No. 18-cv-00165-SPM |

## MEMORANDUM AND ORDER

**McGLYNN, District Judge:**

Pending before the Court is a Motion for Summary Judgment (Doc. 113) filed by Defendants Blake Woods ("Woods") and Alfonso David, MD ("David"), collectively known as defendants. For the reasons set forth below, the Court grants the Motion for Summary Judgment.

## PROCEDURAL HISTORY

On February 2, 2018, plaintiff Richard White ("White") filed his complaint pursuant to 42 U.S.C. § 1983 against Wexford Health Sources, Inc., Physician's Assistant/Nurse Blake, Dr. Alfonso David and Unknown John and Jane Does (Doc. 1). Specifically, White complained that the various medical personnel denied him adequate medical care for a knee injury he sustained at Shawnee Correctional Center in 2015. (*Id.*).

On March 5, 2018, a merit review was conducted pursuant to 28 U.S.C. § 1915A (Doc. 6). At that time, the complaint was divided into three counts, with the Court dismissing counts 2 and 3, but allowing White to proceed on Count 1 – Eighth

Amendment deliberate indifference claim against Dr. David, Nurse Blake and Nurses Jane/John Does for delaying or denying treatment for the knee injury Plaintiff sustained on or around June 26, 2015 (*Id.,* p. 6). The Court substituted Nurses John/Jane Doe in place of John and Jane Does and added the Warden of Shawnee Correctional Center to assist in identifying the unknown defendants (*Id.,* pp. 11, 12). Wexford Health Sources, Inc. was dismissed at this time (*Id.*).

On May 4, 2018, Jeffrey Dennison in his official capacity as the warden at Shawnee CC answered the Complaint (Doc. 19). On July 27, 2018, David answered the Complaint and asserted affirmative defenses, including exhaustion (Doc. 25). On July 30, 2018, Woods answered the Complaint and asserted affirmative defenses, including exhaustion (Doc. 27). On November 24, 2018, David and Blake filed a motion to strike, which the Court construed as a motion to withdraw the affirmative defense of exhaustion of remedies (Docs. 42, 43). On March 26, 2019, after several extensions to amend the Complaint, the Court dismissed John/Jane Does #1-6 for failure to prosecute (Doc. 63).

On April 30, 2019, a motion to dismiss was filed by Dennison seeking dismissal as he was added to the case to assist in identification of unknown defendants (Doc. 66). On October 21, 2019, after an objection and several extensions by White, the motion was granted and Dennison was dismissed from this action (Doc. 82).

On June 1, 2020, Woods and David file their motion for summary judgment, along with supporting memorandum of law (Doc. 93, 94). On June 30, 2020, White filed a motion to reopen discovery and defer or deny defendants' motion for summary

judgment (Doc. 98). On August 12, 2020, said motion was granted and discovery was reopened on the existing claims until November 12, 2020

On December 14, 2020, Woods and David filed their renewed motion for summary judgment and memorandum of law in support thereof asserting that there are no material facts at issue and that plaintiff has not shown deliberate indifference to his medical care and/or treatment (Docs. 113, 114). On February 2, 2021, White filed his renewed memorandum in opposition to defendants' motion for summary judgment (Doc. 118). On February 16, 2021, Woods and David filed a reply reiterating the care and treatment provided to White (Doc. 120). On that same date, White filed a motion to strike the reply and any reliance upon findings made by the Court at preliminary injunction hearing (Doc. 121).

## STATEMENT OF FACTS[1]

On June 26, 2015, White injured his left knee (Doc. 114, p. 3). White was seen by a nurse in the medical unit who received orders from Woods prescribing Motrin, a nonsteroidal anti-inflammatory medication, three times a day and the use of crutches until his appointment with Woods (*Id.*).

On June 30, 2015, White was seen by Woods, who documented a slow gait and a limp (*Id.*). Woods noted no left knee swelling, no bruising and no deformity (*Id.*). Woods again prescribed crutches, gave White a slow walk permit for two weeks, sports restrictions for one month, and scheduled him for a follow-up in 10 days where he would consider an X-ray if no improvement (*Id.*).

---

[1] In an effort to exclude immaterial and irrelevant facts, this Court has prepared its own Statement of Facts based upon the briefs and exhibits provided by the parties herein.

On July 3, 2015, prior to the follow-up appointment, White advised a nurse that his knee had "popped again" (*Id.*). The nurse contacted Woods, who ordered a Decadron steroid injection, Naproxen, which is another nonsteroidal anti-inflammatory medication, an X-ray of the left knee and an ACE wrap (Doc. 114, p.4). On July 6, 2016, the X-ray was conducted that showed early arthritis with a small effusion, or collection of fluid (*Id.*).

On July 10, 2015, White followed up with Woods who documented plaintiff was doing slightly better and was walking without his crutches, but there was still swelling (*Id.*). White was advised to gradually increase his activity and discontinue use of the crutches (*Id.*). Woods also ordered Indocin, a nonsteroidal anti-inflammatory medication for one month (*Id.*).

On August 10, 2015, Woods documented that White said his left knee was worse (*Id.*). Woods noted that the left patella was midline and that a drawer test to determine whether there was excessive laxity of the anterior cruciate ligament (ACL) was negative (*Id.*). The left knee had moderate swelling and mild warmth, so White was referred to David (*Id.*).

On August 13, 2015, White saw David who noted slight tenderness around the patella, but no significant swelling of left knee (*Id.*). White was unable to extend his knee and David diagnosed him with a ligament strain, placed him in a non-weight bearing status with the use of crutches for three weeks, and ordered a nonsteroidal anti-inflammatory medication and repeat X-ray (Doc. 114, p. 5).

On August 27, 2015, a second X-ray was conducted of White's left knee (*Id.*). The radiologist reported "minimal early degenerative changes without appreciable change

since the prior study" and "no acute or bony fracture or loose body" and a "small knee joint effusion" (*Id.*).

On September 8, 2015, White saw David and told him that he still had left knee pain and that certain movements caused his knee to "pop" or "give out" (*Id.*). White indicated he was compliant with the crutches and no weight bearing (*Id.*). David noted a limp and inability to fully extend or flex the knee, although a Lachman's test used to detect an injury to the ACL was negative (*Id.*). David ordered White to continue to use the crutches and not bear weight on left leg (*Id.*). David requested a referral for MRI of White's left knee.

On September 9, 2015, David noted that his request for MRI was not approved, but White was approved for an alternative treatment plan that included a physical therapy ("PT") evaluation to develop a home exercise program that he would do for four to six weeks (*Id.*). On September 18, White underwent the PT evaluation and then participated in monitored PT from September 24, 2015 through November 27, 2015 (Doc. 114, p. 6).

On November 30, 2015, David examined White and found the left knee was unremarkable with no limitation of motion and good strength (*Id.*). White also appeared to walk normally and squat without any problems (*Id.*). The monitored PT was discontinued although White was advised to continue the exercises on his own and to follow-up in 3-4 months (*Id.*).

On January 29, 2016, Woods saw White and documented complaints of knee pain (*Id.*). Woods prescribed a nonsteroidal anti-inflammatory medication and advised White

to do his exercises (*Id.*). Woods had no further involvement in the care and treatment of White's left knee (*Id.*).

On March 14, 2016, White was seen by David and advised he was doing his exercises, but still had occasional left knee pain (*Id.*). David noted that White was walking normally and was able to squat, and that he had no tenderness, swelling, limitation in movement, or crepitation (*Id.*).

On July 14, 2017, White was next seen in healthcare for left knee pain, although he had received treatment for other complaints in the interim (*Id.*).

On August 19, 2017, David was notified by the nurse that Woods was being seen for knee pain (Doc. 114, p. 7). David ordered a nonsteroidal anti-inflammatory medication, a repeat X-ray of left knee, low bunk restrictions, low gallery permits, and crutches for two weeks (*Id.*). A nurse's note dated August 22, 2017 documents that White was seen walking without his crutches, and a note dated August 26, 2017 documents that White was seen in health care without his crutches and walking with a normal gait (*Id.*).

On August 21, 2017, the left knee was X-rayed and showed only mild early arthritis and a small joint effusion (*Id.*). David reviewed the findings with White on August 30, 2017, at which time he noted that White was walking normally, his left knee was not swollen or tender, he had no limitation of movement, and a Lachman's test was negative (*Id.*).

On November 4, 2017, White was again seen in healthcare for left knee pain (*Id.*). The nurse contacted David, who ordered an anti-inflammatory medication and left knee X-ray (*Id.*).

On November 16, 2017, White followed up with David who noted the X-ray was unchanged, but that White was again unable to fully extend his leg (*Id.*). David submitted another request for MRI, which was approved (*Id.*).

On December 19, 2017, White underwent an MRI of his left knee and followed up with David on December 27, 2017 (Doc. 114, p. 8). The MRI showed a large bucket-handle tear of the medial meniscus, and a partial/near full thickness tear of the ACL and the radiologist recommended obtaining additional knee X-rays for comparison (*Id.*).

On January 17, 2018, David's request for referral to orthopedic surgeon was approved and a consultation was scheduled for January 23, 2018 (*Id.*). Because the complaint was dated January 19, 2018 and filed on February 2, 2018, and because it alleges deliberate indifference to his medical care, any subsequent care and treatment is not addressed in the Complaint.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). "A genuine dispute as to any material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014) (citation and internal quotation marks

omitted). In deciding whether a dispute exists, the Court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 723 (7th Cir. 2015) (citation omitted).

Under Rule 56, the movant has the initial burden of establishing that a trial is not necessary. *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). "That burden may be discharged by showing ... that there is an absence of evidence to support the nonmoving party's case." *Id.* (citation and internal quotation marks omitted). If the movant carries this burden, the nonmovant "must make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* (citation and internal quotation marks omitted). The nonmovant "must go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in [their] favor." *Id.* (citation and internal quotation marks omitted). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). "[S]peculation and conjecture" cannot defeat a motion for summary judgment. *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013). In addition, not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted).

In deciding the motion, the Court cannot weigh conflicting evidence, assess the credibility of the witnesses, choose between competing inferences or determine the

ultimate truth 0of the matter, as these are functions of the jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *McCottrell v. White*, 933 F.3d 651, 657 (7th Cir. 2019). Instead, the Court's sole function is "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014). It must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party. *McCottrell,* 933 F.3d at 658.

## DISCUSSION

### Deliberate Indifference

1. **Law**

The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In order to prevail on such a claim, a plaintiff must show first that his condition was "objectively, sufficiently serious" and second that the "prison officials acted with a sufficiently culpable state of mind." *Greeno v. Daley*, 414 F.3d 645, 652-653 (7th Cir. 2005) (citations and quotation marks omitted).

To establish deliberate indifference, a plaintiff must demonstrate that the officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the officials actually drew that inference. *Greeno*, 414 F.3d at 653. Whether a prison official acted with the requisite state of mind "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

"Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain.'" *Estelle*, 429 U.S. at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "The infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal law sense." *Duckworth v. Franzen*, 780 F.2d 645, 652-53 (7th Cir. 1985). Negligence, gross negligence, or even "recklessness" as that term is used in tort cases, is not enough. *Id.* at 653; *Shockley v. Jones*, 823 F.2d 1068, 1072 (7th Cir. 1987).

In cases where a prisoner alleges not that his condition was ignored entirely, but that he received constitutionally deficient treatment for the condition, the Seventh Circuit has framed the issue "not [as] deliberate indifference to a serious medical need, but as a challenge to a deliberate decision by a doctor to treat a medical need in a particular manner." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (quoting *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996) (internal quotation marks omitted)). In those cases, a court should defer to a medical professional's treatment decision "unless no minimally competent professional would have so responded under those circumstances." *Bilik v. Shearing*, No. 20-1323 (7th Cir., June 10, 2021); *citing Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

"Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Lockett*, 937 F.3d at 1023 (internal citation omitted). A health care provider acting in his professional capacity "may be held to have displayed deliberate indifference only if the decision by the professional

is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (citing *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008)).

### 2. Analysis

The crux of White's complaint is that he wanted an MRI and orthopedic consult much sooner than he received them. Yet "[a]n MRI is simply a diagnostic tool, and the decision to [forgo] diagnostic tests is 'a classic example of a matter for medical judgment.'" *Pyles*, 771 F.3d at 411 (quoting *Estelle v. Gamble*, 429 U.S. 97, 107, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). To be sure, White wanted different care than that provided, but an inmate "is not entitled to demand specific care," *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019) (quoting *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011)), and disagreement over a course of treatment does not establish a constitutional violation, *Pyles,* 771 F.3d at 409; see also *Peate v. McCann,* 294 F.3d 879, 882 (7th Cir. 2002) (noting that "mere failure" to choose the *best* course of action does not amount to a constitutional violation).

The record indicates that White was seen by a healthcare professional *at least* 15 times for his knee pain. He was prescribed different medications on multiple occasions, was provided with crutches, non-weight bearing orders, an ACE bandage, and other therapies. Nurses referred White to the nurse practitioner (Woods), who then referred White to the doctor (David) who performed exams and ordered additional medications. X-rays were taken; physical therapy and home exercises were recommended. Furthermore, White showed improvement and had a lengthy gap

between treatment, *to wit:* March 14, 2016 to July 14, 2017.

The fact that White was provided with a conservative treatment plan does not make Woods or David deliberately indifferent, and White has provided no evidence that shows the treatment was not the product of the professional judgment or was "blatantly inappropriate". *See Pyles,* 771 F.3d at 409. Thus, the Court finds that neither Woods nor David were deliberately indifferent.

## CONCLUSION

For the reasons set forth above, the Court **GRANTS** the Motion for Summary Judgment and dismisses this case in its entirety. Clerk is directed to enter judgment in defendants' favor. All pending motions are terminated as moot.

**IT IS SO ORDERED.**

**DATED:**_____

**/s/ Stephen P. McGlynn**
**STEPHEN P. McGLYNN**
**U.S. District Judge**